UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: Jeffrey Cates and Christine Cici-Cates | Bankruptcy No. 21-40882 |
| | Chapter 11 Case |
| Debtors | |

**NOTICE OF HEARING AND MOTION FOR AN ORDER APPROVING THE SALE OF CERTAIN REAL ESTATE OF THE DEBTORS' FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS AT PRIVATE SALE**

TO:    ALL PARTIES IN INTEREST

The Court will hold a hearing on the Motion **on December 15, 2022 at 10 a.m.** before the Honorable William J. Fisher in Courtroom 2A, Warren E. Berger Federal Building, 316 N Robert St, St. Paul, MN 55110. or telephonically or by other electronic means pursuant to the order of the Court. **THE HEARING MAY BE CONTINUED BY THE COURT AT THE TIME OF THE HEARING WITHOUT ADDITIONAL NOTICE.**

1.  Pursuant to Rule 9006(a) of the Bankruptcy Rules of Procedure and Local Rule 9006-1, any response to this motion must be filed and delivered or mailed not later than December 9, 2022, which is the first business day at least five days before the hearing.  UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.

2.  This Court has jurisdiction over this motion under 28. U.S.C. §§ 157 and 1334, Bankruptcy Rule 5005 and Local Rule 1070-1. This proceeding is a core proceeding. The petition commencing this case was filed on May 17, 2021 (the "Petition Date"). This case is now

1

pending before this Court.

3.  This motion arises under 11 U.S.C. § 363(b) and (f) and Bankruptcy Rule 2002(a)(2) and 6004(f)(1). The motions are filed under Bankruptcy Rules 9014 and Local Rules 2001-1(b)(2) and 9013-1 and 9013-2.

4.  On September 1, 2021, Debtors and Oppidan Holdings, LLC ("Oppidan") entered into a Purchase and Sale Agreement ("APA") for the sale of certain real estate owned by the Debtors.  The APA was approved by the Honorable Kathleen H. Sanberg (now retired) pursuant to an order entered on November 9. 2021 as ECF 103.]

5.  Buyer and Sellers entered into a First Amended Purchase and Sales Agreement on February 15, 2022.  The First Amended Purchase and Sale Agreement was subject to approval by the Bankruptcy Court, but the Debtor never sought approval of said agreement.

6.  Debtors and Oppidan entered into a Second Amended Purchase and Sale Agreement on March 10, 2022 that modified the date of the payments under the Original Agreement but otherwise ratified the terms of the Original Agreement. The Second Amended Purchase and Sale Agreement was approved by the judge in the Bankruptcy Case pursuant to an order entered on April 5, 2022 as ECF Docket No. 167.

7.  Oppidan terminated the Original Sales Agreement on May 4, 2022 because certain conditions expected by the Buyer were not met, specifically, on April 5, 2022, the Medina, Minnesota City Council did not approve the request of the Buyer to amend the Medina Comprehensive Plan to include the 67.1 Acres included in the Original Agreement, but encouraged Buyer  to come back with a proposal for amendment of the Comprehensive Plan for the city of Medina with regard to the smaller 30.18 acre parcel (2575 Cates Ranch Rd a/k/a CRP No. 2).

8.  Buyer and Sellers entered into a New Purchase and Sale Agreement on May 4, 2022 that

2

modified the date of the payments under the Original Agreement, reduced the amount of land purchased to CRP #2, paid the Cates $100,000 for the delay caused by having to extend the closing date, reduced the price of the land to $4,501,000, extended the various dates for payment of earnest money and the closing but otherwise ratified the terms of the Original Agreement. The New Purchase and Sale Agreement was approved by the judge in the Bankruptcy Case pursuant to an order entered on May 31, 2022_as ECF Docket No. 187.

9.  The Amended New Agreement is necessary as the Buyer has not yet obtained approval of the City of Medina of its Site Plan.  Despite its completion of many of the contingencies necessary for the approval of the Buyer's site plan, the date for final approval has slipped to April or May of 2023.  Further the Buyer has asked for consideration on the price of the Agreement and the Debtor has agreed to said terms.  The price for the 30.18 acres is now $3,400,000 with a contingency payment of up to $600,000 as an Additional Amount when the Buyer sells the land to a third party.  Debtor believes that the price to be paid even not including the Additional Amount is enough to pay all administrative, secured and unsecured claims in full.

10. Previously the Debtors obtained approval of the September 1, 2021 Sales Agreement based upon a bidding process where there were no other bidders. Based on the wishes of the Debtors, the previous lack of bidding and the amount of time and money already expended by Oppidan Holdings towards a purchase of the property being sold, Debtors request that the Court approve the Amended New Agreement as a Private sale.

11. Pursuant to Local Rule 9013-2(a), these Motions are accompanied by a memorandum of law, proposed order, and proof of service.

3

## PROCEDURAL POSTURE AND MOTION

12. The Debtors filed a Plan of Reorganization on December 15, 2021 [ECF 117] followed by a First Modified Plan on December 27, 2021 [ECF 122] that was sent out for balloting and that was set for confirmation on January 27, 2022.  Several parties in interest objected to the Plan's approval. All parties agreed to continue the confirmation hearing until March 22, 2022 to allow the Debtor time to formulate a new plan, re-solicit approval of that modified plan (and a companion plan filed in the JS Cates Company Chapter 11, 21-40881) and seek consent from the currently objecting parties to the new plan. The Court agreed to the continuance. The Debtors filed and sought votes a Second Modified Plan that has a current confirmation hearing set for May 12, 2022.  Based on the Amended New Agreement, the Debtors sought and obtained a continuation of the confirmation hearing until December 15 and filed a Third Amended Plan which is currently out for balloting.  Based on the New Amended Agreement and the wishes of many of the largest creditors, the US Trustee and the Subchapter V Trustee, the Debtor will be asking for the plan confirmation to be delayed again until July of 2023 and will at the appropriate time file a Fourth Modified Plan.

13. The main thrust of the Debtors' Fourth Modified Plan will not change, the Debtors will continue to sell enough of its real estate to pay its creditors in full or at least pay them as much as the sale of their non-exempt assets will engender from a sale.

14. The parties to the Amended New Agreement will work diligently meet all contingencies necessary to close. Those contingencies, the satisfaction of which is in control of the Buyer, have not yet occurred and have to do with approval of the City of Medina of the Buyer's site plan for the Debtors' real estate.

## DESCRIPTION OF DEBTORS

15. Debtor Jeffrey Cates is the 100% owner of J.S. Cates Construction, Inc. ("Cates Construction") which provides commercial and residential construction services, including design and building, general contracting, and construction management services. Cates Construction, for the reasons detailed below, filed a companion Chapter 11 case on May 17, 2021, (Bky File No. 21-40881) which is the same date that Jeffrey Cates and Christine Cici-Cates filed this Chapter 11 case. Prior to the filing of the Cates Construction Chapter 11, that company merged with its affiliate J.S. Cates Companies, which held certain real property and shared the most significant obligations of Cates Construction.

