## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re: Jeffery Cates and Christine Cici-Cates     Bky File No. 21- 40882 WJF

Debtors     (Chapter 11, Sub. V)

---

## FIFTH MODIFIED PLAN OF REORGANIZATION

## OF

## Jeffery Cates and Christine Cici-Cates

February 9, 2023

Kenneth C. Edstrom (148696)
Sapientia Law Group, PLLC
Minneapolis, Minnesota 55402
kene@sapientialaw.com
612 756-1008

Attorneys for Debtors

## TABLE OF CONTENTS

ARTICLE I. INTRODUCTION ................................................................................. 1

ARTICLE II. DEFINITIONS ................................................................................... 5

ARTICLE III. ESTIMATED CLAIMS, VALUES, AMOUNTS AND OBJECTIONS 7

ARTICLE IV: UNCLASSIFIED CLAIMS ................................................................ 8

ARTICLE V. CLASSIFIED CLAIMS ...................................................................... 10

    A.    Class I: Claim of CorTrust Bank (Impaired) .................................... 10

    B.    Class II: Vehicle Loan: Claims of Ally Bank (Unimpaired). .......................... 12

    C.    Class III: General Unsecured Claims (Impaired). .......................................... 12

ARTICLE VI. IMPAIRMENT OF CLASSES OF CLAIMS AND INTERESTS
UNDER THE PLAN ............................................................................................... 15

ARTICLE VII. GENERAL PROVISIONS .............................................................. 15

ARTICLE VIII. MEANS OF EXECUTION OF PLAN AND FEASIBILITY ............ 16

    A.    Sale of Real Estate and Non-Exempt Personal Property ............................... 16

    B.    Payments to Creditors If Sale of the Real Estate is Delayed ......................... 18

    C.    Claims of Granite Re, Inc. .............................................................................. 21

    D.    Avoidance Actions ......................................................................................... 22

    E.    Plan Implementation. ..................................................................................... 22

ARTICLE IX. EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND
ADMINISTRATIVE CLAIMS ............................................................................... 24

ARTICLE X. MODIFICATION OF THE PLAN ..................................................... 24

i

ARTICLE XI. CONTINUING JURISDICTION OF THE BANKRUPTCY COURT 25

ARTICLE XII. RESERVATION OF ALL RIGHTS, CLAIMS, ACTIONS ............... 25

ARTICLE XIII. DISCHARGE, RELEASE, AND EFFECT OF CONFIRMATION .. 25

ARTICLE XIV. MISCELLANEOUS PROVISIONS ............................................. 26

EXHIBIT A ..................................................................................................... 1

EXHIBIT B ..................................................................................................... 2

EXHIBIT C ..................................................................................................... 3

EXHIBIT D ..................................................................................................... 8

## ARTICLE I. INTRODUCTION

Debtor Jeffrey Cates is the 100% owner of J.S. Cates Construction, Inc. ("Cates

Construction") which, provided commercial and residential construction services,

including design and building, general contracting, and construction management

services. Cates Construction, for the reasons detailed below, filed a companion Chapter

11 case on May 17, 2021 (Bankr. No. 21-40881), which is the same date that Jeffrey

Cates and Christine Cici-Cates filed this Chapter 11, subchapter V, case (the "Petition

Date"). Prior to the filing of the Cates Construction Chapter 11, that company merged

with its affiliate J.S. Cates Companies, which held certain real property and shared the

most significant obligations of Cates Construction. In June of 2022, Cates Construction

voluntarily converted their case to a Chapter 7 liquidation.  That case is still pending, and

there will eventually be a distribution of funds from that estate to those creditors who

hold claims against the corporation.

The original reason for the dual Chapter 11 filings revolves primarily around cash

flow issues experienced by Cates Construction.  Cates Construction was owed significant

sums from project owners and corresponding subcontractors. An inability to collect

receivables led to performance bond defaults and litigation regarding those defaults.  All

of these issues were exacerbated by the COVID-19 pandemic. The Debtors have

personally guaranteed much of the Cates Construction debt.

The Debtors own real estate consisting of approximately 93.55 contiguous acres

in the city of Medina, Minnesota (the "Cates Properties"). The city of Medina is

expanding its commercial development and there is commercial development literally

1

across the street from the Cates Properties.  For over two years, Debtors Jeffrey Cates and

Christine Cici-Cates had a purchase agreement in place to sell the 30.18 acres known as

2575 Cates Ranch Drive or CRP No. 2 to Atkinson Development, LLC (or successors in

interest to Atkinson Development).  Various amendments to that initial purchase

agreement were made in the interim. Additional negotiations were undertaken to sell all

of the Cates Properties to Atkinson Development; however, no final deal was ever

reached.  The agreement with Atkinson Development was rejected by the Debtors

through an order of the Court dated October 13, 2021 [ECF 79].

Despite the efforts of the Debtors and of Cates Construction at holding off their

creditors until funds to pay all of the debts of the corporation could be paid in full

through either collections from business operations or through sale of the Cates

Properties, no deal could be made with the creditors, and the dual Chapter 11s became

necessary.  The Debtors believe that the lack of diligence by Atkinson Development in

closing the initial deal with the Debtors directly led to the Chapter 11 filing.

On September 1, 2021, the Debtors entered into a purchase agreement with

Oppidan Holdings, LLC ("Oppidan Purchase Agreement"), subject to the approval of the

Bankruptcy Court, for sale of two parcels of the Cates Properties, totaling approximately

67 acres, for $10,230,000.00.

The property to be sold under the Oppidan Purchase Agreement was described as

follows:

> That certain real property containing approximately 30.18 acres of land
> having an address of 2575 Cates Ranch Drive, Parcel No. 04-118-23-14-
> 0004, and legally described as: LOT 1, BLOCK 1, CATES RANCH
> SECOND ADDITION, HENNEPIN COUNTY, MINNESOTA ("CRP
> No. 2");

2

and

> That certain real property containing approximately 36.92 acres of land having an address 2590 Cates Ranch Drive, Parcel No. 04-118-23-11-0002, and legally described as Lot 3, Block 1, CATES RANCH, Hennepin County, Minnesota located in the City of Medina, County of Hennepin, State of Minnesota ("CRP No. 3").

The Debtors sought approval of the Oppidan Purchase Agreement through a motion brought on November 8, 2021, and there was no opposition to the Motion. The Court entered an order approving the sale to Oppidan on November 9, 2021 [ECF 103]. Debtors and Oppidan entered into a First Amended Purchase and Sales Agreement on February 15, 2022. The First Amended Purchase and Sale Agreement was subject to approval by the Bankruptcy Court, but the Debtors never sought approval of said agreement.

Debtors and Oppidan entered into a Second Amended Purchase and Sale Agreement on March 10, 2022, that extended certain terms under the contract by 90 days but otherwise ratified the terms of the Oppidan Agreement. The Second Amended Purchase and Sale Agreement was approved by the judge in the Bankruptcy Case pursuant to an order entered on April 5, 2022, as ECF No. 167.