16. The reason for the dual Chapter 11 filings revolves primarily around cash flow issues being experienced by Cates Construction.  Cates Construction is owed significant sums from project owners and corresponding subcontractors. An inability to collect receivables led to performance bond defaults and litigation regarding those defaults.  All of these issues were exacerbated by the COVID-19 pandemic. The Debtors have personally guaranteed much of the Cates Construction debt.

17. The Debtors own the 30.18 acres being sold and additional real estate consisting of approximately 93.55 contiguous acres in the city of Medina, Minnesota (the "Cates Properties"). The plat and description of the Cates Properties is on file with the Court and available to any creditor through a request from Debtors' counsel. The city of Medina is expanding its commercial development and there is commercial development literally across the street from the Cates Properties.  For over two years, Debtors Jeffrey Cates and Christine Cici-Cates had a purchase agreement in place to sell the 36.9 acres known as 2575 Cates Ranch Drive A/K/A CRP No. 2 to Atkinson Development (or predecessors in interest to

5

Atkinson Development).  Various amendments to that initial purchase agreement were made

in the interim. Additional negotiations were undertaken to sell all of the Cates Properties to

Atkinson Development; however, no final deal was ever reached.  The agreement with

Atkinson Development was rejected by the Debtor through an order of the Court dated

October 13, 2021 [ECF 79].

18. Despite the efforts of the Debtors' and of Cates Construction at holding off their creditors

until funds to pay all of the debts of the corporation could be paid in full through either

collections from business operations or through sale of the 30.18 acres, no deal could be

made with the creditors and the dual Chapter 11s became necessary.  The Debtors believe

that the lack of diligence by Atkinson Development in closing the initial deal with the

Debtors directly led to the Chapter 11 filing.

19. The Debtors' primary lender is CorTrust Bank N.A., ("CorTrust") which holds perfected

liens in all of the Cates Properties through five separate mortgages in the estimated total

amount of approximately $2,200,000.

20. The Buyer has the ability to close on the purchase of 30.18 acres from the Debtor and desire

to have the court approve the Amended New Agreement.

21. Debtors as individuals would generally be entitled to sell real estate in the normal course of

their business affairs pursuant to their powers as a Debtors in Possession under 11 USC §§

1107 and 1108. However, out of an abundance of caution and to fully inform the Court and

any other party in interest of the full contours of the deal that the Debtor is seeking to have

the Court approve, the Debtor asks that the Court enter an order approving the sale of the

30.18 acres under 11 USC § 363(b).

22. Notice of these motions will be provided pursuant to all parties-in-interests and the

counterparties to any Assumed Contracts listed in the Purchase Agreement.

23. As described above, a need exists for the Debtor to consummate a sale of the 30.18 acres to the Buyer. The sale is in the best interest of the creditors of the Debtors.

24. For these reasons and the reasons contained in the accompanying Memorandum of Law in Support of the Motion, the Debtor asserts, in its best business judgment, a sale under the terms of the Amended New Agreement represents the best alternative for the Debtors and their creditors.

25. As set forth above, the Amended New Agreement represents the product of a sales effort undertaken by the Debtor over the past three years.  Due to that effort, the real estate of the Debtors has been marketed to the point where the eventual sale of the 30.18 acres will likely fully pay all of the debts of the Debtors.

26. The 30.18 acres estimated market value as currently zoned and without a development deal is estimated by the Debtors to be less than $1,000,000. The Debtors assert based on these values that that the total price of $3,400,000 (with a contingent additional payment) being paid for the 30.18 acres being sold is therefore significantly higher than what they could obtain if they sold the property as farmland.  Debtors believe that, under the circumstances, the efforts they have made to sell their assets with the resources that they have available are sufficient to allow the Court to approve the sale under 11 USC § 363 and at a private sale to Oppidan.

27. In the estimation of the Debtors, the Amended New Agreement represents the highest and best offer received to date for its real property. The Amended New Agreement was actively negotiated between the Debtors and Oppidan and entered into by the parties in good faith and without collusion. In Debtors' opinion, the price being paid for the real estate amounts to fair

market value. In connection with the entry of the Sale Order, the Debtors will seek a determination that the Buyer is a good faith purchaser.

## MOTION FOR RELIEF

27. The Debtors seek Court authorization, pursuant to 11 U.S.C. § 363(b), to sell the 30.18 acres on substantially the same terms as those contained in the May 4, 2021 New Purchase Agreement through the Warranty Deed attached as Exhibit B to the Buyer via private sale. The Debtors seeks an order accomplishing the sale with the following terms:

   a. That the Buyer is a good faith purchaser of the assets being sold.

   b. The Debtors' notice of this motion complies with Rule 2002 for the sale of assets of the Debtors.

   c. The Debtors are authorized to sell the 30.18 acres of real estate described herein free and clear of all liens, claims, encumbrances and interests, on terms contained in that certain Purchase and Sales Agreement of November 21, 2022 ("Amended New Agreement") between the Debtors and Oppidan Holdings, LLC ("the Buyer").

   d. All matters subject to the sales motion and the Amended New Agreement are "core" matters over which the Bankruptcy Court has jurisdiction pursuant to 28 U.S.C. Sections 1334 and 157;

   e. The Purchase Price of $3,400,000.00 constitutes fair value for the 30.18 acres;

   f. The 30.18 acres have been adequately and sufficiently marketed under the circumstances of the nature of this Small Business Chapter 11, the available resources of the Debtor and the nature of the assets being sold;

8

g.  The 30.18 acres are being purchased in good faith and the Amended New

    Agreement otherwise complies with the requirements of Section 363(f) of the

    Bankruptcy Code;

h.  Sound business reasons exist for the approval of the Amended New Agreement;

i.  Except as otherwise provided in the Amended New Agreement, Buyer shall not

    be liable or obligated for any Liability (including Successor Liability), Employee

    and Consultant Claims, liens, interests, damages, costs, expenses, claims, or

    demands arising from or relating to the Debtors' ownership or operation of the

    30.18 acres or the Debtors conduct of its affairs on or prior to the Closing Date or

    taxes arising out of the sale of the 30.18 acres.

j.  Any objections to the Motion and to the sale of the Sales Assets are overruled.

k.  Buyer is obligated to close upon the sale of the assets as set forth in the Amended

    New Agreement unless this order has been stayed, materially modified,

    withdrawn, or reversed as of the Closing Date;

l.  Any assignment and assumption or rejection of certain executory contracts and

    agreements as set out in the Amended New Agreements are approved;

m.  The form of Warranty Deed is approved pursuant to Section 365(f) of the

    Bankruptcy Code.

n.  Upon the closing of the sale, the 30.18 acres are to be conveyed to the Buyer free

    and clear of all Encumbrances. The conveyance free and clear of Encumbrances

    shall be self-executing, and neither the Debtor nor Buyer shall be required to

    execute or file releases, termination statements, assignments, consents, or other

    instruments in order to effectuate the conveyance of the 30.18 acres free and clear

9

of all encumbrances other than any assumed liabilities.

o.  Upon the closing of the sale, the Debtors shall hold the net proceeds of the sale,
after paying any sales commissions and expenses of the sale, in a segregated bank
account until further order of the Court or until consummation of a confirmed
plan of reorganization. As adequate protection under 11 U.S.C. § 363(e), all liens
against the 30.18 acres (including the liens held by CorTrust Bank, N.A.) shall
automatically transfer and attach to the net proceeds of the sale in the same order,
priority, and validity as they had with respect to the 30.18 acres immediately
before the sale. No further action shall be required to perfect the lienholders'
interest in the net sale proceeds.

p.  The terms and provisions of this Order together with the terms and provisions of
the Amended New Agreement shall be binding in all respects on any trustee
appointed in the Bankruptcy Case, or if the Bankruptcy Cases is converted to a
Chapter 7 proceeding, on any trustee appointed in a Chapter 7 proceeding.