Oppidan terminated the Oppidan Sales Agreement (as amended) on May 4, 2022 and entered into a new agreement with the Debtors on May 4, 2022 (the "New Purchase and Sales Agreement"). The Oppidan Sales Agreement was terminated by Oppidan because certain conditions expected by Oppidan by that time did not occur, specifically, on April 5, 2022, the Medina, Minnesota City Council did not approve the request of Oppidan to amend the Medina Comprehensive Plan to include the 67.1 Acres included in the September 1, 2021 Oppidan Sales Agreement. At that time, the City Council also

3

encouraged Oppidan to come back with a proposal for amendment of the Comprehensive

Plan for the city of Medina with regard to the smaller 30.18 acre parcel (2575 Cates

Ranch Rd a/k/a CRP No. 2),

   The New Purchase and Sale Agreement modified the date of the payments under

the original Oppidan Sales Agreement, reduced the amount of land purchased to CRP

No. 2, paid the Cates $100,000 for the delay caused by having to extend the closing date,

reduced the price of the land to $4,501,000, and extended the various dates for payment

of earnest money and the closing but otherwise ratified the terms of the original Oppidan

Sales Agreement. The New Purchase and Sale Agreement was approved by the judge in

the Bankruptcy Case pursuant to an order entered on May 31, 2022, as ECF No. 187.

   An "Amended New Agreement" was necessary as Oppidan not obtained approval

of the City of Medina of its site plan for the development of CRP No. 2.  Despite its

completion of many of the contingencies necessary for the approval of the Buyer's site

plan, the date for final approval slipped from November of 2022 to April or May of 2023.

Further Oppidan asked for consideration on the price for the sale of CRP No. 2, and the

Debtor agreed to those terms.  The price for the 30.18 acres was changed to $3,400,000

with a contingency payment of up to $600,000 as an additional amount when the Buyer

sells the land to a third party.  Debtor believes that the price to be paid even not including

the additional amount is enough to pay all allowed administrative, secured and unsecured

claims in full. The Amended New Agreement was approved by the Court on

December 15, 2022 [ECF 249].

   The Debtors' primary lender is CorTrust Bank N.A., ("CorTrust") which holds

perfected liens in all of the Cates Properties through five separate mortgages in the total

4

amount of $2,436,750.20 as of January 23, 2023.  Other debts total approximately

$524,833.10[1].  The plan in broad terms provides for payment of all of the allowed claims

in their case in full from the proceeds of the sale to Oppidan Holdings.  Payment to

unsecured creditors under the terms of the Plan will be as quickly as possible after the

closing of the sale of the real estate but in any event no more than ninety (90) days

thereafter. To the extent that the sale to Oppidan does not close or is not enough to pay

their Allowed Claims in full, the Debtors will sell as much of their non-exempt real and

personal property as is necessary to pay all Allowed Claims in full, if possible, as

explained more fully in Article VIII, Section B.[2]

Debtors hereby propose the following plan of reorganization (the "Plan" or "Plan

of Reorganization") pursuant to United States Bankruptcy Code, Title 11 of the United

States Code including provisions for a Subchapter V small business reorganization.

## ARTICLE II. DEFINITIONS

For the purposes of this Plan, the following terms shall have the respective

meanings hereinafter set forth. Any terms contained in this Plan that are not specifically

defined shall have the meaning provided for in the Bankruptcy Code unless the context

otherwise requires. To the extent any term defined herein conflicts with the definition in

---

[1] Medina 55, LLC, the successor in interest to Atkinson Development, LLC has filed a claim in the amount of $1,341,486.07 based on the rejection of the previous purchase agreement between Atkinson and the Debtors.  Debtors believe that the claim is without merit and has objected to the claim.  However, even if such a claim were allowed, it would not change the terms of the Plan.

[2] If the plan is not confirmed as a consensual plan the Bankruptcy Code provides that debtors must pay at least a total to creditors equal to their Projected Disposable Income for three years.  Therefore, the minimum total paid to creditors under the plan will be the total of their Projected Disposable Income for the three years after the Effective Date. Projected Disposable Income is detailed on Exhibit A. This amount is considerably less than Debtors believe will be available from the sale of their non-exempt assets.

the Bankruptcy Code, the Bankruptcy Code definition will prevail.

"Allowed Amount", "Allowed Claim" or "Allowed Interest" means a claim or interest to the extent that:

    (a)   A proof of such claim or interest has been

          (i)    timely filed,

          (ii)   deemed filed pursuant to Bankruptcy Code § 1111(a), or

          (iii)  late filed with leave of the court after notice and opportunity for hearing given to counsel for the Debtors and counsel for the committee of unsecured creditors, if any; and

    (b)   (i)    that is not a contested claim, or

          (ii)   that is allowed (and only to the extent allowed) by a final order.

    (c)   A claim asserted by any professional seeking compensation in connection with this case is an allowed claim only to the extent that the claim is allowed by order of the court after notice and hearing as provided in the Bankruptcy Code.

"Avoidance Actions" means claims made under 11 U.S.C. §§ 510, 542, 544, 545, 547, 548, 549, 550 and 553.

"Bankruptcy Court" or "Court" means this court, a unit of the United States Bankruptcy Court for the District of Minnesota, or any other court having competent jurisdiction to enter an order confirming the Plan.

"Debtors" means Jeffery Cates and Christine Cici-Cates.

"Confirmation Date" means the date of entry of an order confirming the Debtors' Plan.

6

"Effective Date" means the first business day following the 14th day following the filing date of the final order confirming this Plan.

"Interest" means the equity interest of any shareholder in the Debtors.

"Net Proceeds" means the total proceeds received from recoveries under any legal proceeding, including but not limited to any Avoidance Actions, less reasonable costs, expenses and attorneys' fees.

"Plan" means this Chapter 11 plan of reorganization and any amendments, or modifications thereto.

"Projected Disposable Income" has the meaning set out in 11 USC § 1191, that is, the Debtors' projection of the income that is received by the Debtors and that is not reasonably necessary to be expended for the maintenance or support of the Debtors or a dependent of the Debtors or a domestic support obligation that first becomes payable after the date of the filing of the petition; or for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the Debtors.

"Pro Rata Share" means, as to a claimant, the amount determined by multiplying the total amount of Debtors' payment to a particular class by a fraction, the numerator of which is the amount of the claimant's allowed claim and the denominator of which is the total amount of all allowed claims in that class.

ARTICLE III. ESTIMATED CLAIMS, VALUES, AMOUNTS AND OBJECTIONS

Except as otherwise provided herein, the Debtors, or any party in interest, have the right to object to Claims or Interests filed within the bankruptcy proceeding within 30 days of the Confirmation Date, or such other time as the Court may direct. Unless otherwise stated below, the valuations, claim amounts or projected payouts given in this

7

Plan of Reorganization are approximations. The Debtors will examine all Claims and

work to come to agreements with creditors relating to values, claim amounts and the like.