28. The Debtors asks that the Court enter an order approving the Amended New Agreement
under 11 USC § 363.

29. If testimony is necessary in connection with this Motion, Debtor may call the Debtors or
David Scott, Vice-President of Oppidan, as witnesses in support of this Motion.

For the foregoing reasons, Debtor respectfully requests that the Court enter an order
approving the merits of the Motion and granting such other and further relief as the Court deems
appropriate.

Dated: November 21, 2022

/e/   *Kenneth C. Edstrom*
Kenneth C. Edstrom (148696)
Sapientia Law Group
120 South Sixth Street, Suite 100
Minneapolis, MN  55402
612-756-7100
kene@sapientialaw.com
Attorneys for Debtor

## <u>VERIFICATION</u>

I, Jeffery Cates, one of the Debtors in this Chapter 11 case declare under penalty of

perjury that the facts set forth in the preceding Motion and accompanying memorandum of

law are true and correct to the best of my knowledge, information, and belief and any

Exhibit attached hereto is a true and correct copy of the original document.

Date: November 20, 2022           _____

Jeffery Cates

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re: Jeffrey Cates and Christine Cici-Cates          Bankruptcy No. 21-40882

Chapter 11 Case

Debtors

MEMORANDUM OF LAW IN SUPPORT OF MOTION UNDER 11 U.S.C. §§ 105, 363 AND 365 (1) APPROVING THE NOVEMBER 21, 2022 AMENDED NEW AGREEMENT WITH OPPIDAN HOLDINGS

FACTS

The facts relevant to this memorandum are laid out in the Motion and incorporated herewith by reference.

ARGUMENT

A.  The Motion Should be Granted to Assist the Debtor's Reorganization.

Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision how and when to sell assets. *See Group of Institutional Investors Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523, 550 (1943). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

Section 363(b) of the Bankruptcy Code provides, in part, that a debtor after notice and a hearing, may sell or lease property of the estate outside the ordinary course of business. Per Rule 6004(f)(1) of the Federal Rules of Bankruptcy Procedure, all sales of assets under the bankruptcy code not in the ordinary course of business may be by private sale or by public

1

auction.  Cases addressing the sale of a debtor's assets outside a plan of reorganization examine a variety of issues, but most cases focus on whether a sound business justification has been articulated for the sale of the assets outside the context of a plan of reorganization. *Id.*; *Stephens Indus. Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Delaware & Hudson Ry Co.,* 124 B.R. 169 D.. Del 1991); *In re Titusville Country Club*, 128 B.R. 396 (Bankr. W.D. Pa. 1991).

In examining business justifications for a sale of a debtor's assets outside a plan of reorganization, a number of courts have relied upon the financial position of the debtor as sufficient justification. *See In re Tempo Technology Corp.*, 202 B.R. 363 (D. Del. 1996) aff'd 141 F.3d 1155 (3rd Cir.1998) (sale of substantially all of a chapter 11 debtor's assets pursuant to section 363(b) motion approved where debtor faced a severe cash shortfall and had no readily available source of capital); *In re Mulberry Corp.,* 261 B.R. 757 (Banrk. M.D. Fla. 2001) (value of assets will rapidly depreciate if not sold immediately); *Stephens Indus. Inc. v. McClung*, 789 F.2d 386 (sale justified based on the Debtor's continued losses).

B.   Under the Facts of this Case, The Debtors Can Sell Their Land at A Private Sale Without Letting Any Other Prospective Purchaser Bid on the Properties.

The paramount goal in any asset sale is to obtain the highest and best price available <u>under the circumstances</u> of the case. That assumes that the price being offered to the debtors is less than payment in full for all of the creditors. However, since the price being paid for the 30.18 acres under the Oppidan deal will pay off all of their creditors, the Cates should have the say in how their properties are being sold as to any amounts received over and above the amount needed to pay all of their personal debts.  According to the schedules and the proofs of claim filed in the case, the amount of debt, (not

including duplicative claims based on personal guaranties of corporate debt) is as follows:

|  | Secured (without Duplication as to corporate debts) | Estimated Unsecured (without duplication as to corporate debts) |
|---|---|---|
|  | $ 2,093,683.52 | $ 516,024.88[1] |
| **Grand Total** | **$ 2,609,708.40** | |

Administrative claims are estimated in the Plan at $200,000.00. The Debtors individually as the stakeholders in their own Chapter 11 stand to receive any difference between the price paid to the creditors and the price paid under the terms of the Amended New Agreement Debtors should have the right to determine whether any other bids should be accepted or if so, under what conditions they would be accepted.  The Debtor believes that a substantial delay in consummating a sale through a protracted bidding process may in fact depreciate the price for the 30.18 acres. Other potential bidders have either a poor record of performing (in the case of Atkinson Holdings and their affiliate Medina 55 as set out in in the Debtors' Motion to Reject an Executory Contract [ECF 68]) or are otherwise unknown to the Debtors.  There was a previous opportunity for other bidders to bid on the properties being sold per the September 1, 2021 agreement and no other bidders came forward. The Debtors have therefore decided that the only entity they trust to pay them in the future is Oppidan.

The business judgment standard used in the section of the Bankruptcy Code governing the use, sale, or lease of assets outside the ordinary course of business is flexible and encourages discretion. *In re ASARCO, L.L.C.,* 650 F.3d 593 (5th Cir. 2011).

A bankruptcy court may approve a private sale in lieu of a bidding process to a party bidding higher than the initial bidder when, among other things there was nothing to suggest that

---

[1] Includes a placeholder value for the claim of Medina 55, LLC that the Debtors are objecting to.

private purchaser was not acting in good faith. 11 U.S.C. § 363(b). *In re 160 Royal Palm, LLC,* 600 B.R. 119, 127 (S.D. Fla. 2019).

While a debtor-in-possession, in connection with the sale of estate property outside the ordinary course of debtor's business, has the duty to maximize the return for the bankruptcy estate, which often does require acceptance of the highest monetary bid, overemphasis on this usual outcome overlooks a fundamental truism, i.e., that the highest bid is not always the highest and best bid; inclusion of the word best in that conjunction is not mere surplusage. *Id.* at 129.