If agreements cannot be reached, Debtors or any party in interest may file any objections

relating to such Claims as are appropriate. Any such Claims for which an objection has

been filed or with respect to which a determination of the amount or value must be made,

shall be paid when, and to the extent allowed or determined by the Court, or as otherwise

agreed to by the Debtors and such claimant, and approved by the Court.

<u>ARTICLE IV: UNCLASSIFIED CLAIMS</u>

Unclassified claims include:

1.      Post-petition claims, incurred in the ordinary course of the Debtors'
        business. [other than those listed in paragraph (3) below].

2.      Allowed administrative expense claims, except as otherwise
        classified herein, including:

        a.      Allowed fees and expenses of professionals for the Debtors
                pursuant to 11 U.S.C. § 503(b)(1)(A);

        and

        b.      Allowed administrative claims under 11 U.S.C. §503(b)(9).

3.      Administrative claims of taxing authorities for post-petition taxes.
        Debtors is current on all post-petition taxes.

<u>Treatment</u>:

The Allowed Amounts of the foregoing claims will be satisfied by payment in full

on the effective date, unless otherwise agreed to by the particular claimant to the extent

not otherwise paid in the ordinary course of business as the same become due or as agreed

upon by a particular claimant. The largest of these claims is likely to be attorney's fees

for Debtors' counsel, estimated at $200,000 who agrees to take payments over time as

available from the cash flow of Debtors or until the sale of assets is closed. Debtors will

continue to pay all court fees and all other trustee fees, including subchapter V Trustee

fees, if any, that come due until the Chapter 11 case is closed, converted or dismissed.

Unpaid Subchapter V trustee fees are estimated at $25,000 or less.  As of the Effective

Date, the duty to file Monthly Operating Reports ceases.

     4.     Pre-Petition Tax Claims under 11 U.S.C. § 507(a)(8)

The IRS has filed a proof of claim for taxes as follows:

    Priority     $  4,704.00

The priority claim of $4,704.00 is included in the unclassified claims.

Hennepin County is owed $11,056.52 for unpaid property taxes. Those taxes will

be considered to be a claim under § 507(a)(8) and treated as set forth below.

<u>Treatment of Any Tax Claims</u>:

The Allowed Amount arising under § 507(a)(8) will, unless otherwise agreed, be

paid, with interest, at the rate set forth in applicable state or federal provisions regarding

interest on unpaid taxes under a plan of reorganization. Such taxes will be payable in

amounts as they become available from either the sale of the Cates Parcels or in equal

monthly payments from the earnings of the Debtors not to exceed 60 months from the

Petition Date.

     5.     Priority claims for pre-petition wages used §11 U.S.C. § 507(a)(4).

These claims, to the extent they exist, and are allowed, are for all wages, salary or

commissions earned under § 507(a)(4) of the bankruptcy code. Debtors as individuals do

not have any employees and therefore believe that there are no such claims.

<u>Treatment</u>:

Such claims will be paid, in full, on the Effective Date, or according to the term of

any agreement with any such claimholder. Again, Debtors believe that there are no such claims.

ARTICLE V. CLASSIFIED CLAIMS

A.      <u>Class I: Claim of CorTrust Bank (Impaired)</u>

CorTrust Bank has four loans with the Cates as individuals and two loans with Cates Construction which Jeffrey Cates personally guaranteed. As of January 23, 2023, the loans owed to CorTrust, including unpaid post-petition interest fees and costs, total $2,436,750.20. All loans are secured by first-priority mortgages against the Cates' real property as described below. The Cates have been unable to make payments on the mortgages during the course of the Chapter 11 due to the cash flow issues identified above. However, the Cates have made adequate protection payments to CorTrust, including $75,000 for the period through July 1, 2023. [*See* ECF No. 249, ¶ 12.] The loans are secured by four mortgages on the following parcels owned by the Cates:

| | |
|---|---|
| 2400 Cates Ranch Rd | LOT 1, BLOCK 1, CATES RANCH, HENNEPIN COUNTY, MINNESOTA |
| 2575 Cates Ranch Rd a/k/a CRP No. 2 | LOT 1, BLOCK 1, CATES RANCH SECOND ADDITION, HENNEPIN COUNTY, MINNESOTA. |
| 2590 Cates Ranch Rd a/k/a CRP No. 3 | Lot 3, Block 1, CATES RANCH, Hennepin County, Minnesota. |
| CRP No. 1 -XXX Willow Drive | LOT 1, BLOCK 2, CATES RANCH SECOND ADDITION, HENNEPIN COUNTY, MINNESOTA |

<u>Treatment:</u>

10

CorTrust will have an allowed secured claim against the Debtors in the amount of $2,436,750.20, plus any additional post-petition interest, fees and costs that accrue after January 23, 2023 under CorTrust's loans.  The loans with CorTrust will be re-written with all previous terms remaining the same except that the loans' due date will be extended by the number of months between the Petition Date and the Effective Date and the amounts due to CorTrust that have been unpaid during the course of the Chapter 11 will be added to the principal of the loans.  CorTrust will retain all liens to secure its claim.  The loans will continue to be encumbered by the existing mortgages until they are paid in full.  No payments will be made to CorTrust until the sale of the real estate contemplated by this plan is/are completed.  Except as otherwise expressly provided by this Plan, all terms and conditions of CorTrust's loan documents will remain in full force and effect.

Upon the closing of the sale to Oppidan Holdings or any other buyer, CorTrust's allowed secured claim will be paid in full within ten (10) business days.

Also upon the closing of the sale to Oppidan Holdings or any other buyer, after paying any sales commissions and expenses of the sale, the Debtors shall hold as much of the net proceeds of the sale as necessary to pay Cor Trust's claims in a segregated bank account until further order of the Court, or, if the sale is closed after the Effective Date, the Allowed Claim of CorTrust shall be paid in full from the net proceeds of the sale. As adequate protection under 11 U.S.C. § 363(e), all liens against the Cates Properties (including the liens held by CorTrust Bank, N.A.) shall automatically transfer and attach to the net proceeds of the sale in the same order, priority, and validity as they had with respect to the Cates Properties immediately before the sale. No further action shall be

11

required to perfect the lienholders' interest in the net sale proceeds.

If the sale to Oppidan Holdings does not close by August 1, 2023 or is otherwise
terminated, CorTrust will be paid in full after a public auction or auctions of some or all
of the Debtors' real estate as described in Article VIII, below.  The auctions will take
place within ninety (90) days after the earlier of: (i) the date the Debtors' purchase
agreement with Oppidan is terminated, or (ii) August 1, 2023 (by October 30, 2023).

In the event that CorTrust's allowed secured claim is not paid in full for any
reason, CorTrust will have an allowed Class III general unsecured claim in the amount of
the unpaid portion of its claim, provided that CorTrust's Class III general unsecured
claim shall not include any post-petition interest, fees or costs.  In the event that
CorTrust's allowed secured claim is not paid in full for any reason, CorTrust will retain
all claims it possesses against Cates Construction and all liens against Cates
Construction's assets, to secure its unpaid claim.