A debtor is in better position than court to choose between possible suitors. A debtor knows its industry and its business and which bidder is best positioned to take advantage of the opportunity. *In re Castre, Inc.*, 312 B.R. 426, 429 (Bankr. D. Colo. 2004).

The Debtors desire to approve a sale to Oppidan without allowing any mechanism for others to pay more for the Sales Property.  That is, under the circumstances, a sound use of their business judgment. Further, the sale of a portion of the Debtors' real estate in its reorganization case is not undertaken in an effort to circumvent the protections provided through the plan confirmation process. The Debtors will propose a newly modified plan of reorganization and hopes to achieve consummation of its plan shortly after the approval of the proposed sale by the Court.

In light of the present circumstances, concrete business justifications exist for the proposed sale. The Court should grant approval of the sale of the 30.18 acres pursuant to the Amended New Agreement. The approval of the Amended New Agreement will move the process along at a minimal cost which is important in a Subchapter V Small Business Case where the objective is the quick exit from bankruptcy.

C.  There is No Collusion or Bad Faith in the Proposed Sale

4

There is no relationship between Buyer or its principals and the Debtors nor any relationship between the Debtor and the sales agents who have been hired to assist in the sales process (The Oppidan Contract does provide for a 4% sales commission to a real estate agent whose appointment has been approved by the Court. There was no self-dealing or manipulation in the negotiation of the price of the sale. Additionally, Buyer has expended approximately $400,000.00 in costs for due diligence and delay payments to Debtors to date

The approved sale of the Debtors' assets represents the exercise of sound business judgment. If the Oppidan sale closes, per the terms of a soon to be filed modified plan of reorganization all of the Debtors' creditors will be paid in full.

## CONCLUSION

The Debtor has demonstrated that a sale of its real estate assets represents the exercise of sound business judgment, and that this motion is necessary to consummate the Amended New Agreement with Oppidan. Therefore, the Debtors respectfully request that the Court grant the relief requested in the Motion.

Dated: November 21, 2022

/e/  *Kenneth C. Edstrom*
Kenneth C. Edstrom (148696)
Sapientia Law Group
120 South Sixth Street, Suite 100
Minneapolis, MN  55402
612-756-7100
kene@sapientialaw.com
Attorneys for Debtor

# Exhibit A

# Amended New Purchase and Sale Agreement

## AMENDED NEW PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("Amended New Agreement") is made and entered into this November 21, 2022, by and between Oppidan Holdings, LLC, a Minnesota limited liability company ("Buyer") and Jeffrey Cates and Christine Cici-Cates, husband and wife residing in Hennepin County, Minnesota (collectively, "Seller"). In consideration of the mutual covenants and agreements contained herein, Seller and Buyer hereby enter into this Amended Agreement upon the following terms and conditions.

RECITALS

A. Prior to the execution of this Agreement, the Seller commenced a case in the United States Bankruptcy Court for the District of Minnesota (Bky File No. 21-40882 - the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code, a/k/a the United States Bankruptcy Code (the "Bankruptcy Code"), by filing a voluntary petition in the Bankruptcy Court. The Bankruptcy Case is still pending.

B. The Buyer and the Seller acknowledge that as part of the Bankruptcy Case this New Agreement is subject to Bankruptcy Court approval ("Bankruptcy Approval").

C. On September 1, 2021, Buyer and Seller entered into a Purchase and Sale Agreement for the sale of 67.1 acres of real estate owned by the Seller, September 1, 2021 ("Original Agreement"). The Original Agreement was approved by the judge in the Bankruptcy Case pursuant to an order entered on November 9, 2021 as ECF Docket No. 103.

D. Buyer and Sellers entered into a First Amended Purchase and Sales Agreement on February 15, 2022. The First Amended Purchase and Sale Agreement was subject to approval by the Bankruptcy Court, but the Parties never sought approval of said agreement.

E. Buyer and Sellers entered into a Second Amended Purchase and Sale Agreement on March 10, 2022 that modified the date of the payments under the Original Agreement but otherwise ratified the terms of the Original Agreement. The Second Amended Purchase and Sale Agreement was approved by the judge in the Bankruptcy Case pursuant to an order entered on April 5, 2022 as ECF Docket No. 167.

F. The Buyers terminated the Original Sales Agreement on May 4, 2022 because certain conditions expected by the Buyer were not met, specifically, on April 5, 2022, the Medina, Minnesota City Council did not approve the request of the Buyer to amend the Medina Comprehensive Plan to include the 67.1 Acres included in the Original Agreement, but encouraged Buyer to come back with a proposal for amendment of the Comprehensive Plan

1

for the city of Medina with regard to the smaller 30.18 acre parcel (2575 Cates Ranch Rd a/k/a CRP No. 2).

G. Buyer and Sellers entered into a New Purchase and Sale Agreement on May 4, 2022 that modified the date of the payments under the Original Agreement, reduced the amount of land purchased to CRP #2, paid the Cates $100,000 for the delay caused by having to extend the closing date, reduced the price of the land to $4,501,000, extended the various dates for payment of earnest money and the closing but otherwise ratified the terms of the Original Agreement. The New Purchase and Sale Agreement was approved by the judge in the Bankruptcy Case pursuant to an order entered on May 31, 2022 as ECF Docket No. 187.

H. Either in concert with this agreement or prior to it the Buyer intends to terminate the New Agreement and substitute this Amended New Agreement in its place.

### ARTICLE I
### PURCHASE AND SALE

1.0    Initial Payment. In consequence of the delay in the completion of the sale, and as an inducement for the Sellers to enter into this New Agreement, the Buyer shall pay the Sellers the sum of One Hundred Thousand and no/100's Dollars ($100,000.00) upon bankruptcy court approval of this Amended New Agreement. The  payment shall be "hard money," that is, the payment shall be nonrefundable.

1.1    Agreement of Purchase and Sale.  Seller agrees to sell to Buyer, and Buyer agrees to buy from Seller, that certain real property containing approximately 30.18 gross acres of land having an address of 2575 Cates Ranch Drive, located in the City of Medina, County of Hennepin, State of Minnesota (Parcel Nos. 04-118-23-14-0004), together with the building and all improvements thereon, and easements and rights benefiting or appurtenant thereto (the "Property").

1.2    Purchase Price and Manner of Payment.  purchase price for the Property shall be Three Million Four Hundred Thousand  and no/100 Dollars ($3,400,000.00) (the "Purchase Price"). The Purchase Price, subject to prorations and adjustments set forth in this Agreement, shall be payable in full at Closing by wire transfer of immediately available funds.

1.3    [Deleted].

1.4    [Deleted].