B.      Class II: Vehicle Loan: Claims of Ally Bank (Unimpaired).

Ally Bank has a secured loan on a 2015 Lincoln MKC Sports Utility Vehicle
(VIN 5LMTJ2QH5FUJ3473) in the amount of $12,157.94.

Treatment:

To the extent that any payments on the vehicle loan have been missed during the
pendency of the Chapter 11, those payments will be made up on the Effective Date (the
last payment made pre-petition covered the loan payments through December of 2021).
The terms of the loan with Ally Bank will continue as written. The Debtors will continue
to pay on the vehicle loan to Ally Bank until it is paid in full.

C.      Class III: General Unsecured Claims (Impaired).

This class shall consist of allowed unsecured claims not entitled to priority and not treated in any other class in the Plan. The claims in Class III are scheduled by the Debtors in the amount of $524,833.10[3], not including the $1,341,486.07 claim filed by Medina 55 Holdings, LLC. If the claim of Medina 55 Holdings is allowed, that creditor would be a Class III creditor entitled to a pro rata share of any payments to members of that class.

Treatment:

The holder of a Class III Allowed Claim shall be paid the Pro Rata Share of any remaining proceeds of any sale of non-exempt assets after the unclassified claims, secured claims in Class I and II and all administrative claims have been paid in full. If the sale of CRP No. 2 to Oppidan Holdings does not close by August 1, 2023, interest will be paid on the Class III claims, assuming the proceeds of any sale of all non-exempt assets described in the plan exceed the total owed to the unclassified claims, the secured claims, the administrative claims and 100% of the allowed Class III claims.  The amount of any interest owed to Class III claims will be paid at the federal judgment rate in place as of the Petition Date (.05% per annum). If the net proceeds of any sale of non-exempt property are insufficient to pay all of the Allowed Class III Claims with interest, then the interest will be paid pro rata to the extent of available funds.

Upon the sale of CRP No. 2 contemplated by the Plan, the pro rata portion of any proceeds that would be paid to Medina 55 Holdings if its claim were allowed will be escrowed by the Debtors until the allowance of their claim is settled or is subject to a final non-appealable order allowing the claim in whole or in part.  Assuming the sale of

---

[3] This assumes that the claim of Granite RE will be reduced to $344,371.22 as explained below.

CRP No. 2 is closed no later than August 1, 2023 and that sale results in the full payment

of CorTrust's Allowed Claim, all Allowed Administrative Claims, and all unclassified

claims that are then due, no further sale, liquidation or auction of the Debtor's property

will take place until the objection to Medina 55's claim is settled or is subject to a final,

non-appealable order allowing the claim in whole or in part. After that determination, any

funds from the sale of CRP No. 2 that are escrowed for the purpose of paying any

Allowed Claim of Medina 55 that are in excess of Medina 55's Allowed Claim will be

redistributed to the Allowed Claims of the other Class III creditors pro rata up to an

amount necessary to pay their Allowed Claims in full under the terms of this Plan.

Debtors believe that they will be able to pay all Allowed unsecured claims in full

from the sale of CRP No. 2 to Oppidan Holdings, which the Debtors believe will close no

later than August 1, 2023. Payment to Class III Allowed Claims shall be as fast as

possible after the closing, or after the allowance of any claim, whichever comes later but

no later than 90 days thereafter. If the Oppidan sale fails to close, the Debtors will re-list

all or part of the Cates Parcels and their non-exempt personal property for sale as set forth

in Article VIII below.  The Debtors will pay the unsecured creditors from the net

proceeds of any sale of non-exempt real or personal property after all unclassified claims,

secured claims and administrative claims are paid in full. Per the Bankruptcy Code, 11

U.S.C. § 1191(b), in case of a confirmation by cram down, the plan payments to

unsecured creditors must be equal to or greater than the Projected Disposable for the

three years (or up to five years if the court so rules) after the Effective Date. In the case of

the Debtors, that amount is $43,936.63 for three years (see Exhibit A).

## ARTICLE VI. IMPAIRMENT OF CLASSES OF CLAIMS AND INTERESTS UNDER THE PLAN

Classes I and III are impaired under the Plan.  Class II is unimpaired.

## ARTICLE VII. GENERAL PROVISIONS

A.      Payments under this Plan will be made by check, mailed postage prepaid, to the Claimant at the address listed on its proof of claim or, if no proof of claim has been filed, to the address listed on the schedule.

B.      Except as to the Claims of Taxing Authorities, Debtors reserves the right to designate the application of any payment on a Claim under this Plan.

C.      In the event a payment is returned to Debtors unclaimed, with no indication of claimant's forwarding address, Debtors will hold such payment for a period of 60 days from the date of return. If not claimed by claimant by the end of that period, the payment shall become the property of the Debtors.

D.      Proofs of Claims or Interests not timely filed and not otherwise scheduled will not participate in distributions under this Plan and will be discharged under Bankruptcy Code § 1141(d) or § 1192 unless otherwise ordered by the Court.

E.      In the event this Plan is not confirmed under the Bankruptcy Code § 1191(a), the Debtors requests this Plan be confirmed under Bankruptcy Code § 1191(b).

F.      G      Any creditor holding a deposit, including but not limited to utilities, shall return the full amount of the deposit, without the right to set off, as soon as practicable following consummation of this Plan.

15

G.      As of the Confirmation Date, the Debtors will continue to run their own

affairs and distribute the payments due creditors unless the plan is confirmed under 11

USC § 1191(b) in which case payments shall be made by the Subchapter V Trustee, Mary

Sieling, or her successor or as otherwise provided by the Confirmation Order.

H.      Contingent, unliquidated, or contested Claims will be paid to the extent

and manner agreed upon by the Debtors and the affected parties as approved by the

Court, or as liquidated by the Court after hearing, as a general unsecured Claim under

Class III. If any contested claim is unresolved by the time of the real estate being sold

under the terms of the Plan has been sold, the Debtors will set up a reserve account in the

amount of that/those contested claim(s) or a pro rata portion of that/those claims if the net

proceeds of the sale of real estate contemplated by the plan fails to provide for payment

in full of all Class III creditors until such time as that contested claim is resolved.

I.      Any funds or benefits received by the Debtors by virtue of any adversary

proceedings, lawsuit or any proceeding, claim, or any other legal right assertable by the

Debtors under the Bankruptcy Code, or other law, shall remain the property of the

Debtors, and may be used by the Debtors to fund the Plan. Debtors knows of no such

claims.

J.      If the Effective Date or any other date on which a transaction may occur

under this Plan shall occur on a day that is not a Business Day, the transactions

contemplated by this Plan shall occur on the next succeeding Business Day.

## ARTICLE VIII. MEANS OF EXECUTION OF PLAN AND FEASIBILITY

A.      Sale of Real Estate and Non-Exempt Personal Property

The Debtors have determined in their business judgment, that it is in the best

16

interest of the creditors to sell as much of their real estate and non-exempt personal property as necessary to pay the Allowed Claims in full, if possible.