1.5    Additional Amount Due Upon Sale of the Property.  Buyer intends to sell the Property but has not yet identified a buyer. When the Property is sold their may be an additional sum payable to seller as follows: Gross Proceeds (defined as the total amount received by Buyer as a result of the sale of the Property by the Buyer to a third party) shall be distributed and applied in the following order of priority:

2

1.51 first, to the payment of all debts and liabilities of Buyer relating to the Property, including, but not limited to, all expenses of the development and management of the Property, development fees, the mortgage debt of the Property and all expenses of the disposition of the Property;

1.52 second, to fund reserves which Buyer shall deem necessary to provide for contingent or unforeseen liabilities or obligations of Buyer, and any balance of such reserves remaining after payment of such contingencies shall be distributed as provided in this Section 1; and

1.53 third, the remaining Gross Proceeds (a) 90% to Buyer and (b) 10% to Seller, up to a maximum amount payable to seller of $600,000.00 (the "Additional Amount").

1.6   Audit.  Buyer shall keep and maintain proper and complete records documenting all debts and liabilities relating to the Property, including, but not limited to, all expenses of the development and management of the Property, the mortgage debt of the Property, all expenses of the disposition of the Property, all reserves funded pursuant to subsection 1.52 above, and all dispositions pursuant to this Agreement.  Seller upon request inspect and audit any of Buyer's books and records relating to such matters.

## ARTICLE II
## TITLE AND SURVEY

2.1   Title Examination.  Within twenty (20) days after the Effective Date, Buyer shall obtain from Title Company, a commitment for an ALTA extended owner's policy of title insurance covering the Property in the amount of the Purchase Price, together with legible copies of all documents referenced therein and proper searches for bankruptcies, judgments, liens and assessments (the "Title Commitment").

2.2   Survey.  Buyer may employ a surveyor to survey the Property and prepare and deliver to Buyer an ALTA survey (the "Survey").

2.3   Conveyance of Title; Permitted Exceptions.  Seller shall convey and transfer title to the Property pursuant to Section 5.2, subject to the Permitted Exceptions.  The definition of "Permitted Exceptions" shall include: (a) any item contained in the Title Commitment or shown on the Survey to which Buyer does not object as set forth in Section 2.4; and (b) any other exception to title which Buyer determines, in its sole discretion, to be acceptable.  Notwithstanding anything to the contrary contained in this Agreement, in no event shall the definition of Permitted Exceptions include a valid and enforceable lien against the Property that is liquidated in amount and that is not asserted by a creditor or other party claiming through Buyer [or Buyer's agent(s) or contractor(s)] and such liens shall in all cases be Objections as defined in Section 2.4 below whether Buyer makes, or fails to make, such Objections.  There shall be no matter affecting title other than the Permitted Exceptions.

3

2.4    <u>Title Objections; Cure of Title Objections</u>.  Buyer shall have until the Contingency Date, as herein defined, to notify Seller, in writing, of such objections as Buyer may have to anything contained in the Title Commitment or the Survey ("<u>Objections</u>").  If Buyer does not provide notice of any Objections within such time period, Buyer shall no longer have any right to make such Objections under this Section.  Upon receipt of Buyer's written notice of Objections, Seller shall have five (5) days to provide Buyer written notice of any objections specified therein which Seller does not intend to attempt to satisfy.  Seller shall have until the Closing Date to cure any Objections not waived by Buyer, during which time the Closing shall be extended as necessary.

If Seller does not cure the Objections within such cure period, Buyer may, at its sole discretion, do one or more of the following:

2.4.1    <u>Proceed to Closing</u>.  For Objections that are liens of a liquidated amount, proceed to Closing and withhold from the Purchase Price an amount which, in the reasonable judgment of Title Company, is sufficient to assure cure of the Objections.  Any amount so withheld shall be placed in escrow with Title Company.  Seller shall pay the cost and expense to create and administer the escrow.  If Seller does not cure such Objections within thirty (30) days after such escrow is established, Buyer may then cure such Objections within a reasonable time and charge the costs against the escrowed amount.  The parties agree to execute and deliver such documents as may be reasonably required by Guaranty Commercial Title, Inc., 465 Nicollet Mall, Suite 230, Minneapolis, Minneapolis, Minnesota 55401 ("<u>Title Company</u>") to cure such Objections.  Upon cure of such Objections, any unused escrow funds shall be refunded to Seller;

2.4.2    <u>Waive Objections</u>.  Waive the Objections, accept title subject to the Objections, and proceed to Closing, in which event such Objections shall be considered Permitted Exceptions, and in which case Seller shall remain obligated to perform pursuant to the terms of this Agreement; and/or

2.4.3    <u>Terminate Agreement</u>.  Terminate this Agreement by sending written notice to Seller, and upon such notice, this Agreement shall terminate and the Earnest Money shall be returned to Buyer.


ARTICLE III
INSPECTION AND CONTINGENCIES

3.1    <u>Right of Inspection/Buyer's Covenant to Hold Harmless</u>.  During the period beginning upon the Effective Date and ending on the Closing Date, Buyer and its agents shall have the right to access the Property to make such physical and visual inspections, investigations and tests as Buyer deems necessary.  Except to the extent specifically set forth to the contrary in this Agreement, Buyer shall pay all costs and expenses of such inspections, investigations and tests.

4

Buyer shall repair and restore any damage to the Property caused by Buyer's inspections, investigations and tests to substantially the same condition as existed prior to such entry. Buyer agrees to indemnify and hold Seller and the Property harmless from all claims, costs, expenses or damages, including reasonable attorneys' fees, for damages resulting from such activities. This obligation of Buyer shall not be construed to require Buyer to perform any removal or remediation of any Hazardous Substances revealed by Buyer's actions under this Section.

3.2    Contingencies. Buyer's obligation to purchase the Property is contingent upon Buyer being satisfied in Buyer's sole discretion and exclusive judgment, on or before the time period between the execution of this Amended New Agreement and approval of rezoning and Oppidan's site plan by the Medina City Council or July 1, 2023, whichever comes first, this period being referred to herein as the "Contingency Period" and the final date of the Contingency Period being the "Contingency Date"), with the Property, with title to the Property, with any surveys, engineering and soil tests and other tests, studies or inspections deemed necessary by Buyer in its sole discretion, with the documents provided by Buyer as required in this Agreement, and with the feasibility of Buyer using the Property for the purposes desired by Buyer, including any and all governmental and/or third party approvals or adequate assurances that Buyer deems necessary in Buyer's judgment to make use of the Property as Buyer elects.

3.3    Right of Termination. Seller agrees that in the event Buyer determines that the Property is not suitable for its purposes on or before the Contingency Date, or that the contingencies contained in Section 3.2 have not been satisfied on or before the Contingency Date, Buyer shall have the right to terminate this Agreement by written notice to Seller given not later than the Contingency Date. Upon such termination, any Earnest Money that is not non-refundable shall be returned to Buyer. If Buyer acknowledges the satisfaction or waiver of a contingency by written notice to Seller, Buyer shall no longer have a right to terminate this Agreement under this Section because of such contingency. If Buyer does not provide a written notice of termination by the date required above, the contingency shall be deemed satisfied. All the contingencies set forth in Section 3.2 are specifically for the benefit of the Buyer.