Under the provisions of the Bankruptcy Code, a creditor having a lien or security interest in the assets of the Debtors will have a secured claim only up to the value of the collateral securing the claim.

An appraisal of the Debtors' 36.92 acre parcel of real estate (CRP No. 3) subject to the original September 1, 2021 Oppidan Sale Agreement was done in 2017, valuing the parcel at $1,070,000 assuming that the parcel could not be developed and noting that the value would be significantly increased if the property could be developed.[4] An appraisal of the Debtors' 30.18 acre parcel of estate (CRP No. 2) subject to the Oppidan New Agreement was done in 2020 valuing the parcel at $1,100,000 assuming that the parcel could not be developed and also noting that the value would be significantly increased if the property could be developed.[5] No more current appraisals are available but the Debtors believe that a fair market value of all of the Cates Parcels in a non-developed state is $4,600,000 as set forth in the schedules filed with the bankruptcy petition.

Based on the superior claims of the secured creditors, the unclassified claims, unpaid administrative claims and the Debtors' agricultural exemption allowance, Debtors estimate that they would have to receive net proceeds of $ 4,097,751.56 to pay non-disputed unsecured creditors in full (with interest), and $ 5,439,237.63 if the Disputed Claim of Medina 55 is allowed in full (with interest). See the Liquidation Analysis,

---

[4] The voluminous 2017 appraisal, previously served upon all creditors with the First Modified Plan is not attached but is available through Debtor's counsel.

[5] The voluminous 2020 appraisal, previously served upon all creditors with the First Modified Plan is not attached but is available through Debtor's counsel.

Exhibit C, attached.

As set out in Article V, above, the holder of a Class III Allowed Claim shall be paid the Pro Rata Share of any remaining proceeds of any sale of any assets after the unclassified claims and secured claims in Class I and II and all administrative claims have been paid in full. If the net proceeds of any sale of non-exempt property are insufficient to pay all of the Allowed Class III Claims with interest, then the interest will be paid pro rata to the extent of available funds.  If the closing of CRP No. 2 takes place before August 1, 2023, proceeds of the sale will be distributed as set forth under the terms of the Plan set forth above.

B.      Payments to Creditors If Sale of the Real Estate is Delayed

If the sale to Oppidan Holdings does not close by August 1, 2023 or is otherwise terminated, Debtors will within 90 days sell enough of their real estate and non-exempt personal property at a public auction in an amount necessary to pay the Class I allowed secured claim, administrative claims, unclassified claims, and make such payments to Class III Allowed Claims up to 100% of allowed claims without interest as are available after all unclassified claims, Class I and Class II claims, administrative claims are paid and the Debtors' $1,125,000 exemption allowance on their 19 acre homestead is accounted for.[6]  Such an auction is estimated to cost between 6 and 10% of the gross proceeds.  The auction will take place within ninety (90) days after the earlier of: (i) the

---

[6] There is a dispute over whether the Debtors are entitled to a $450,000 homestead exemption or the $1,125,000 agricultural homestead exemption. The Debtors believe that all the creditors will be paid their Allowed Claims in full as set forth under the terms of the plan. Therefore, this issue may never need to be decided, Therefore, rather than determining the issue at the time of confirmation, if the amount of the Debtors' homestead exemption ends up being determinative of the amount that the creditors will receive, the Bankruptcy Court will retain jurisdiction over determination of the appropriate amount of homestead exemption the Debtors are entitled to.

date the Debtors' purchase agreement with Oppidan is terminated, or (ii) August 1, 2023

(by October 30, 2023. If the Plan is confirmed as consensual then the Debtors will be in

charge of the auction and the distribution of proceeds.  If the Plan is confirmed as a non-

consensual plan then the Subchapter V Trustee shall be in charge of the auction, except

that the real estate of the Debtors will be sold in four groups in the following order:

**Group One:**

36.92 acres of land having an address 2590 Cates Ranch Drive, Parcel No. 04-118-23-11-
0002, and legally described as Lot 3, Block 1, CATES RANCH, Hennepin
County, Minnesota located in the City of Medina, County of Hennepin, State of
Minnesota ("CRP No. 3") - minimum bid will be the unpaid amount of the
allowed secured claim of the Class I creditor, currently at $2,436,750.20 as of
January 23, 2023 unless the minimum is waived by CorTrust Bank.

**Group Two:**

6.09 Acres - Address Unassigned, Medina MN 00000 (PID 0411823140005) CRP 1 -
minimum bid will be the amount of the unpaid allowed secured claim of the Class
I creditor, currently at $2,436,750.20 as of January 23, 2023 unless the minimum
is waived by CorTrust Bank.

**Group Three:**

30.18 Acres - 2575 Cates Ranch Dr, Medina MN 55340 (PID 0411823140004) (CRP No.
2 (currently under contract to sell to Oppidan Holdings)) - minimum bid will be
the amount of the unpaid allowed secured claim of the Class I creditor, currently
at $2,436,750.20 as of January 23, 2023 unless the minimum is waived by
CorTrust Bank.

**Group Four:**

19.41 Acres - 2400 Cates Ranch Dr, Medina MN 55340 (PID 0311823220002) (Cates
Homestead) - minimum bid will be the amount of the Cates claimed agricultural
homestead exemption, $1,125,000.00 unless waived by the Debtors, provided
that, in the event any portion of CorTrust's allowed secured claim remains unpaid,
this minimum bid amount shall not apply to CorTrust.

3.67 Acres - Address Unassigned, Medina MN 00000 (PID 0311823220004) (Separate
plat for Cates Ranch Drive)

All remaining non-exempt real and personal property of the Debtors that exists as
of the date of the auction, including any non-exempt property and earnings

19

acquired by the Debtors after the date of confirmation of the Plan.

If, at any time, the Debtor and the Subchapter V Trustee agree that the net proceeds of the sale of one or more group of properties is sufficient to pay all Allowed Claims in full with interest as described above, at the discretion of the Debtors, all further auctions of the Debtors property will be halted and the plan payments will be made from the proceeds of the properties already sold.

The Subchapter V Trustee will also be in charge of the hiring of the auctioneer (which cannot be the Debtors themselves) and distribution of the proceeds.  Based on the equity in the properties owned by the Debtors, Debtors believe but cannot guarantee that all Allowed Claims of all creditors will be paid in full through the eventual liquidation of all or part of the Cates Parcels and other non-exempt assets.[7]

At any auction of the Debtors' property, the minimum bid for the property shall be the unpaid amount of CorTrust's allowed secured claim, unless CorTrust agrees otherwise in writing.  At any auction of the Debtors' property, CorTrust shall be entitled to participate in the auction and credit bid the unpaid amount of its allowed secured claim, or any portion thereof, to purchase the property.  In the event the auction does not take place within 90 days, any party in interest (including CorTrust and the Subchapter V bankruptcy trustee) shall be entitled to bring a motion on an expedited basis to enforce the Plan, including seeking relief from the automatic stay or conversion or dismissal of the Debtors' bankruptcy case.