3.4    [Omitted].

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

4.1    Representations and Warranties of Seller. Seller represents and warrants to Buyer as follows:

4.1.1    Authority. Seller has the requisite power and authority to enter into and perform this Agreement and to transfer all of the Property in accordance with this Agreement.

5

4.1.2  <u>Assessments</u>.  Seller has received no written notice of threatened or pending special assessments or reassessments of the Property.

4.1.3  <u>Proceedings</u>.  There is no action, litigation, investigation, condemnation, eminent domain or proceeding of any kind pending or threatened against the Property.

4.1.4  <u>Environmental Laws</u>. To the best of Seller's knowledge, no toxic or hazardous substances or wastes, pollutants or contaminants (including, without limitation, asbestos, lead paint, urea formaldehyde, the group of organic compounds known as polychlorinated biphenyls, petroleum products including gasoline, fuel oil, crude oil and various constituents of such products, and any hazardous substance as defined in any Environmental Law (collectively, "<u>Hazardous Substances</u>") have been generated, treated, stored, transferred from, released or disposed of, or otherwise placed, deposited in or located on the Property in violation of any Environmental Law, nor has any activity been undertaken on the Property that would cause or contribute to the Property becoming a treatment, storage or disposal facility within the meaning of any Environmental Law.  The term "Environmental Law" shall mean any and all federal, state and local laws, statutes, codes, ordinances, regulations, rules, policies, consent decrees, judicial orders, administrative orders or other requirements relating to the environment or to human health or safety associated with the environment, as currently in effect.  To the best of Seller's knowledge there has been no discharge, release or threatened release of Hazardous Substances from the Property, and there are no Hazardous Substances or conditions in or on the Property that may support a claim or cause of action under any Environmental Law. To the best of Seller's knowledge the Property is not now and never has been listed on any list of sites contaminated with Hazardous Substances, nor used as graveyard, landfill, dump, disposal or storage site for Hazardous Substances.

4.1.5  <u>Title</u>.  Seller has fee simple title to the Property subject to the Permitted Exceptions.

4.1.6  <u>Liens and Encumbrances</u>.  Upon Seller's receipt of the Purchase Price at Closing, the Property will be free and clear of all liens, security interests, encumbrances, easements, leases, mortgages, mechanics' liens or other restrictions, except the Permitted Exceptions.

4.1.7  <u>Access to Records</u>.  Seller shall provide to Buyer, within five (5) days after the Effective Date, copies of all existing soil and environmental tests, engineering reports, surveys, any and all leases and service agreements affecting the Property, Seller's wetland delineations studies, soil borings affecting the Property, Property tax information affecting the Property, existing incentives or financing (such as TIF) applicable to the Property, and any and all other pertinent documents relating to the Property which are in Seller's possession or control.

4.1.8  <u>Governmental Approvals</u>.  Seller shall cooperate in all reasonable respects with Buyer in obtaining governmental approvals, and shall execute such applications, permits and other documents as may be reasonably required.  Seller shall not be entitled to any compensation in connection with such cooperation.

4.1.9  <u>Compliance with Laws</u>.  Seller has complied with all applicable laws, codes, ordinances

6

and regulations with respect to the Property and the Property is in compliance with all subdivision, platting and other regulations of any governmental authority having jurisdiction over the Property.

The representations and warranties contained in this Section shall survive Closing and shall be true and correct on the Effective Date and Closing Date. Seller shall indemnify and hold Buyer harmless from any expenses or damages, including reasonable attorneys' fees, that Buyer incurs by reason of, or arising out of, any breach by Seller of any of the above representations and warranties, whether such breach is discovered before or after Closing. This indemnification obligation of Seller shall survive Closing or any termination of this Agreement. Consummation of this Agreement by Buyer with knowledge of any breach by Seller of the aforesaid representations and warranties shall not constitute a waiver or release by Buyer of any claim for such breach.

ARTICLE V
CLOSING

5.1    Time and Place. The closing of the purchase and sale transaction contemplated by this Agreement ("Closing") shall occur fifteen (15) days after the Contingency Date ("Closing Date") or at an earlier time as mutually agreed to between the parties, at the offices of Title Company. Closing shall occur through deliveries by the parties of those documents and funds contemplated in Sections 5.2 and 5.3 hereof into a closing escrow to be administered by Title Company. Seller shall deliver possession of the Property to Buyer on the Closing Date.

5.2    Seller's Obligations at Closing. At the Closing, Seller shall:

5.2.1    Deed. Deliver to Buyer a duly executed warranty deed in recordable form, conveying to Buyer marketable fee simple title to the Property and all rights appurtenant, free and clear of all encumbrances except the Permitted Exceptions.

5.2.2    Authority. Deliver to Buyer such evidence as Buyer's counsel and/or Title Company may reasonably require as to the authority of the persons executing documents on behalf of Seller.

5.2.3    Seller's Affidavit. Deliver to Buyer an affidavit duly executed by Seller that on the Closing Date, there are no outstanding unsatisfied judgments, tax liens or bankruptcies against or involving Seller or the Property; that there has been no skill, labor or material furnished to the Property at the request of Seller for which payment has not been made and that there are no unrecorded interests in the Property known to Seller.

5.2.4    Other Documents. Deliver to Buyer all other documents reasonably necessary to consummate the transaction contemplated by this Agreement.

5.3    Buyer's Obligations at Closing. At Closing, Buyer shall:

5.3.1    Purchase Price. Pay to Seller the full amount of the Purchase Price, as increased or

7

decreased by prorations or adjustments set forth in this Agreement, by wire transfer of immediately available funds.  Buyer and Seller agree that the Earnest Money shall be applied towards payment of the Purchase Price.

5.3.15 Additional Amount Potentially Due. Payment of the full amount of the Purchase Price at closing shall not end Buyer's obligations to pay the Additional Amount as that term is used herein.

5.3.2    Other Documents.    Deliver to Seller all other documents reasonably necessary to consummate the transaction contemplated by this Agreement.

5.4      Closing Costs.  Seller and Buyer agree to the payment of costs in connection with the Closing as follows:

5.4.1    Closing Fee.  On the Closing Date, Seller and Buyer each will pay one-half (½) of any reasonable and customary fee imposed by Title Company for the Closing.

5.4.2    Real Estate Transfer Fee.  On the Closing Date, Seller shall pay all real estate transfer taxes, deed stamps, deed taxes, and/or other similar transfer fees for conveyance of the Property to Buyer and/or the recording of the deed to be delivered by Seller under this Agreement.

5.4.3    Recording Costs.  On or before the Closing Date, Seller shall pay the cost of recording all documents necessary to place record title in the condition warranted by Seller in this Agreement. Buyer will pay the cost of recording the deed conveying the Property to Buyer.

5.4.4    Title Insurance Costs.  Seller shall pay the costs of issuing the Title Commitment and Buyer shall pay the premium for any owner's policy and loan policy.