---

[7] The Debtors believe that this liquidation of all non-exempt assets provides the basis for the Court to conclude that the Debtors have met the threshold of 11 USC § 1191(c)(3)(ii)(B) if the plan is confirmed as non-consensual.

C.     Claims of Granite Re, Inc.

With regard to the claim of Granite Re, Inc., the Debtors are personally guaranteed on this Class III claim that is owed by J.S. Cates Construction, Inc. (Bankr. No. 21-40881).  Granite Re, Inc. has settled an Adversary Action in the case of J.S. Cates Construction, Inc. (Granite Re, Inc. v. J.S. Cates Construction, Inc., et. al., Adv. No. 22-4004). The complaint alleged that Granite Re had a superior interest in the receivables being collected post-petition by the corporate debtor. The settlement recognized this priority as pleaded in the complaint. After payment of all accounts receivable collected under the settlement in Adv. No. 22-4004, Granite Re's claim in this Chapter 11 is approximately $344,371.22 and that is the estimated amount of claim used for the purposes of estimating payments under this Plan to unsecured creditors.

The stipulation between Debtors and Granite Re settled the adversary as follows:

1.     Assuming Granite Re's claim in the converted JS Cates Construction, Inc. Chapter 7 are received by Granite Re prior to the distributions to Granite Re under the plan, Granit Re will amend their claim against the Cates in their individual Chapter 11 to take into account that payment, dollar for dollar.

2.     Assuming Granite Re's claim in the converted JS Cates Construction, Inc. Chapter 7 will be received by Granite Re after the distributions to Granite Re under the plan, assuming Granite Re is paid its Allowed Claim under the plan in full, Granite Re will assign Granite Re's remaining claim in the J.S. Cates Construction, Inc. estate, if any, to the Cates. Counsel for J.S. Cates shall prepare and submit to Granite Re's counsel such assignment documents as necessary.

3.     Granite Re agrees to support the Third Modified plan of reorganization in the Personal Chapter 11 or any modification of that plan that doesn't negatively impact payment to unsecured creditors, and Granite Re shall withdraw any objections previously filed.

4.     The Debtors agree to have its debt to Granite Re be declared to be non-dischargeable.

21

5.     Mutual releases will be exchanged effective upon payment in full of Granite Re's Allowed Claim.

The stipulation was approved by the Court on August 30, 2022 [ECF 200].

D.     Avoidance Actions

Debtors have investigated potential causes of action and believe that there are no significant avoidance recovery available that would exceed the cost of litigation.  They reserve the right to bring any Avoidance Action for the benefit of unsecured creditors under the terms of this plan if further facts become known. Because no estimate of recovery of any potential claims is available, no amount has been included in the exhibits attached that show available proceeds to unsecured creditors. In addition to Exhibit C, which is the liquidation analysis, Debtors have attached Exhibit D which is a "waterfall" analysis of payments listed under the terms of the plan.

E.     Plan Implementation.

If the plan is confirmed as a consensual plan under 11 USC §§ 1129(a) and 1191(a), Debtors shall implement the plan and pay creditors directly. Pursuant to 11 USC § 1190(2), if the plan is confirmed as a cramdown under 11 USC § 1191(b), all of the future earnings and proceeds from the sale of assets of the Debtors will be submitted to the supervision and control of the Subchapter V trustee under the terms and time limits set out in Article VIII as necessary for the execution of the plan. In that case, unless the Confirmation Order provides otherwise, creditors shall be paid through Mary Sieling, c/o Manty & Associates, 150 S 5th St. St. 3125, Minneapolis MN 55432, or via email at Mary@mantylaw.com. Unsecured creditors will be paid in one payment after sufficient assets of the Debtors are liquidated. If the liquidation of the assets of the Debtors is insufficient to pay Class III creditors in full and if the Debtor pursues any Avoidance

Actions, the proceeds of the Avoidance actions will be paid separately to Class III

creditors after the conclusion of all Avoidance Action Proceedings.  Any questions

concerning provisions of the plan shall be directed to the Debtors at jeff@catesco.com or

chris@catesco.com. Payments will be made by check, mailed postage prepaid, to the

Claimant at the address listed on its proof of claim or, if no proof of claim has been filed,

to the address listed on the schedules. The Debtors, after confirmation, will continue to

manage their remaining affairs as a liquidating agent for the purpose of liquidating the

assets necessary under the terms and time limits of Article VIII of the plan, subject to the

supervision of the subchapter V trustee as provided herein. If the Plan is confirmed under

11 U.S.C. § 1191(a), the Debtors will file a Notice of Substantial Consummation not later

than 14 days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2). The

Debtors will provide or pay all of the Debtors' expenses and business debts arising post-

confirmation in the ordinary course of business. Notwithstanding the forgoing, so long as

the estate exists post-confirmation, any post-confirmation fees or costs owed to

professionals, including fees of the Subchapter V Trustee and any professionals working

for the Reorganized Debtors shall be subject to approval by the Court pursuant to 11

U.S.C. § 503(b). Upon Court approval of any such post-confirmation administrative

expenses, the Debtors will pay such approved administrative expense in the ordinary

course of business, unless otherwise agreed to by the particular claimant.

   Debtors estimates that it will have no other expenses in that regard other than

Subchapter V Trustee's fees and administrative expenses for professionals to carry out

any avoidance litigation and to provide service to the Debtors to prepare documents

necessary to affect a sale of the real estate of the Debtors and assist the Debtors in the

closing of the sale or sales.

## ARTICLE IX. EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND ADMINISTRATIVE CLAIMS

Attached to this Plan and marked as Exhibit B is a list of the executory contracts and leases to which the Debtors are a party. As to each such contract or lease except as provided in the Plan, the Debtors will continue to pay on the lease until the assets are sold or abandoned. If any executory contracts or leases are not listed on Exhibit B, said lease or contract shall be deemed rejected, if not previously rejected, as of the Confirmation Date.

Unless otherwise ordered by the Court, any party holding a pre-confirmation Administrative Claim which has received a copy of this Plan, shall have thirty (30) days following the confirmation date to file a request for payment of pre-confirmation administrative expenses pursuant to the applicable provisions of the Bankruptcy Code and Rules. So long as the estate exists post-confirmation, any claims for post-confirmation administrative expenses are subject to approval by the Court pursuant to 11 U.S.C. § 503(b) and shall be filed no later than thirty (30) days after the final payment of any Allowed Classified Claim by the Debtors. Failure to file such a request in a timely manner shall be deemed a waiver of the claim and the Debtors shall not be obligated to pay such claim.

## ARTICLE X. MODIFICATION OF THE PLAN

The Debtors hereby reserve the right to amend or modify the Plan in the manner provided for under 11 U.S.C. § 1191 or § 1193, at any time prior to confirmation, or if allowed by the Court, at or after confirmation. Debtors reserve the right to amend the Plan or remedy any defect or omission, or reconcile any inconsistencies of the Plan, or

24

the order of confirmation, in such manner as may be necessary to carry out the purpose

and effect of the Plan or ensure confirmation.