ARTICLE VI
REAL ESTATE TAXES AND SPECIAL ASSESSMENTS

6.1      Real Estate Taxes and Special Assessments.  On or before the Closing Date, Seller shall pay all general real estate taxes for the Property due and payable in years prior to the year of Closing.  Seller shall also pay, on or before the Closing Date, all deferred taxes for the Property (including green acre taxes) and all special assessments levied or pending against the Property as of the Closing Date, including, without limitation, any installments of special assessments (or estimates thereof) and interest thereon payable after the Closing Date.  General real estate taxes for the Property due and payable in the year of Closing shall be apportioned between Buyer and Seller based on a 365 day calendar year as if Buyer were vested with title to the Property on the Closing Date.

ARTICLE VII
COMMISSIONS

8

7.1    Brokerage Commissions.  Seller shall pay a commission at Closing equal to four percent (4%) of the Purchase Price to CBRE, Inc. Buyer warrants to Seller that it has dealt with no other brokers, finders or the like in connection with this transaction other than CBRE, Inc.  Seller warrants to Buyer that it has dealt with no other brokers, finders or the like in connection with this transaction other than CBRE, Inc. Buyer and Seller agree to indemnify and hold harmless the other party from any loss, liability, cost, damage or expense resulting from, or relating to, any claim for such commissions or finder's fees.  This obligation of Buyer and Seller shall survive Closing or any termination of this Agreement.

ARTICLE VIII
DEFAULT AND REMEDIES

8.1    Default.  Buyer or Seller shall be in default under this Agreement if either fails to observe, perform or comply with any term, condition or obligation of this Agreement and such failure continues for a period of ten (10) days after written notice of the failure to the Buyer or Seller from the other party.

8.2    Remedies.  Upon default by a Buyer or Seller, the other party shall have the following remedies:

8.2.1  Buyer's Remedies.  Upon Seller's default under this Agreement, then the remedies available to Buyer shall be (i) to terminate this Agreement by written notice to Seller and to receive the return of the Earnest Mone, or (ii) to seek specific performance of this Agreement on or before six (6) months after Seller's default during which time the Closing will be postponed until such time as Seller has cured its default.  The rights and remedies of this Section shall survive Closing or any termination of this Agreement.

8.2.2  Seller's Remedies.  Upon Buyer's default under this Agreement, then the sole remedy available to Seller shall be to terminate this Agreement according to Minnesota law and upon such termination to receive the Earnest Money. Upon such termination and release of the Earnest Money, Buyer shall be released from all liability hereunder and neither party shall have further rights or obligations under this Agreement.  The rights and remedies of this Section shall survive Closing or any termination of this Agreement.

ARTICLE IX
MISCELLANEOUS

9.1    Successors or Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties, and their respective successors and assigns.

9.2    Severability.  In the event any provision of this Agreement shall be held to be invalid,

9

unenforceable or in conflict with the law of the jurisdiction where the Property is located, the remaining provisions of this Agreement shall continue to be valid, enforceable and not be affected by such holding.

9.3     Assignment.  Either party may assign its rights under this Agreement before or after the Closing.  Any such assignment will not relieve such assigning party of its obligations under this Agreement.

9.4     Notices.  Any notice required or permitted pursuant to this Agreement shall be in writing and delivered by (a) email, with delivery receipt requested, (b) personal delivery, (c) reputable overnight or two-day delivery service with proof of delivery/attempted delivery, or (d) United States mail, postage prepaid, either certified or first class mail.  All notices shall be sent to a party at the address set forth below, or to such other address or person as the party shall have designated in writing.  Notices shall be deemed given upon the earlier of the date of actual receipt or (i) at the time of delivery if by personal delivery, (ii) as of the date of first attempted delivery if by overnight or two-day delivery or certified mail, or (iii) if by email, as of the time and date of the delivery receipt confirming the message was delivered to the recipient's email server.

If to Seller:          Jeff Cates
                       2400 Cates Ranch Drive, #100
                       Hamel, MN 55340

Email: jeff@jscatesco.com

If to Buyer:           Oppidan Holdings, LLC
                       Attn: Megan Zieske
                       CC: Dave Scott
                       400 Water Street, Suite 200
                       Excelsior, Minnesota 55331

Email: dave@oppidan.com
       megan@oppidan.com

9.5     Further Assurances.  Each party agrees that it will execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may reasonably be requested by the other party, to further consummate the transaction contemplated by this Agreement, without further consideration.

9.6     Calculation of Time Periods.  Except as specifically set forth to the contrary in this Agreement, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is on a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next business day following such Saturday, Sunday or legal holiday.

10

9.7    Governing Law.   This Agreement shall in all respects be interpreted, construed and enforced according to the laws of the State of Minnesota.

9.8    Counterparts. This Agreement and any related documents may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Electronic signatures using a certified e-signature via Adobe or DocuSign are acceptable for this Agreement and related documents, except for documents and instruments to be delivered at Closing. Documents executed by the parties (whether via certified electronic signature as described above or manually signed) but delivered by email or share-drive link as "pdf" or other electronic means will be accepted with the same effect as original ink-signed "hard copy" versions of such documents. Notwithstanding the foregoing, all documents which are to be recorded at Closing must be delivered by the signing party as fully executed and acknowledged (and, if required by applicable law, witnessed) "wet ink" originals.

9.9    Construction.   Seller and Buyer and their respective counsel have reviewed and revised this Agreement.  Seller and Buyer acknowledge that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

9.10    Attorneys' Fees and Costs.  In the event of litigation arising out of breach or claimed breach of this Agreement, the prevailing party shall be entitled to recover from the other party all costs and expenses incurred as a result, including attorneys' fees and costs.

9.11    Survival.   Except to the extent set forth in this Agreement, all of the terms of this Agreement, including, without limitation, the representations and warranties contained herein, shall survive and be enforceable after the Closing and delivery of the warranty deed.

9.12    Entire Agreement/Amendment.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter herein and fully supersedes all prior written or oral agreements between the parties with respect to such matters.  No other agreement, statement or promise made by any party and no amendment, modification or other change of any provision of this Agreement shall be effective unless in writing signed by the parties.

11

IN WITNESS WHEREOF, Seller and Buyer have executed this Purchase and Sale Agreement as of the Effective Date.

SELLER:

Jeffrey Cates

Signature: _____

Christine Cates

Signature: _____


BUYER:

Oppidan Holdings, LLC,
a Minnesota limited liability company

By:    David Scott
Its:    Vice President

4892-2048-6719, v. 3

12

# Exhibit B

# Form of Warranty Agreement

**(Top 3 inches reserved for recording data)**

**WARRANTY DEED**
**Individual(s) to Business Entity**

DEED TAX DUE:  $_____                                DATE: _____, 202__

FOR VALUABLE CONSIDERATION, **Jeffrey Cates and Christine Cates**, husband and wife
("**Grantors**"), hereby convey and warrant to **Oppidan Holdings, LLC, a Limited Liability Company**
under the laws of **Minnesota** ("**Grantee**"), real property in **Hennepin** County, Minnesota, legally
described as follows:

      See attached legal description.