## ARTICLE XI. CONTINUING JURISDICTION OF THE BANKRUPTCY COURT

The Bankruptcy Court shall retain jurisdiction over the Debtors' property, after

confirmation of the Plan, for the purpose of enforcing the provisions of the Plan,

including without limitation, the determination of the amount of Allowed Claims, the

hearing of objections, if any, to Claims, for estimating any contingent or unliquidated

Claims, for conducting adversary proceedings, actions to subordinate Claims under

§ 510, to conduct any actions which may be properly removed to the Bankruptcy Court,

and for other proper purposes related to this Plan.

## ARTICLE XII. RESERVATION OF ALL RIGHTS, CLAIMS, ACTIONS

General Reservation. Debtors reserve all of their rights, at law or in equity, not

otherwise specifically modified by this Plan, to object to claims, commence adversary

proceedings or other legal actions, and take any other legal action allowed by the

Bankruptcy Code or other applicable law, and use the Net Proceeds thereof to fund

operations or this Plan.

## ARTICLE XIII. DISCHARGE, RELEASE, AND EFFECT OF CONFIRMATION

The provisions in the Bankruptcy Code for Subchapter V Chapter 11 cases shall

govern the effect of confirmation of this plan. Upon confirmation of this plan, whether

through acceptance of all classes of creditors or otherwise, then the Debtors will receive a

discharge as provided under 11 USC § 1192 after completion of all payments due within

the term of the plan. After that discharge is entered, the order discharging the Debtors

shall constitute a complete waiver and release and satisfaction of all Claims of all

25

creditors and shareholders against the Debtors, to the full extent allowed under

bankruptcy law, except as otherwise as provided by the Plan. This discharge and release

shall include any purported liens, encumbrances, or security interests claimed by a

claimant or any other entity against property of the debtor, or property dealt with by the

Plan, except such liens as are expressly stated to survive confirmation. On the Effective

Date, except as otherwise as provided by the Plan, Debtors shall be restored to its full

ownership and dominion over all property and assets owned by it, which property shall

be properly dealt with by the Plan, pursuant to Bankruptcy Code § 1141(c).

ARTICLE XIV. MISCELLANEOUS PROVISIONS

The headings of the articles, sections and subsections of this Plan are inserted

for convenience only and shall not affect the interpretation hereof.

The rules of construction used in Section 102 of the Bankruptcy Code shall apply

to the construction of this Plan of Reorganization.

Except to the extent that the Bankruptcy Code or other Federal law is

applicable, the rights, duties and obligations arising under this Plan of

Reorganization shall be governed by, construed and enforced in accordance with the

internal laws of the State of Minnesota.

The rights, duties and obligations of any person or entity named or referred to in

this Plan shall be binding upon and shall inure to the benefit of the successors and assigns

of such person or entity.

The Remainder of this page is intentionally blank.  Execution page follows.

**JEFFERY CATES**

Dated: 2-9-23

**CHRISTINE CICI-CATES**

Dated: 2-9-23

EXHIBIT A

**POST CONFIRMATION PROJECTION OF DISPOSABLE INCOME FOR**

**THREE YEARS**

**(see attached)**

| Period | Monthly | Year One | Year Two (Year One plus 2%) | Year Three (Year Two plus 2 %) | Totals |
|---|---|---|---|---|---|
| Income | | | | | |
| Christine Net Income | $ 2,400.00 | $ 28,800.00 | $ 29,376.00 | $ 29,963.52 | $ 88,139.52 |
| Jeff Net Income | $ 10,000.00 | $ 120,000.00 | $ 122,400.00 | $ 124,848.00 | $ 367,248.00 |
| Rental Income | $ 2,800.00 | $ 33,600.00 | $ 34,272.00 | $ 34,957.00 | $ 102,829.00 |
| Contribution from Tax refunds | $ - | $ - | $ - | $ - | $ - |
| Total Income | $ 15,200.00 | $ 182,400.00 | $ 186,048.00 | $ 189,768.52 | $ 558,216.52 |
| | | | | | |
| Expenses | | | | | |
| Mortgage (interest only next 18 months, assumes pay out to Cor Trust no later than 18 months after confirmation Date) | $ (8,500.00) | $ (102,000.00) | $ (51,000.00) | $ - | $ (153,000.00) |
| Administrative Claim for Post-Petition Real Estate Taxes (assumes will be paid at sale of CRP No. 2 after 18 months if not sooner per terms of plan) | $ (230.00) | $ (2,760.00) | $ (1,380.00) | | $ (4,140.00) |
| Current Real Estate Taxes | $ (1,000.00) | $ (12,000.00) | $ (12,240.00) | $ (7,275.00) | $ (31,515.00) |
| Electricity, Heat, Natural Gas | $ (150.00) | $ (1,800.00) | $ (1,836.00) | $ (1,872.00) | $ (5,508.00) |
| Repairs and Maintenance | $ (400.00) | $ (4,800.00) | $ (4,896.00) | $ (4,993.00) | $ (14,689.00) |
| Century Link-Direct TV | $ (170.00) | $ (2,040.00) | $ (2,080.80) | $ (2,122.00) | $ (6,242.80) |
| Food and Housekeeping Supplies | $ (650.00) | $ (7,800.00) | $ (7,956.00) | $ (8,115.00) | $ (23,871.00) |
| Personal Care products and services $25/month | $ (150.00) | $ (1,800.00) | $ (1,836.00) | $ (1,872.00) | $ (5,508.00) |
| Entertainment, recreation | $ (200.00) | $ (2,400.00) | $ (2,448.00) | $ (1,248.48) | $ (6,096.48) |
| Health and Wellness | $ (650.00) | $ (7,800.00) | $ (7,956.00) | $ (8,115.00) | $ (23,871.00) |
| Transportation | $ (800.00) | $ (9,600.00) | $ (9,792.00) | $ (9,987.00) | $ (29,379.00) |
| Ch 11 Professional Fees (Assumes all fees paid at closing of CRP No. 2 in month 18 if not sooner) | $ (1,500.00) | $ (18,000.00) | $ (182,000.00) | $ - | $ (200,000.00) |
| Ally Car Loan | $ (490.00) | $ (5,880.00) | $ (5,880.00) | $ (1,000.00) | $ (12,760.00) |
| American Family InsuranceCar | $ (1,600.00) | $ (2,288.88) | $ (2,334.66) | $ (2,381.35) | $ (7,004.89) |
| Total Expenses for Period | $ (16,490.00) | $ (180,968.88) | $ (293,635.46) | $ (48,980.83) | $ (523,585.17) |
| Net Projected Disposible Income | | $ 1,431.12 | $ (107,587.46) | $ 140,787.69 | $ 34,631.35 |

Exhibit A, Disposable Income

EXHIBIT B

**LIST OF EXECUTORY CONTRACTS**

| **PARTY** | **TYPE** | **ASSUME / REJECT** |
|---|---|---|
| SJS FARMS | FARM LEASE (2021-22) | Assume |
| North Metro Company | Farm House Lease | Assume |

EXHIBIT C

**LIQUIDATION ANALYSIS**

**Personal Property**:

The Debtors have listed non-exempt personal property at $509,614.00 in their schedules. Of that amount the Cates have exempted approximately $30,000 under Minnesota exemption statutes for their personal belongings. Of the remaining $479,614.00, $325,000 is value attributed to JS Cates Construction, Inc. and JS Cates Companies, Inc. (which have now merged and converted to Chapter 7). The Cates believe that the net liquidation value of their interest in the corporation is $0.00. Of the remaining $154,614.00 in value, the Debtors own an interest in two apartment complexes valued at a total of $100,000 which the Cates believe they could receive if they had to sell those interests. The other miscellaneous assets in the amount of $54,614.00 would likely have to be sold at a significant discount but for the sake of this liquidation analysis those items will be valued at the amounts listed in the Debtors' schedules. That means that the total liquidation value of the personal assets of the Debtors is $154,614.00.