*Check here if all or part of the described real property is Registered (Torrens)* ☐

together with all hereditaments and appurtenances belonging thereto, subject to the following exceptions:
None.

*Check applicable box:*

☒ The Seller certifies that the Seller does not
   know of any wells on the described real
   property.

☐ A well disclosure certificate accompanies this
   document or has been electronically filed.

☐ I am familiar with the property described in this
   instrument and I certify that the status and
   number of wells on the described real property
   have not changed since the last previously filed
   well disclosure certificate.

Grantors

_____
**Jeffrey Cates**

_____
**Christine Cates**

Drafted By/Return To:
Johnson, Larson & Peterson, P.A.
908 Commercial Drive
Buffalo, MN 55313

**WARRANTY DEED**

State of Minnesota, County of _____

This instrument was acknowledged before me on _____, 202__, by **Jeffrey Cates and Christine Cates**, husband and wife.

(Stamp)

_____
*(signature of notarial officer)*

Title (and Rank): _____

My commission expires: _____
*(month/day/year)*

THIS INSTRUMENT WAS DRAFTED BY:

Kenneth C. Edstrom
Sapientia Law Group, PLLC
120 6th St. S. Ste 100
Minneapolis MN 55402
(612)756-7108

TAX STATEMENTS FOR THE REAL PROPERTY DESCRIBED IN THIS INSTRUMENT SHOULD BE SENT TO:

Oppidan Holdings, LLC
400 Water Street, Suite 200
Excelsior, MN 55331

CERTIFICATE OF SERVICE

Under penalty of perjury, I declare that on November 21, 2022 in connection with the matter below, the following document(s) were served on the party(s) listed below in the manners indicated:

1. Notice of Hearing and Motion for Order approving Amended New Agreement for Sale of Assets of the Debtors;

2. Memorandum in Support of Motion and Exhibits

3. Verification

4. Certificate of service

5. Proposed Order

by ECF/EMAIL NOTIFICATION to those Registered Users of the Court's ECF Filing system and that other parties in interest will be served by US Mail through certificatesofservice.com who will file their own certificate of service.

/e/ *Kenneth C. Edstrom*

Kenneth C. Edstrom

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re: Jeffrey Cates and
Christine Cici-Cates

Bankruptcy No. 21-40882

Chapter 11 Case

ORDER APPROVING THE SALE OF REAL ESTATE OF THE DEBTOR FREE AND
CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS AT PRIVATE SALE

The Debtors' Motion for an Order Approving the Sale of Certain Real Estate of

the Debtors' Free and Clear of Liens, Claims, Encumbrances and Interests at Private Sale

came on for a hearing before the undersigned on May 31, 2022. Appearances, if any, were

noted the record.

Based on the arguments of counsel, all the files, records and proceedings herein,

the Court being advised in the premises, the Court rules as follows:

FINDINGS OF FACT

The Purchase Price of $3,400,000 constitutes fair value for the 30.18 acres of the

Debtors' real estate  as described below;

The 30.18 acres have been adequately and sufficiently marketed under the circumstances

of the nature of this Small Business Chapter 11, the available resources of the Debtor and the

nature of the assets being sold;

All matters subject to the sales motion and the Amended New Agreements are "core"

matters over which the Bankruptcy Court has jurisdiction pursuant to 28 U.S.C. Sections 1334

2

and 157;

The 30.18 acres are being purchased in good faith and the Amended New Agreement otherwise complies with the requirements of Section 363(f) of the Bankruptcy Code;

Sound business reasons exist for the approval of the Amended New Agreement;

Based upon the forgoing:

IT IS HEREBY ORDERED THAT:

1. The Motion is granted.

2. The Debtors' notice of this motion complies with Rule 2002 for the sale of assets of the Debtors.

3. The Debtors are authorized to sell the following real estate free and clear of all liens, claims, encumbrances and interests, on terms contained in that certain "Amended New Agreement" dated as of November 21, 2022 between the Debtors and Oppidan Holdings, LLC ("the Buyer").

   Approximately 30.18 acres described as 2575 Cates Ranch Drive A/K/A CRP No. 2, Parcel Nos. 04-118-23-14-0004 and legally Described as:

   LOT 1, BLOCK 1, CATES RANCH SECOND ADDITION, HENNEPIN COUNTY, MINNESOTA.

4. The sale is for the described real estate, together with the building and all improvements thereon, and easements and rights benefiting or appurtenant thereto is hereby referred to as the "Sales Property".

5. All matters subject to the sales motion and the Amended New Agreement are "core" matters over which the Bankruptcy Court has jurisdiction pursuant to 28 U.S.C. Sections 1334 and

3

157;

6. Except as otherwise provided in the Amended New Agreement, Buyer shall not be liable or

obligated for any Liability (including Successor Liability), Employee and Consultant Claims,

liens, interests, damages, costs, expenses, claims, or demands arising from or relating to the

Debtors' ownership or operation of the 30.18 acres or the Debtors conduct of its affairs on or

prior to the Closing Date or taxes arising out of the sale of the 30.18 acres.

7. Any objections to the Motion and to the sale of the Sales Assets are overruled.

8. Buyer is obligated to close upon the sale of the assets as set forth in the Amended New

Agreement unless this order has been stayed, materially modified, withdrawn, or reversed as

of the Closing Date;

9. Any assignment and assumption or rejection of certain executory contracts and agreements as

set out in the Amended New Agreements are approved;

10. The form of Warranty Deed is approved pursuant to Section 365(f) of the Bankruptcy Code.

11. Upon the closing of the sale, the 30.18 acres are to be conveyed to the Buyer free and clear of

all Encumbrances. The conveyance free and clear of Encumbrances shall be self-executing,

and neither the Debtor nor Buyer shall be required to execute or file releases, termination

statements, assignments, consents, or other instruments in order to effectuate the conveyance

of the 30.18 acres free and clear of all encumbrances other than any assumed liabilities.

12. Upon the closing of the sale, the Debtors shall hold the net proceeds of the sale, after paying

any sales commissions and expenses of the sale, in a segregated bank account until further

order of the Court. As adequate protection under 11 U.S.C. § 363(e), all liens against the

30.18 acres (including the liens held by CorTrust Bank, N.A.) shall automatically transfer

and attach to the net proceeds of the sale in the same order, priority, and validity as they had

4

with respect to the 30.18 acres immediately before the sale. No further action shall be

required to perfect the lienholders' interest in the net sale proceeds.

13. The terms and provisions of this Order together with the terms and provisions of the

Amended New Agreement shall be binding in all respects on any trustee appointed in the

Bankruptcy Case, or if the Bankruptcy Cases is converted to a Chapter 7 proceeding, on any

trustee appointed in a Chapter 7 proceeding.

14. The 14-day stay set out in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure is

hereby waived.


Date: _____


_____
William J. Fisher, Bankruptcy Judge

4882-0625-2351, v. 1

5