**Real Property**:

In addition, the Debtors have the five Cates Parcels, one of which (CRP No. 2, approximately 30.19 acres) is under contract to be sold to Oppidan Holdings, LLC for $3,400,000. Debtors believe that with a closed sale to a developer that the Real estate value for all parcels is in excess of the total Allowed Claims. Without a

3

sale to a developer, in other words, if the Oppidan deal falls through and there are

no other buyers of the Cates Real Estate for development that the Real Estate is

worth approximately $4,600,000 per their schedules filed with the bankruptcy Court

if given time to sell the property. The plan provides that, if the Oppidan sale or the

sale of CRP No. 2 to another developer does not close by August 1, 2023, the

Debtors will sell as much of their real estate and non-exempt personal property as

they need to pay their creditors in full. In the case of this type of liquidation sale, the

unsecured creditors would be subordinate in priority to the approximate $2,400,000

claim of CorTrust Bank, which is secured by the Cates Parcels;; the priority claims

in an amount of approximately $15,760.52; unpaid administrative claims in the

estimated amount of $225,000; and the Debtors' entitlement to their $1,125,000.00

exemption under Minnesota Statutes § 510.01, et. sec., for the 19-acre parcel that is

homesteaded and not currently under contract to be sold. Therefore, the Plan itself

provides for liquidation of assets at a higher price than could be obtained in a forced

sale.

   A forced sale of real estate is the alternative that creditors should weigh

against the plan's proposal to sell enough property to pay the creditors in full or as

much as possible by selling their real estate and non-exempt personal property in an

orderly sale.  The only reason that the Debtors foresee for not being able to sell their

property at a high enough value to pay their creditors in full would be if their

property, currently zoned as agricultural farmland, was not allowed to be rezoned

for other purposes. As of July 19, 2022, the initial vote of the Medina City Council

to allow commercial development of CRP No. 2 makes that rezoning likely but not

guaranteed. In addition, the rezoning of CRP No. 2 makes all the Cates property

more likely to be approved for development in the future and thus, at a properly

advertised auction, more valuable. Again, Debtors will sell as much of their

property under the terms of the Plan to pay off all creditors in full. If the price that

they receive for their non-exempt assets (the vast majority of which is tied up in

their real estate) is less than the total of all unclassified and classified Allowed

Claims the unsecured creditors will receive whatever net proceeds are available

after higher priority claims are paid.

The purpose of the liquidation analysis is to provide information as to what

the assets of the Debtors could be sold as an alternative to accepting the plan.  Since

the real estate that the Debtors own, as of the time of the filing of the bankruptcy

was zoned as agricultural farmland, for purposes of this liquidation analysis, the

Debtors assume that the property would be liquidated via foreclosure at no more

than tax value. The two most recent appraisals of the Debtors' land support these

valuations.

The tax value for the five parcels is as follows:

1.    2400 Cates Ranch Dr, Medina MN 55340 (PID 0311823220002) (Cates
      Homestead)

      Acreage: 19.41

      2021 Market Value: $1,079,300

5

2.      2590 Cates Ranch Dr, Medina MN 55340 (PID 0411823110002) (A/K/A "CRP 3" (under contract to sell to Oppidan Holdings))

Acreage: 36.92

2021 Market Value: $242,900

3.      2575 Cates Ranch Dr, Medina MN 55340 (PID 0411823140004) (A/K/A "CRP2" (under contract to sell to Oppidan Holdings))

Acreage: 30.18

2021 Market Value: $453,900

4.      80 Address Unassigned, Medina MN 00000 (PID 0411823140005) (largely wetland)

Acreage: 6.09

2021 Market Value: $10,600

5.      80 Address Unassigned, Medina MN 00000 (PID 0311823220004) (separate plat for Cates Ranch Drive)

Acreage: 3.67

2021 Market Value: $1,400

Total for all five parcels at liquidation: $1,788,100.00.

Personal Property Liquidated Value:  $154,614.00.

**Total of Liquidation Value: $1,942,714.00**

Secured Debt:

Cor Trust: $2,436.750.00

Priority Claims: $15,760.52

Unpaid Administrative Claims: $225,000 (estimate)

Exemption allowance of Debtors for Real Estate: $1,125,000.00

**Net Available to Unsecured Creditors at forced liquidation:  $0.00.**

Total Scheduled unsecured debt: $524,833.10 (not including disputed

$1,341,486.07 claim of Medina 55 Holdings, LLC).

**Net Proceeds of sale of assets needed to pay non-disputed unsecured creditors**

**in full without interest:**

**$ 4,327,343.82**

Disputed Claim of Medina 55:       $1,341,486.07

**Net Proceeds needed to pay unsecured creditors in full if Medina 55 claim is**

**allowed in full without interest:**

**$ 5,668,829.89**

<u>EXHIBIT D</u>

**<u>WATERFALL ANALYSIS</u>**

4877-9827-8989, v. 2

| Claim | Amount | Estimated Available Proceed from CRP 1 and 3 | Estimated Net Sale Price for CRP No. 1 and 3 | Remainder after paying Claim if applicable |
|---|---|---|---|---|
| Closing Costs | Estimated at 10% | $          4,500,000.00 | $          4,050,000.00 | |
| Secured Debt of CorTrust | $       (2,436,750.20) | $          4,050,000.00 | | $          1,613,249.80 |
| Secured Debt Ally Bank for Lincoln SUV | Paid monthly | $          1,613,249.80 | | $          1,613,249.80 |
| Administrative Costs | $          (225,000.00) | $          1,613,249.80 | | $          1,388,249.80 |
| Priority Claims | | | | |
| IRS | $              (4,704.00) | $          1,388,249.80 | | $          1,383,545.80 |
| Hennepin County | $            (11,056.52) | $          1,383,545.80 | | $          1,372,489.28 |
| Unsecured Creditors (Assuming Granite RE claim is reduced to $344371.22 and Medina 55 claim is disallowed)- includes one year of .05% interest) | $          (551,074.76) | $          1,372,489.28 | | $             821,414.53 |