## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re Jeffrey Scott Cates and                       Case No. 21-40882 WJF
    Christine Therese Cici-Cates,

        Debtor(s).                       Chapter 11, Sub. V

## DEBTORS' POST-EVIDENTIARY HEARING BRIEF

# CONTENTS

INTRODUCTION ..................................................................................................1

ARGUMENT ......................................................................................................2

I.    Because Atkinson breached the Atkinson Purchase Agreement, the Cates were excused from performing under the contract, and the Claim must be rejected. 2

II.   Because Claimant repudiated the Atkinson Purchase Agreement in February of 2021, Debtors are excused from performing on the contract. ...................................9

III.  A date before the filing of the bankruptcy is the key date for valuing rejection damages. ....................................................................................................14

IV.   There was no evidence produced by Claimant on the value of the two properties in question as of May of 2021. ................................................................15

V.    The Court should ignore the evidence of value to be paid in the future only if and when the contingencies of the contract in question were satisfied. ...................18

VI.   Claimant is not entitled to any damages under any theory. ...........................22

    A.    Damages related to specific performance are not available to the Claimant because they acted in such a manner as to make the equitable remedy of specific performance unavailable. ...............................................................22

    B.    Specific performance is not available as a remedy because the Claimant could not have met all of the contingencies in the contract prior to March 2, 2022. ......................................................................................................23

    C.    Specific performance-type damages in Bankruptcy are limited to the value of the property as of the time of the bankruptcy filing. ....................................25

    D.    The Atkinson Purchase Agreement provides that the Claimant can only seek one of two remedies. Having chosen to seek damages for specific performance, it has abandoned its right to pursue a claim under the "actual out-of-pocket" provision of the contract. ...........................................................27

    E.    If the Court allows Claimant to pursue damages under the "actual out-of-pocket costs and fees" provision of the Contract between Atkinson Holdings and the Cates, the Court should not award those damages for a number of reasons. ..................................................................................................29

    F.    Medina 55 failed to mitigate its damages, and therefore its claim must be denied. ...................................................................................................41

    G.    There is NO evidence that Medina 55 is liable for the liabilities of Atkinson Holdings, Inc. .................................................................................44

VII.  Claimant's motion for judicial estoppel should be denied. ..............................46

    A.    Claimant's still-pending motion in limine for judicial estoppel on one of the key elements of the case is a disguised motion for Summary Judgment. ... 46

    B.    Judicial Estoppel is an Equitable Remedy inapplicable in this instance. 47

i

C.      Claimant has no right to freeze the value of the property at the time when
the Motion to Approve the First Oppidan Contract was approved. ................... 50

**CONCLUSION** ........................................................................................................**52**

**EXHIBIT A**..............................................................................................................**54**

An evidentiary hearing was held on March 22, 23, and 27, 2023, concerning Debtors Jeffrey Scott Cates and Christine Therese Cici-Cates ("Debtors" or the "Cates") objection [ECF No. 196 (the "Objection)] to the claim of Medina 55, LLC ("Medina 55" or "Claimant") [Claim No. 20 (the "Claim")]. The Court ordered post-hearing briefing. In this memorandum, Debtors will show that all the evidence presented and all of the applicable law prove that Medina 55's Claim should be denied.

## INTRODUCTION

It should be noted at the outset that the chief witness for Claimant, Robert "Bobby" Atkinson, decided not to show up for trial and give live testimony as to why his company was entitled to receive $1,341,486.07 in damages for a rejected real estate purchase contract. This memorandum will discuss the testimony at the hearing and show Atkinson Holding's and Medina 55's own actions and inactions repudiated the contract, breached the covenant of good faith and fair dealing, and rendered impossible their performance under the Third Amendment to Purchase Agreement upon which the Claim is based. Therefore, the Cates request that the Court reject Medina 55's Claim in its entirety and award them their reasonable attorney's fees for having to defend the objection.

This memorandum will also show that, even if Medina 55 had a valid claim for breach of contract, it cannot show that it was entitled to specific performance under state law, which is an equitable remedy. Further, even if the Court rules that Medina 55 would have been allowed to pursue the equitable right of specific performance under state law, Medina 55 did not show damages applicable to that

1

theory under the law since the only testimony on the value of the land as of the time
prior to the Petition Date, May 17, 2021, was that the value of the property was less
than the price that was in the purchase agreement. Further, this memorandum will
argue that, because Medina 55 is seeking damages for specific performance, it
cannot be awarded the costs that it would take to obtain the land per the actual out-
of-pocket damage clause to the Third Amendment to Purchase Agreement. Finally,
if the Court rules that Medina 55 can still seek damages per the actual out-of-
pocket damages clause, there are a myriad of reasons why the Claimant failed to
prove that it is entitled to any actual out-of-pocket damages.

## ARGUMENT

The Court is directed to the Joint Stipulation of Facts.  Those facts and the
testimony and exhibits entered into evidence will prove that the Claim should be
rejected for multiple reasons. Note that because an official transcript was not
available in time for the court's briefing schedule and per the Court's direction,
certain quotes from an unofficial transcript are included in this memorandum that
was prepared from the official recording using Adobe Premier software which was
checked for accuracy by counsel.

**I.    Because Atkinson breached the Atkinson Purchase Agreement, the Cates were
excused from performing under the contract, and the Claim must be rejected.**

Section 3.1.5 of the Atkinson Purchase Agreement provides that the buyer
"shall act diligently and in good faith to obtain the requisite government approvals."
Stipulation No. 22; Exhibit 61-B at CATES 722. Atkinson Holdings failed to
perform items of due diligence in the Purchase Agreement for a period of over two

2

years—most importantly, doing *absolutely nothing* to meet its obligation to pursue

government approvals after recommitting to this obligation on August 3, 2020,

through the Third Amendment to Purchase Agreement. Atkinson and Claimant

failed to meet this obligation because they didn't have the financing to perform the

due diligence required and they were using the extensions of time to try to obtain

the financing necessary to pay for the due diligence, A/K/A "entitlements." Robert

Atkinson testified that, at the time he entered into a contract with the Cates, he

had just re-entered into the business of developing real estate and did not have any

funds.

> A: There's clearly two -- there's a pool of money I would
> have used to close on the property and there was a pool of
> money that I needed for entitlements.  And those are two
> different pools.  Not always, but in this case, there
> were two different pools that I needed.  And Jeff  knew that right
> from the beginning because he knew that I was coming
> back from New York from my other business that I took the
> hiatus from -- and I didn't have the money to do this on my
> own, so he knew that right away.

Exhibit 137, Robert "Bobby" Atkinson Deposition, January 26, 2023 ("Atkinson

Deposition") at 21:10–14.

The evidence shows that the due diligence necessary to prepare a complete

preliminary application for the addition of CRP 2 and CRP 3 into the City of

Medina's comprehensive plan could have been done within seven months. See

Exhibit 122, minutes of Medina City Counsel indicating that Oppidan's initial

completed application to amend the Medina City Council's Comprehensive Plan was

presented in April of 2021.  The evidence shows that Oppidan Development began

the initial due diligence tasks the minute their contract was approved by the Court

and that their first submission to the City of Medina was in December of 2021, a

mere two months after the Oppidan contract was approved by this Court. Exhibit

80, Agenda, City of Medina, Minnesota for December 20, 2021, VII. F., Presentation

of [Cates] Environmental Worksheet (Cates 827). Atkinson Holdings, by contrast,

never submitted a completed application to the City of Medina in the 31 months

they were under contract with the Cates.

| | | | |
|---|---|---|---|
| Ken Edstrom | 02;52;38;04 | 02;52;48;14 | I'm going to ask you to answer yes or no. Did he give you the resources necessary to complete a final application? The city to amend the comprehensive plan, which was step one into development? |
| Ted Wagor | 02;52;48;28 | 02;52;50;12 | Objection. Asked and answered. |
| Judge | 02;52;51;02 | 02;52;51;15 | Overruled. |
| Rose Lorsung | 02;52;52;06 | 02;52;54;14 | No, he didn't. He didn't submit the fee to the city. |

Testimony of Rose Lorsung, March 23, 2023.

This failure by Atkinson Holdings to ever even submit a complete proposal

for a comprehensive plan amendment or, under the applicable Third Amendment,

do anything to pursue governmental approvals was a breach of the covenant of good

faith and fair dealing in the contract and excused the Cates from going forward with

the agreement. The evidence is overwhelming that this lack of funding was the

principal reason why the governmental approval of the Atkinson Holdings Contact

was never achieved.  It was not, as proffered by Claimant, that the onset of the

Covid pandemic delayed the application or that the Claimant couldn't find the

elusive "end user" or that the elections of a new Medina City Council meant that the

application had to be delayed.  These are mere excuses put forward by a Claimant

that clearly did not have the funding to ever push the development forward.

Debtors worked with Robert "Bobby" Atkinson ("Bobby Atkinson") and

Atkinson Holdings, LLC ("Atkinson Holdings") for three years in good faith—

granting extension after extension to allow Atkinson Holdings to perform the due

diligence built into the contract to obtain government approvals for the purchase of

CRP No 2 and CRP 3[1].

| Ken Edstrom | 00:47:02:29 | 00:47:07:01 | Why did you decide to do that [cancel the Atkinson Contract].? |
|---|---|---|---|
| Christina Cates | 00:47:08:09 | 00:47:37:28 | Well, we lost faith and trust. We were promised many, many times that they were going to be presenting to the city for the comprehensive plan amendment, which was the first part of this whole development process. We felt that he had not done the due diligence. He didn't waive any of the contingencies, and therefore he did not act in good faith, according to the contract. |
| Christina Cates | 00:47:39:25 | 00:47:45:04 | And so we decided to cancel the agreement. |
| Ken Edstrom | 00:47:46:26 | 00:47:50:04 | Did you feel like you were breaching the agreement? |
| Christina Cates | 00:47:50:21 | 00:48:23:23 | No, not at all. We felt that he was at fault for not performing the contingencies that he was supposed to perform. We gave him plenty of time. We gave them, you know, several extensions. And they kept asking for more extensions. And we felt like we were just spinning our wheels and not making any progress after really three years from, you know, fall of 2018 to 2021. |

---

[1] The Cates were unrepresented in all of their negotiations with Atkinson Holdings.  This accounts for the heavy-handed and one-sided language of the documents in Atkinson Holding's favor.

Testimony of Christine Cici-Cates, March 23, 2023 ("Chris Cates").

Atkinson Holdings took advantage of Debtors by not ever submitting a completed application to amend the comprehensive plan for the city of Medina to include CRP 2and CRP 3. After reaffirming its obligation to pursue government approvals in August of 2020, Claimant did absolutely nothing to meet this obligation.

Atkinson Holdings failed to do the literal "spade work" that would have been necessary to present a plan to the Medina Planning Commission and City Council, because Atkinson Holdings did not have the funds to do the work necessary to achieve governmental approval. Lorsung at 2:52:52 to 2:55:00. David Scott, the Executive Vice-President and General Counsel of Oppidan Holdings, LLC, testified that Atkinson had not acted with due diligence in seeking government approvals. Testimony of David Scott, March 27, 2022 ("Scott") at 00:25:37:24.

The Claimants argue that the failure of Atkinson Holdings to do literally anything towards government approval for the nearly three years it had the Cates under contract, was not a breach of the contract, because at any moment it could have waived the contingencies in the contract and paid the Cates cash without obtaining government approval for their development plan. Although the Purchase Agreement provides that the due-diligence contingency to obtain governmental approval was waivable, the evidence showed that there was never any act or

communication by Atkinson or Rose Lorsung that Atkinson Holdings intended to

waive the due diligence requirements in the contract.

| | | | |
|---|---|---|---|
| Ken Edstrom | 00:04:33:08 | 00:05:09:22 | There's been some talk about in this agreement and the other amendments to the agreement that there was a right of Mr. Atkinson to waive the contingencies in the contract. Did you ever have any conversation with Mr. Atkinson where he indicated that he was going to waive the contingency? |
| Christina Cates | | | No. |
| Ken Edstrom | | | Did you ever have any conversation with Miss Lorsung, who was his agent, that Mr. Atkinson was willing to waive the contingency? |
| Christina Cates | | | No. |
| Ken Edstrom | 00:05:09:24 | 00:05:16:19 | Have you received any communication from either one of them that said they were waiving the contingency? |
| Christina Cates | 00:05:17:04 | 00:05:17:15 | No. |
| Ken Edstrom | 00:05:18:02 | 00:05:23:16 | Did you believe at any time that Mr. Atkinson was going to waive the contingencies in the contract? |
| Christina Cates | 00:05:23:20 | 00:05:31:27 | No. |

Testimony of Chris Cates.

There was simply no good faith and no due diligence performed by Atkinson

and Atkinson Holdings, and this was an actionable breach that excuses the non-

breaching party from performing on the contract. *See, e.g., In re Cornerstone*

*Pavers, LLC*, 642 B.R. 459, 469 (Bankr. E.D. Wis. 2022) (citing examples).

The lack of diligence and good faith in seeking government approval was a

breach of that contract, and the illusory statement that these conditions "could be

7

waived" is a legal nullity as there was no evidence presented that Atkinson or

Atkinson Holdings ever considered waiving their conditions. Indeed, Claimant's

witnesses testified that it never waived these conditions:

| | | | |
|---|---|---|---|
| Ted Wagor | 00;49;08;26 | 00;49;17;22 | So under this provision, Mr. Atkinson could waive the approvals contingencies that we were just talking about at any time by written notice to seller. |
| Rose Lorsung | 00;49;18;06 | 00;49;22;10 | At any time. |
| Ted Wagor | 00;49;22;10 | 00;49;24;29 | And are you aware if you ever did that in this case? |
| Rose Lorsung | 00;49;25;11 | 00;49;28;08 | No, I did not. |

Testimony of Rose Lorsung; *accord* Atkinson Deposition at 39:7–9 ("Q: Did you ever

waive a contingency in the agreements with the Cates? A: I don't recall.").

The Claimant agreed that Section 3.1.5 of the Atkinson Purchase Agreement

provides that the buyer "shall act diligently and in good faith to obtain the requisite

government approvals." Stipulation No. 22. However, the Claimant tries to make

much of the additional language in Section 3.3 that states that "[a]ll of the

contingencies are specifically for the benefit of the Buyer and Buyer has the right to

waive any contingencies by written notice to Seller." Stipulation No. 14. Just what

the Claimant believes this language proves is mysterious.  The Buyer's promise to

obtain governmental approvals and meet other conditions is contained in at least

8

four places in the contract, Section 3.15, Section 3.2, 3.2.1 and Section 3.3. Claimant appears to be arguing that the Cates had no right to rely on multiple recitations of the Buyers' duties in the contract since that language was "for the benefit of the Buyer." However, the language clearly only means that the Buyer can either live up to the contingencies or waive them. Unless the Buyer specifically waived the provision that governmental approvals were needed to close[2], the Buyer had the duty to diligently and in good faith seek those approvals, and the Seller had the right to rely on that language. The fact that Claimant is saying that it didn't breach the contract because it in reality had no duty to seek government approval shows the desperate nature of all of the Claimant's case. The due diligence language is not a nullity that has no meaning at all. The contingencies weren't waived, and that lack of waiver means that the diligent and good faith covenant was at all times in place and needed to be fulfilled by Atkinson Holdings and Medina 55.

The lack of diligence and good faith in seeking government approval was an ongoing breach of that contract accruing at least prior to the Petition Date, and this breach excused the Cates from continuing on with the contract. Thus, the rejection of the Atkinson Holdings Purchase Agreement did not breach the agreement and the Claim must be rejected.

## II.  Because Claimant repudiated the Atkinson Purchase Agreement in February of 2021, Debtors are excused from performing on the contract.

An anticipatory breach is one in which "one party unequivocally informs the other that it no longer intends to honor their contract." *Ricketts v. Adamson,* 483

---

[2] Which they clearly did not, see above.

9

U.S. 1, 17, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987) (Brennan, J. dissenting) (stating

additionally the breach must be accompanied by an "absolute and unequivocal"

renunciation of all duties under the contract); *see also In re Haugen,* 278 N.W.2d

75, 79 n. 6 (Minn.1979) (defining an anticipatory repudiation as "an

unconditional repudiation of a contract, either by words or acts, which is

communicated to the other party prior to the time fixed by the contract for his

performance"). *Melford Olsen Honey, Inc. v. Adee,* 452 F.3d 956, 965 (8th Cir. 2006).

Tellingly, an anticipatory repudiation can be found through the acts of the

counterparty to the contract.  That is exactly what happened here.

 The facts show that Atkinson Holdings repudiated its contract with the Cates

through its own actions and through the actions of its agent, Rose Lorsung as of

February of 2021.

 The evidence shows that, as of February of 2021, the Cates were given a

"take it or leave it" deal to sell all of their five separate pieces of property to

Atkinson. (Stipulated Facts No. 60, 61, 62, 63). The new deal had to be signed before

Atkinson would even attempt to get government approval of the development plan

proposed by Atkinson, EVEN THOUGH the Purchase Agreement provided that it

had the affirmative duty to diligently seek governmental approval for the

development of the original two pieces of land (Stipulated Fact No.22) CRP 2 and

CRP 3 that were already under contract. In the months that followed, up until the

date of the rejection of the Atkinson Purchase Agreement, Atkinson

Holdings/Medina 55 did not present any application to the Medina City Council to amend their comprehensive plan.

Chris Cates testified that she understood the series of emails from Lorsung and Atkinson in February 2021 were a rejection by Atkinson of the original contract.

| | | | |
|---|---|---|---|
| Ken Edstrom | 00:41:43:02 | 00:42:09:24 | So, by this point, you received four communications from either Ms. Lorsung or Mr. Atkinson concerning what it would mean if you did not sign it in the fourth amended agreement. The first communication said the purchase agreement on your homestead and the Triangle was needed before we can get in front of the city with application. And the second email said the purchase agreement on your homestead and the triangle was needed before we can get in front of the city with an application. |
| Ken Edstrom | 00:42:10:10 | 00:42:35:29 | The third email said, We need you to sign the agreement or we were at a standstill. And the fourth email said the amendment we sent stands, we need this sign to move forward. So does any of these communications with you say that they were willing to move forward with CERP two and CRP 3 as a standalone development? |
| Christina Cates | 00:42:36:04 | 00:42:36:16 | No. |
| Ken Edstrom | 00:42:37:18 | 00:42:41:20 | What did you what did these statements mean to you? |
| Christina Cates | 00:42:43:10 | 00:43:13:26 | It meant to us that he wanted a larger project than what was originally agreed to with us. And so we wanted -- the fact that he didn't make any progress, and now he wanted a larger project, we didn't believe that he was going to follow |

|  |  |  | through and get everything he needed. |
|---|---|---|---|
|  |  |  | So when you told him that you wouldn't sign purchase agreement – amended purchase agreement number four, did he ever come back to you and say, okay, that's all right, we can just go back to the original? |
| Ken Edstrom | 00:43:17:27 | 00:43:33:03 | |
| Christina Cates | 00:43:33:10 | 00:44:30:14 | No, that was never discussed. |

Testimony of Christine Cates.

Under cross-examination she reiterated this statement. Christina Cates from 01:11:53:20 to 01:11:55:05. Claimant will argue that there was never any direct statement that "we hereby repudiate the current contract we have with you," but under the law, that is not necessary.

Mr. Atkinson in his deposition contradicted the evidence that the four February ultimatum emails meant that Atkinson Holdings was repudiating the Atkinson Holdings Agreement:

> Q. Attached to this email [Exhibit 39] from Rose Lorsung to Jeff Cates is an agreement and it provides that the contingency date would be extended to September 30th, 2022, and that additional properties would be added to the purchase agreement. Do you see that?
>
> A. Yes.
>
> Q. And so I will suggest to you that this is all the Cates Property, correct?
>
> A. Yes.
>
> Q. So Rose Lorsung in February of 2021 is saying that it is critical to get all of the pieces of the property in order to go forward with the application with the City. Do you see that?

A. Yes

Q. All right. An was this your direction to Rose Lorsung that you -- that they needed to sign this agreement so that you could get all of their property for this bigger project?

A. No, like I said I would have been happy either way.

Q. Does it say that here?

A. It doesn't say that here, but I'm just talking about what the deal was.

Q. All right. Did you tell them at any point after February of 2021 that if they didn't sign this new agreement that everything was going to be fine, you would just go back to the 67-acre development?

A. We had multiple conversations about all of the above.

Q. Okay. After February of 2021?

A. I don't know what the date was.

Atkinson transcript at 45 line 15 to 46 at 22.

However, there is no evidence in the record that Atkinson or Lorsung ever told the Cates that they could ignore the four written ultimatums delivered in February of 2021. At the end of Atkinson's deposition, requests were made to obtain additional evidence of various issues, including any proof that Atkinson had told the Cates, in contradiction to four written demands, that he would continue working on the original 67-acre development even if the Cates did not sign the new agreement. Exhibit 68. There was no such evidence produced in any of the exhibits or the testimony at the hearing.

The Debtors have proven that the Claimant had moved on to a new, bigger deal and that they had no intention of fulfilling the current contract. The admission

13

in the February ultimatums that they had not sought governmental approval up to

that time and the clear and unequivocal statements that they would not go forward

with any approvals for any contract proves that the Claimant had rejected its

contract with the Cates. That anticipatory breach excuses the Cates from the

performance of providing their property for sale to the Claimant.

## III.   A date before the filing of the bankruptcy is the key date for valuing rejection damages.

Section 502(g) of the Bankruptcy Code provides how the Court should treat a

putative Claim for the rejection of an executory contract:

> [a] Claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such Claim had arisen before the date of the filing of the petition.

11 USC § 502(g).

Although there was testimony by both Claimant and Debtors during the

evidentiary hearing concerning the value of Debtors' real property in the fall of

2021, the Court asked the parties to brief whether the date of rejection or the date

prior to the filing of the bankruptcy should be the key date in determining damages

(if any) due to a rejected executory contract.  In *In re American HomePatient, Inc.,*

the 6th Circuit concluded that the plain language of section 502 requires that

damages for rejection Claims be fixed as of a date "before the date of the filing of the

petition." The court reasoned that this was consistent with the language of the

section which requires that the rejection Claim be both *determined* and *allowed* as

if the Claim had arisen before the date of the filing of the petition. *In re American HomePatient, Inc.,* 414 F.3d 614, 618 (6th Cir.2005). The court rejected the contention that the only consequence of section 502(g) was to classify a rejection Claim as a pre-bankruptcy unsecured Claim. *Id.* Rather, the 6th Circuit reasoned that if that were the only consequence intended, use of the two words, "determine" and "allow," would be unnecessary as that effect would be accomplished by the use solely of the term "allowed." *Id.  Accord, In re Enron Corp.,* 330 B.R. 387, 390 (Bankr. S.D.N.Y. 2005).

## IV. There was no evidence produced by Claimant on the value of the two properties in question as of May of 2021.

The A/B schedules filed on the Petition Date of May 17, 2021 (Exhibit 65, Cates 844 at section 1.2 and 1.3) listed the value of CRP 2 as $1,100,000 and CRP 3 as $1,200,000. Jeff Cates testified that these values were based on previous appraisals (Exhibits 66 and 67) and his owner's opinion. Testimony of Jeff Cates, March 24, 2023 (hereafter "Jeff Cates") at 01;35:05 to 01;35:07.

The reason for the low price was that the land was (and is still currently) zoned as "Rural Residential-Urban Reserved" and no guarantee could have been made that the two properties would be included in the City of Medina's comprehensive plan and allowed to be rezoned as industrial property. *See* Exhibit 66, Appraisal of CRP 2, at 12, Cates 920.

> [Development is] not scheduled to be available to the subject site until after 2040...

*Id.* at 20, Cates 933.  Indeed, as the situation developed, the City of Medina rejected

a plan by Oppidan Development to include the 36-acre CRP 3 property into their

comprehensive plan.

| | | | |
|---|---|---|---|
| Ken Edstrom | 00;22;00;09 | 00;22;23;06 | And so you attended the meeting where CRP two and CRP three were presented to the city council and asked and asked the city to allow the amendment of the comprehensive plan to include CRP Two and CRP Three in current development as commercial property? |
| David Scott | 00;22;23;27 | 00;22;26;18 | It was on the phone but yes. Yep. |
| Ken Edstrom | 00;22;27;05 | 00;22;32;01 | And did they indicate why they were rejecting the application? |
| David Scott | 00;22;35;14 | 00;22;50;09 | I'm trying to remember, you know, best memory is they wanted to keep specifically CRP number three as residential in the future and didn't didn't want that to be commercially developed. |

Testimony of David Scott.

This rejection gives credence to the appraiser's belief that the properties

would be difficult to develop and that the price as undeveloped land ($2,300,000) of

the two parcels as listed in the Debtor's schedules was a correct Fair Market Value

as of the date of the Petition.

Jeff Cates testified that as of September 1, 2021, he would not have sold all of

his of property for what they were listed for on the schedules, $1,100,000 for CRP 2

and $1,200,000 for CRP 3 (Jeff Cates at 01;35;15.). He instead testified that he as a

willing seller would sell those two parcels of land on that date for cash in the

amount of $5,000,000 total and that he believed that a willing buyer would pay

$5,000,000.00 total for those two parcels. Jeff Cates, from 01;35;25 to 01;36;22.

The only evidence of value produced by Claimant was the testimony of Jonathan Yanta and the exhibit (Broker's Price Opinion) produced by Mr. Yanta (Exhibit 57).  Mr. Yanta testified that although there was no date on the exhibit, that the operative date of the opinion was September of 2021.

| | | | |
|---|---|---|---|
| Jonathan Yanta | 04;40;46;06 | 04;41;03;08 | Well, I think there's dates and the sale prices when the dates were, but not on the specific date of the pricing. You know, in opinion. No. The assumption is it was at that time that we put, you know, September of 2021. So that was the date that I would assume that would be okay. |

Testimony of Jonathan Yanta, April 23, 2023 (hereafter "Yanta"). Leaving aside that Yanta's opinion of value exhibit was riddled with errors, did not comply with Minn. Stat. 82.735[3], could not be used as a substitute for an appraisal, and presented no evidence whatsoever of what a willing seller would pay a willing buyer for cash on a certain day, a/k/a Fair Market Value (*see generally* Yanta Cross-Examination from 04;04;14;13 to 04;29;42;19), the exhibit should be excluded from the Court's consideration of value as there was no presentation of any evidence by Mr. Yanta or by any other witness presented by the Claimant as to any value of CRP 2 and CRP 3 in May of 2021.

---

[3] Minnesota Statutes § 82.735 was referred to during Mr. Yanta's cross-examination by Debtors' Counsel, Alexander Beeby, and a copy of the statute was provided to the Court, the witness and Counsel for the Claimant at that time. That statute is reproduced as Exhibit A to this Memorandum of law.

Because Claimant has failed in its burden to present any evidence, credible or otherwise, as to value, it has failed in its burden of proof to show that it was damaged by the rejection of its contract. For this reason alone, the Claim should be rejected.

## V.   The Court should ignore the evidence of value to be paid in the future only if and when the contingencies of the contract in question were satisfied.

The two appraisals in evidence, Exhibits 66 and 67, provide similar definitions of Fair Market Value that appraisers are constrained to use based on the Code of Federal Regulations and their own industry standard:

> MARKET VALUE - The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
>
> a)     buyer and seller are typically motivated;
>
> b)     both parties are well informed or well advised, and each acting in what they consider their own best interest;
>
> c)     a reasonable time is allowed for exposure in the open market;
>
> d)     payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
>
> e)     the price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.
>
> Source: OCC 12 CFR 34.42, Definitions

Exhibit 66, Appraisal of CRP 2, at 45 (Cates 963).

The definition of Market Value in Exhibit 67, the appraisal of CRP 3 is

similar:

> MARKET VALUE - The most probable price which a
> property should bring in a competitive and open market
> under all conditions requisite to a fair sale, the buyer and
> seller each acting prudently, knowledgeably, and assuming
> the price is not affected by undue stimulus.  Implicit in this
> definition is the consummation of a sale as of a specified
> date and the passing of title from seller to buyer under
> conditions whereby:
>
> (A)     Buyer and seller are typically motivated;
>
> (B)     both parties are well informed or well advised, and
> each acting in what they consider their own best interest.
>
> (C)     a reasonable time is allowed for exposure in the open
> market;
>
> (D)     payment is made in terms of cash in U.S. dollars or
> in terms of financial arrangements comparable thereto;
> and
>
> (E) the price represents the normal consideration for the
> property sold, unaffected by special or creative financing or
> sales concessions granted by anyone associated with the
> sale.
>
> Source: Dictionary of Real Estate, Fifth Edition, 2010

Exhibit 67, Appraisal of CRP 3, at 46 (Cates 1028).

These definitions include a couple of particularly relevant requirements:

(1) that the value is determined as of the date the sale is *consummated* (i.e. closed)

and (2) that the value is determined in terms of cash for title without special or

creative financing or sales concessions (i.e. without further sale conditions).

In this case, Oppidan's general counsel, David Scott, testified that despite

first signing a contract with Debtors on September 1, 2021 (Testimony of Scott, at

00;11;30;28) and working through the development process as fast as possible, Scott

at 00;25;59;05, after 19 months and the expenditure of $500,000 out of pocket to

date (Scott at 00;47;38;29), the now amended contract has not closed because the

conditions of the contract (full government approval) have not yet been fulfilled

(Scott at 00;24;57;00). Saying what the price would be in the future if contingencies

in the contract were fulfilled over time (in this case 19 months and counting) after

expending significant funds to reach that point is equal to current Fair Market

Value mixes apples and oranges. There is no bankruptcy case attempting to

determine the value of rejection damages involving a contract for the sale of real

property that finds that that market value can be based on what a property MIGHT

be worth at 19 months in the future after $500,000 has been spent to improve the

property's value. Applicable case law is also clear on this point.

One court found that fair market value does not include subjective

considerations and speculation as to the potential value of the property once present

factors diminishing the value of the property (such as significant necessary repairs,

corrections of multiple code violations and increased rents that could be available

after remediation of the property) are alleviated. *See In re Barbieri,* No. 00-22274-

478, 2009 WL 5216963, *1, *11 (Bankr. E.D.N.Y. Dec. 29, 2009).

Similarly, a New Jersey Bankruptcy Court found that a real estate purchase

contract may be deemed irrelevant and inadmissible in the consideration of the fair

market value if the contract is so affected by conditions that it is more similar to an

offer or option to purchase. *In re GGI Properties, LLC,* 588 B.R. 401 (Bankr. D.N.J.

20

2018). The *GGI Properties* Court specifically dealt with the issues of a purchase agreement filled with contingencies, including due diligence and environmental certifications. *Id.* at 418-19.  The court held that an unconsummated contract and the circumstances of its execution must be examined to determine whether "it is replete with contingencies and is in fact nothing more than an offer or option to purchase, in which case the contract must be disregarded and given no probative effect" *Id.* at 419.

Finally, a New York Bankruptcy Court found that any admitted defects in the property, such as limited road access and the need to acquire a quit-claim deed from a third party should be taken into account to determine fair market value. *In re Urban,* 202 B.R. 565 (Bankr. S.D.N.Y. 1994). These defects are similar to the conditions in the Atkinson contract that Atkinson had to overcome over time to get to closing.  The offering price has to be discounted to take into account the "defects" in the undeveloped property that need to be changed in order to get to the payment of the increased value sometime in the future.

Significantly, the *Urban* Court found that, since the market value of the property was less than the contract price, no damages could be awarded.  "As this court has found that the market value of the Contract Land was less at the time of the breach than the contract price, Hurley has no allowable loss of bargain damages." *Id.* at 572. That is the situation at bar.

There is no way to extrapolate the Fair Market Value of a piece of property by looking at what the property would sell for in the future IF all conditions were

21

met.  Therefore, the Court should reject Claimant's non-existent evidence of the

value of the two parcels and find it has failed in its burden of proof to show damages

for the rejection of the Atkinson Purchase Agreement.

## VI.   Claimant is not entitled to any damages under any theory.

### A. Damages related to specific performance are not available to the Claimant because they acted in such a manner as to make the equitable remedy of specific performance unavailable.

Medina 55 alleges that it is entitled to damages greater than the actual out-

of-pocket damages clause in the Atkinson Purchase agreement because Atkinson

could not avail itself of a suit for specific performance based on the automatic stay.

Medina 55 presumes that, in such an action in state court, it would be granted the

right to specific performance. This is mere speculation and is unsupported by the

evidence.

> A party does not have an automatic right to specific performance as a remedy for breach of a contract; the district court must balance the equities of the case and determine whether the equitable remedy of specific performance is appropriate.

*Dakota County HRA v. Blackwell*, 602 N.W.2d 243, 244 (Minn. 1999); *accord*

*Metropolitan Sports Facilities Com'n v. Minnesota Twins P'ship*, 638 N.W.2d 214,

227 (Minn. Ct. App. 2002); *Minnesota Vikings Football Stadium, LLC v. Wells*

*Fargo Bank, N.A.*, 193 F. Supp. 3d 1002, 1015 (D. Minn. 2016).

> Specific performance, as sought by plaintiff, is purely an equitable remedy, governed by equitable principles. *See Kopp v. Franks,* 792 S.W.2d 413, 419 (Mo.App.1990) (citing *Seabaugh v. Keele,* 775 S.W.2d 205, 207 (Mo.App.1989)). Under Missouri law, a decree for "specific performance is not a matter of right even to enforce the terms of a legal and binding contract." *Id.* at 420 (quoting *Zoellner v. Carty,*

> 585 S.W.2d 289, 291 (Mo.App.1979)). Specific performance
> "is a matter of grace resting upon basic equities and
> residing within the sound discretion of the chancellor,
> depending in the last analysis, upon the facts of each
> particular case." *Id.*

*Safeco Ins. Co. of Am. v. Lake Asphalt Paving & Const.*, LLC, 807 F. Supp. 2d 820,

826 (E.D. Mo. 2011)

> Specific performance will not be decreed when, for any
> reason, it would be inequitable. *Buckley v. Patterson,* 39
> Minn. 250, 39 N.W. 490 (1888).

*In re MJK Clearing, Inc.,* 286 B.R. 862, 876 (Bankr. D. Minn. 2002).

> Specific performance is available as a remedy for a breach
> of contract only if: (1) the terms of the contract are
> sufficiently certain; (2) no adequate remedy at law exists
> for the breach; (3) the party seeking relief has materially
> performed his obligations under the contract; and (4) the
> grant of such relief is not unfair, against public policy, or
> otherwise inequitable. *See* Restatement (Second) of
> Contracts §§ 357, 359, 362, 364, 369.

*In re Pickel*, 493 B.R. 258, 271 (Bankr. D.N.M. 2013), *aff'd,* 512 B.R. 390 (B.A.P.

10th Cir. 2014).

"If one seeks equity, one must act equitably" is a maxim applicable in this

case. As set forth above, the evidence shows that Atkinson failed to act equitably

and therefore would not have had a state court order damages based on specific

performance.

### B. Specific performance is not available as a remedy because the Claimant could not have met all of the contingencies in the contract prior to March 2, 2022.

Atkinson asks for the Court to award specific performance of a contract it

couldn't possibly have completed by the deadline in the contract, March 2, 2022.

Rose Lorsung testified that one of the clauses in the unexecuted 4th Amended

Atkinson contract (Exhibit 61F) was that the contingency date to obtain all

governmental approvals was being extended to September of 2022 because those

contingencies could not be met by the beginning of March, which was the last

possible Contingency Date in the 3rd Amended Atkinson Contract (Exhibit 61E,

Stip. ¶ 42).

| Ken Edstrom | 03;08;04;15 | 03;08;21;16 | And the reason why this extension of the contingency date needed to be extended beyond January 2022, as of February of 2021 is that the development couldn't be completed by January 31st, 2022. |
| Rose Lorsung | 03;08;23;16 | 03;08;27;00 | Likely amongst other reasons. But yes, there was not enough time. |
| Ken Edstrom | 03;08;27;00 | 03;08;28;29 | Or by February 28, 2022. |
| Rose Lorsung | 03;08;29;00 | 03;08;29;09 | Sure. |
| Ken Edstrom | 03;08;30;02 | 03;08;32;13 | Because step one hadn't even been done by then. |
| Rose Lorsung | | | Correct |
| Ken Edstrom | 03;08;43;21 | 03;09;01;13 | So Mr. Atkinson was taking a risk that by waiting to do his due diligence and putting in an application that the project was not going to get done before the contingency date ran out and the Cates wouldn't agree to extend. |
| Rose Lorsung | 03;09;03;03 | 03;09;12;27 | Yeah, that's his own risk. |

Testimony of Rose Lorsung.

Claimants seeking specific performance for real estate contracts ask the court

to award the property under contract to the buyer where the seller attempts to sell

the property to a third party. *See* description of treatment of such Claims in

bankruptcy below.  However, that equitable doctrine can't possibly apply where

there is a deadline on the original contract that the buyer cannot meet.  That is, if

the buyer could not have performed on the contract before the contract deadline, the

seller would not be in breach of the contract by refusing to sell to the buyer, and the

buyer would not have been entitled to specific performance under Minnesota law.

The Claimant's Claim for specific performance fails for this additional reason.

### C. Specific performance-type damages in Bankruptcy are limited to the value of the property as of the time of the bankruptcy filing.

The only damages the Claimant has for Specific performance, if it was

available, is based upon the value of the property as of the date of the bankruptcy

filing.

> When a vendee has elected not to treat the vendor's refusal
> to perform as terminating the contract of sale and has
> instead sued for specific performance, the Bankruptcy
> Code treats rejection of the executory contract as replacing
> the equitable remedy of specific performance with a
> monetary Claim, and treats the petition date as the date
> of breach and the date on which to measure
> the damages arising from specific performance being lost
> as a remedy, not the earlier date on which the debtor-
> vendor initially refused to perform. *In re Aslan,* 909 F.2d
> at 371–72. *See also Beard v. S/E Joint Venture,* 581 A.2d
> 1275, 1284 (Md.1990) ("Where, as here, the purchaser sues
> for specific performance upon breach of a contract to
> convey realty, and specific performance becomes
> unavailable during the pendency of the action, the loss of
> the bargain damages, awarded in substitution for specific
> performance, may properly be computed by valuing the
> property at the time specific performance becomes
> unavailable."), *motion for reconsideration denied,* 587 A.2d
> 239 (Md.1991); *Dunning v. Alfred H. Mayer Co.,* 483
> S.W.2d 423, 428 (Mo.App.1972) (damages awarded as of
> date that court ruled that specific performance would be
> denied). In other words, upon rejection of an executory
> contract, it is loss of the right of specific performance that

is to be compensated, with damages to be measured by the
value of the property as of the petition date.

*In re Aegina Investments, LLC,* 07-00297, 2008 WL 5076979, at *2 (Bankr. D.D.C.
Sept. 22, 2008). The amount of such damages is limited to the increase in value of
the property. *In re Urban,* 202 B.R. 565, 572 (Bankr. S.D.N.Y. 1994).

As noted, Jeff Cates testified that the value of CRP 2 and CRP 3 at the time
of the filing of the Petition was $2,300,000 ($1,100,000 for CRP 2 and $1,200,000 for
CRP 3. He also testified that as of September of that year he would only have
agreed to a cash sale of CRP 2 and CRP 3 for $5,000,000 total ($2,500,000 per
parcel) and that he believed he could have found a buyer for that price. In addition,
the two appraisals (Exhibit 66 and 67) valued the two parcels at a total of
$2,170,000 as of the dates of those appraisals ($1,070,000 for CRP 2 as of February
of 2017 and $1,100,000 for CRP 3 as of January of 2020). These are the only credible
pieces of evidence introduced as to the Fair Market Value of the two parcels at any
moment in time.

Whatever the Fair Market Value of the two parcels was as of the filing of the
Cates bankruptcy petition in May of 2021, that value was demonstrably less than
the price in the purchase agreements with Atkinson Holdings (Exhibits 61A, 61B,
61C, 61D and 61E), $4,126,961 for CRP 2 plus a potential $5,048,621.61 if Atkinson
Holdings exercised the option for CRP 3 (which there was no evidence of).

There was no proof of loss of value by the Claimant as of the petition date.
The only values in evidence were presented by the Debtors. That evidence shows
that the price of the property in question was less than the contract price, and

26

therefore the Claimant has no damages under a theory of a lost specific

performance claim.

### D. The Atkinson Purchase Agreement provides that the Claimant can only seek one of two remedies. Having chosen to seek damages for specific performance, it has abandoned its right to pursue a claim under the "actual out-of-pocket" provision of the contract.

Rejection of an executory contract is treated as a prepetition breach. 11

U.S.C. §§ 365(g), 502(g)(1). Calculation of the amount due under the rejected

executory contract is determined under the terms of the contract and applicable

state law. *Giant Eagle, Inc. v. Phar-Mor, Inc.*, 528 F.3d 455, 459 (6th Cir. 2008);

*Bittner v. Borne Chemical Co.*, 691 F.2d 134, 135 (3d Cir. 1982); *R and O Elevator*

*Co., Inc. v. Harmon*, 93 B.R. 667, 669 (D. Minn. 1988).

The Atkinson Purchase Agreement lays out what claims are available to a

buyer if the seller breaches the purchase agreement:

> 16.2 Seller Defaults. If Seller defaults under this Agreement, Buyer shall, as its sole and exclusive remedy, *either*
>
> Terminate this Agreement, recover the Earnest Money (and all interest accrued thereon and recover Buyer's actual out-of-pocket costs and fees, including without limitation, reasonable attorneys' fees, accountants' fees and other consultants' fees incurred by Buyer in preparing and negotiating this Agreement, preparing for the Closing, obtaining financing commitments, investigating the status, title and the condition of the property and other similar reasonable costs and expenses;
>
> *or*
>
> (ii) seek specific performance of this Agreement by commencing suit therefor within one year after the date on which Buyer Terminates this Agreement.

27

> If Buyer elects neither remedy available under section
> 15.2(i) or the remedy under section 15.2(ii) within one year
> after the date of Seller's default, Buyer is deemed to have
> elected the remedy available under Section 15.2(i).

Exhibit 61A at 9–10, Atkinson Purchase Agreement dated January 31, 2019,

*emphasis added.*

Even if the Cates breached the contract with Atkinson holdings (which they did not), the Claimant has chosen to invoke the terms of section 15.2(i) of the Atkinson Purchase Agreement, *instead of* section 15.2(ii), and seek damages under the theory of specific performance. As such, the Court should rule on that damage theory and deny the Claim in full. However, the Claimant also requests that the Court allow them to rely on the Contract's clause allowing for reimbursement of "actual out-of-pocket costs and fees" (Section 15.2(ii)) as a "Plan B" for damages. It is clear that specific performance and "actual out-of-pocket costs and fees" are alternative remedies and not both available to the Seller.

The Court should not allow this double dipping and should rule that because the Claimant has elected its remedy of specific performance and lost, that it cannot then seek an alternative remedy in the "actual out-of-pocket" damages clause in the contract.

> The seller under a conditional sales contract has
> the choice of the following remedies in case of default: (1)
> To repossess the conditionally sold property and retain
> what has been paid; (2) to sue for and recover a judgment
> for the purchase price, while at the same time retaining his
> seller's lien rights until fully paid; or (3) to foreclose by
> appropriate action in the courts of this state. The election
> of one remedy by the seller excludes the others and
> constitutes an abandonment of them.

*Minnesota State Bank of St. Paul v. Batcher,* 263 Minn. 71, 71, 116 N.W.2d 77, 77

(1962).

The logic of *Batcher* applies here.  Claimant is seeking an equitable remedy

under the specific term of the Purchase Agreement. Having elected its remedy of

specific performance, the Court should rule that Claimant has abandoned its right

to seek damages for "actual out-of-pocket costs and fees."

E.   **If the Court allows Claimant to pursue damages under the "actual out-of-pocket costs and fees" provision of the Contract between Atkinson Holdings and the Cates, the Court should not award those damages for a number of reasons**.

Even if the Court lets Claimant pursue an alternative theory of damages

despite the clear language of the contract, there was no evidence presented by

Medina 55 that it incurred any "actually out of pocket" costs associated with

developing the Cates Property. There are multiple definitions in the case law of

"out-of-pocket damages" depending on the type of case and applicability of statutes

and common law.  In general, all of the definitions deal with economic loss.  One

judge adopted a definition of the term from the dictionary.  "The term "out of

pocket" has been defined as follows: "paid out or owed in cash; necessitating an

expenditure of cash." *In re Sight Res. Corp.*, 2005 WL 4030131 at *4 (Bankr. S.D.

Ohio, Sept. 22, 2005).  Although the Claimant may argue that they are entitled to

damages for bills from vendors that were merely incurred but not yet paid, the key

provision in the contract concerning out-of-pocket damages is that they must be

"actual."  This negates the possibility that any unpaid invoice can count towards

Claimant's damages.

Debtors are unsure which actual out-of-pocket damages Claimant will assert

in its Post-Hearing Brief. However, in its Responses to Answers to Interrogatories,

the Claimant Claimed the following out of pocket damages:

> 1. $100,000.00 Earnest Money. Payment documented in produced documents.
>
> 2. Approximately, $243,250.00, for Consulting fees owed to Rose Lorsung/Pulse Land Group, Inc., incurred for services rendered from February 26, 2019, through October 20, 2021. Invoice has been produced.
>
> 3. Approximately, $123,808.83 for contractually owed broker commissions to Cushman Wakefield for the sale of the 30.18 acre parcel (3% commissions at initial contract price), and another $152,538.64 in commissions on the sale of the 36.92 acre parcel, for a total of approximately $276,347.47 in broker commissions. Listing contract has been produced and is in receipt of Debtors.
>
> 4. Approximately, $6,500.00, for civil engineering services to Kimley-Horn and related work, incurred beginning in approximately, March 2020. Estimate, Traffic Memo, and related work and emails with Kimley-Horn has been produced.
>
> 5. Approximately, $10,000.00, for Wetland Delineation work with Westwood in September-October, 2021. Invoice and emails with Westwood have been produced.
>
> 6. Approximately, $500.00, for title commitment from Guaranty Title. Commitment has bene [sic] produced.
>
> 7. Approximately, $36,579.00, in legal fees to Culligan Legal & Business Counsel, PLLC, incurred for services rendered from March 2021, through October 2021. Redacted invoice to be produced.
>
> 8. Approximately, $34,692.50, in legal fees to Huffman, Usem, Crawford, Greenberg & Smith, P.A., incurred for services rendered from June 2020, through October, 2022. Statement of invoices to be produced.

> 9. Ongoing incurred and expected legal fees to Ravich
> Meyer Kirman McGrath Nauman & Tansey, PA, in excess
> of approximately $50,000.00, to be sought, produced and
> made by motion in accordance with the federal and local
> rules.

(Exhibit 60 at Cates 695-Response to Interrogatory No. 21).

### 1. $100,000 Escrow.

The only evidence that Robert Atkinson and Atkinson Holdings paid

anything to any vendor is the $100,000 paid for the escrow of the earnest money for

the contract with the Cates (*Id.* and Exhibit 61A at Cates 768 – Escrow Agreement).

Because those funds are in escrow waiting for a Court to rule on who is entitled to

the funds, Atkinson Holding was not damaged through payment of the escrow.

### 2. Pulse Land Group Invoice

With regard to the consulting damages Claimed to be owed to Pulse Land

Group, Inc., a company owned by Rose Lorsung, Mr. Atkinson testified in his

deposition that there is no contract between Atkinson Holdings and Pulse Land

Group.

> Q. … do you have a contract between Atkinson Holdings,
> LLC, or Medina 55, LLC for Pulse Land Group?
>
> A. I would have provided that if I had it.

Exhibit 137, Atkinson Deposition at 64, lines 11-14.

There is no such contract in evidence.  In fact, Ms. Lorsung disclaimed that

she was owed any money as to the Pulse Land Group invoice (Exhibit 55), and

stated that she was only entitled to be paid based on the contract her company

Recreate Realty had with the Cates (as opposed to Atkinson Holdings, LLC) if the

property sale closed. See Exhibit 53 at 2, Brokerage Contract with ReCreate Realty

where compensation would be paid by the Cates only upon the successful sale of

CRP 2 or CRP 3 at a rate of 4% of the purchase price.

| | | | |
|---|---|---|---|
| Ted Wagor | 02;34;45;09 | | Okay. Can you turn and then I'm wrapping up here, getting close. Can you turn to exhibit 55? Okay. So this is an invoice from Pulse Land Group Inc, dated October 20th, 21. In regards to land project management, do you recall this invoice? |
| Rose Lorsung | | | Yes. |
| Ted Wagor | | | Did you prepare this invoice? |
| Rose Lorsung | 02;34;43;05 | 02;34;46;17 | Yes. |
| Ted Wagor | 02;34;46;17 | 02;34;51;15 | When you prepared this invoice. I'm sure that everything that's listed on the invoice is that ‑ Does that include all the work and consulting work that you were talking about when we first started our conversation today? |
| Rose Lorsung | 02;35;05;14 | 02;35;13;07 | Yes. The consulting work that was inside of the agreement between me and Mr. Atkinson. |
| Ted Wagor | 02;35;13;07 | 02;35;16;04 | Do you expect to get paid for your services. |
| Rose Lorsung | 02;35;18;07 | 02;35;22;02 | If the property closes? I usually get paid, but we didn't get that opportunity. |
| Ted Wagor | 02;35;23;08 | 02;35;27;04 | What about for your consulting services? |
| Rose Lorsung | 02;36:18 | | I'm not expected to get paid pursuant to the agreement, it was a percentage. I was asked to put together an invoice by Mr. Atkinson and I think he was perhaps confused as to what was supposed to be presented. But we do have an agreement on 4% of the final |

| | | | purchase price, but I was asked to put together an invoice, so I did. |
|---|---|---|---|

Testimony of Rose Lorsung, March 23, 2023 ("Lorsung").

There is simply no evidence that Atkinson Holdings, much less Medina 55 had a contract with Pulse Land Group, Inc. and, in addition, no evidence that any money was paid to Pulse Land Group meaning that the Claimant has suffered no damages as a result of this made-up and fallacious invoice.

### 3. Cushman Wakefield Commissions

As to the Claimed $276,347.47 in damages for real estate commissions owed to Cushman Wakefield, the evidence showed that with regard to Exhibit 103, the March 13, 2019 commission agreement between Cushman Wakefield and the Cates, neither Atkinson nor Medina 55 could have been damaged by this contract as the payment of the commission was to come from the Cates and not Atkinson or Medina 55. Yanta at 04;56;21;06. Even if that were not the case, no commission was ever earned because there was no sale of the Cates property to Atkinson Holdings or Medina 55, a fact Mr. Yanta admitted.  Yanta at 05;00;17;13.

Further, with regard to Exhibit 136, the listing agreement for sale or lease between Atkinson Holdings and Cushman Wakefield for CRP 2, there has been no closing on the Cates Property and there has been no sale of the Cates property to a third party, which are the triggering events for the payment of those commissions again which Mr. Yanta admitted. Yanta at 05;00;17;13. Finally, since no

commission has been paid, Atkinson Holdings has not been damaged, much less the

Claimant, Medina 55, LLC.

### 4. Kimley Horn Engineering Fees

Medina 55 Claims it is entitled to damages for fees owing to the engineering

firm of Kimley Horn. However, Robert Atkinson denied in his deposition that he

ever hired Kimley Horn and said that he had not paid them:

> Q. So you eventually did hire Kimley-Horn?
>
> A: No, I didn't.  They were working for me on [30] the cuff and, if the project went forward, I was going to hire them.
>
> Q. Okay.  Well, didn't they prepare site plans for you?
>
> A. They were just playing with site plans. They were just conceptualizing it at best.
>
> Q. Did Kimley-Horn ever send Atkinson Holdings an invoice?
>
> A. I don't -- I think so, but I don't remember.
>
> Q. Okay.  If they did, you haven't paid it?
>
> A. I didn't have to pay it.  I didn't have an agreement with them.

Exhibit 137, Deposition of Robert "Bobby" Atkinson, January 26, 2023 ("Atkinson

Deposition") at page 30, line 23 to page 31, line 13.

It should be evident that neither Atkinson Holdings nor Medina 55 can claim

damages for a vendor that was not paid, much less not hired.

### 5. Wetland Delineation Work done by Westwood Engineering

Exhibit 50 is an email from Westwood Engineering to Bobby Atkinson demanding payment for Wetlands delineation work. To the extent the work was done, it was undertaken after the Oppidan contract was signed.

| | | | |
|---|---|---|---|
| Ken Edstrom | 01:51:03:12 | 01:51:43:24 | So you signed the first contract with Mr. Akinson in January of 2019. And then the Oppidan contract was signed September 1st, 2021, from January of 2019 to September of 2021 had any engineer been on your property doing a wetland evaluation or wetland delineation for Atkinson? |
| Jeff Cates | | | No. |
| Ken Edstrom | | | For anybody? |
| Jeff Cates | | | No. |
| Ken Edstrom | 01:51:44:00 | 01:51:59:05 | Okay. So did any engineer call you when you were under contract with Mr. Atkinson or his company prior to September of 2021? |
| Jeff Cates | 01:51:59:10 | 01:52:01:15 | No. |

Testimony of Jeff Cates.

If any work was done by Westwood Engineering as indicated by them in the invoice in evidence, it was after the Oppidan contract was signed. The listed period that Westwood Engineering did wetland delineation work done is "September to October 2021." Atkinson should have realized that his too-little-too-late attempts at due diligence that he should have started 31 months previously were not going to result in government approval since the Cates were in the process of rejecting the Atkinson Purchase Agreement at the time Westwood was working for Atkinson

Holdings. This failure to mitigate is in addition to the fact that there was no evidence presented that this invoice was ever paid.

Mr. Atkinson was asked about Westwood Engineering's request for payment in his deposition.

> Q. And did Atkinson Holdings have a contract with Westward [sic] Engineering?
>
> A. Yes.
>
> Q. And it mentions in here [referring to Exhibit 50] -- if you would read through on the second paragraph on Medina 10, which is the second page of the exhibit, it says, "We -- through last Friday" -- the last sentence of the second paragraph of that page says, "Through [62] last Friday, October 22nd, we are approximately $10,000 of the $14,500 contract budget and would simply track additional effort for the final delineation coordination against the total payment amount."
>
> So at this point it appears like, from this email, that Westward Engineering is asking to get paid something, correct?
>
> A. Yes.
>
> Q. And do you know if Westward Engineering was ever paid by Atkinson Holdings, LLC?
>
> A. They have been.
>
> Q. Okay.
>
> A. They're still owed some money, but they were paid, I believe, for this project.
>
> Q. Okay.  Do you have proof that they have been paid?
>
> A. Yeah.  Somewhere.
>
> Q. I'm going to ask your counsel to get that to me.

Exhibit 137, Atkinson Deposition at 61, lines 18-25, through 62, lines 1-20.

Exhibit 58 is a letter from Attorney Edstrom to Attorney Wagor dated

February 3, 2023 following up on the questions raised in the Atkinson deposition

about proof of damages and other issues.  The letter asked for:

- Any emails/communications that show that the Cates were told that Ted Bigos was going to be involved in the real estate deal (p. 23).
- Any emails/communications indicating that the deal for 67 acres could still go forward in the event the larger 100 plus acre deal did not go through (pp. 50-51, 72)
- Any additional agreements between Atkinson Holdings, LLC and Medina 55, LLC that have not yet been produced (other than Ex. 64 – Assignment and Assumption Agreement from May 2021) (pp. 59-60, 72)
- Any contracts between Atkinson Holdings, LLC or Medina 55, LLC and Pulse Land Group (p. 64).
- Any agreements that Medina 55 has with any of the vendors that worked on the project (p. 72)
- Invoices from Westwood Engineering and any other vendors that worked on the project (p. 72)
- Records of payments made to Weston [*sic,* should be "Westwood"] Engineering and any other vendors that worked on the project (pp. 61-62, 72).

Exhibit 58 at 1-2.

Despite these requests in the deposition and in the follow up letter, there is

no evidence in the record of any payment to any vendor including Westwood

Engineering. Mr. Atkinson's bare testimony that he paid Westwood Engineering

"something" without proof of payment is not enough to award Atkinson Holdings,

much less Medina 55 any damages on this Claim.

## 6.  $500.00 for title commitment from Guaranty Title

The only reference to Guaranty Title obtaining a title commitment in all 1063

pages of exhibits is in Exhibit 61-F, the August 2021 unexecuted Medina 55/Cates

Contract at the top of page 5 (Cates 735). Since the Cates never executed this

contract, they are not liable for any funds that were expended by anyone for this
title commitment.  Further, as is the case with all the other Claimed vendor
payments, there is nothing in evidence that Medina 55 paid this alleged item of
damage. This is not surprising since the title commitment would only have been
undertaken after the contract was signed, which it never was.

### 7.  Legal fees to Culligan Legal & Business Counsel, PLLC

Robert Atkinson testified about the invoice from Culligan Legal at his
deposition:

> Q. So this [Exhibit 49] is an invoice, dated October 18th,
> 2021, which would have been after the Medina 55 Claim
> was objected to.  Did you ask to get this receipt or this
> invoice from Culligan Legal?
>
> A. I don't recall.
>
> Q. Okay.  So because it's addressed to Atkinson Holdings,
> LLC/Medina 55, LLC.   My question is:   Was there a
> contract between Atkinson Holdings and Culligan Legal &
> Business Counsel?
>
> A. Yes.
>
> Q. Was there a contract between Medina 55 and Culligan
> Legal?
>
> A. I don't know.
>
> Q. Okay.  A lot of the work that was done—you can't hardly
> read it because it's in really small type--was done before
> Medina 55, LLC, was even created.  Do you agree with
> that?
>
> A. I don't know.  I don't think so.  I don't think that's true.
>
> Q. We'll let the document speak for itself.
>
> A. Yeah.  That's a good idea.

Exhibit 137, Atkinson Deposition, at 67 line 15 to 68, line 4.

In fact, Exhibit 49 has legal work described from March through October

2021. Exhibit 54 is the assignment of the Atkinson Purchase Agreement and all

amendments to Medina 55. It is dated "May __, 2021," so at least some of the work

done in the Culligan invoice was done prior to the time that Medina 55 assumed the

purchase agreement. Secondly, there is no detail provided that would allow a court

to determine whether the fees sought were reasonable, all the description has been

redacted. In addition, there is no evidence that Culligan Legal had a contract with

Medina 55 (see Exhibit 58 requesting any contracts between any vendor and

Medina 55) and there is no evidence that Culligan Legal was paid by Atkinson

Holdings much less Medina 55, despite the Debtors request that such evidence be

produced (*Id.*)

### 8. Legal Fees owed to Huffman, Usem, Crawford, Greenberg & Smith, P.A., from June 2020, through October, 2022.

As to the Craig Greenberg invoice, the testimony of Mr. Atkinson in his

deposition was that he didn't even know what the invoice from Mr. Greenberg to

Atkinson Holdings was for and didn't know if it had been paid:

> Q. Let's go to Exhibit 56.
>
> (Exhibit 56 was introduced.)
>
> A. Okay.
>
> Q. This is a -- looks like an invoice or a statement from Craig D. Greenberg, Esquire, to Atkinson Holdings, LLC, correct?
>
> A. Yes.

Q. Who is Craig D. Greenberg, Esquire?

A. He is one of my attorneys.

Q. And was this invoice -- it's dated October 19, 2022.  Do you know if this invoice was prepared in connection with your damage Claim in these [65] proceedings?

A. I don't know that.  I get regular bills from Craig Greenberg.

Q. This invoice shows that he's unpaid.  Well, I guess I don't know that.  It says, "Amount Due, $34,692.50," so I guess it's not paid.  Was this $34,692.50 ever paid?

A. I don't know.

Q. Okay.  Is it your belief -- I mean, this is 3 months ago.  Is it your belief that you're up to date--when I say "you," I mean, Atkinson Holdings, LLC--with Mr. Greenberg?

A. I have worked on a lot of projects with Craig Greenberg, so as I sit here today, I can't tell you what I owe him or what he has been paid or not been paid.

Exhibit 137, Atkinson Deposition at 64 line 15 - 65 line 17.

The unrefuted testimony of Claimant's chief witness was that he didn't know if the Greenberg invoice was paid or whether the invoice was associated with any work being done on the Cates project.  Further, despite Atkinson's testimony that there was a contract between Mr. Greenberg's firm and Atkinson Holdings, there is no written evidence in the record (see Exhibit 58 requesting any contracts between any vendor and Medina 55) and there is no evidence that Mr. Greenberg's firm was paid by Atkinson Holdings much less Medina 55, despite the Debtors' request that such evidence be produced (*Id.*)

### 9. Ongoing incurred and expected legal fees to Claimant's Counsel, Ravich Meyer Kirman McGrath Nauman & Tansey, PA

The fees of counsel for Claimant will be addressed at a time if and when the Court allows counsel to apply for such fees[4].  However, the Atkinson Purchase Agreement (Exhibit 61A) provides for fee shifting in the case of a dispute between the parties.

> 5.5 Attorney's Fees. Each of the parties will pay its own attorneys' fees, except that a party defaulting under this Agreement or any Closing Document will pay the reasonable attorneys' fees and court costs incurred by the nondefaulting party to enforce its rights hereunder.

Exhibit 61 A, January 31, 2019, Atkinson Purchase Agreement at 5, Cates 710.  Since the Claimant's Claim should be rejected *in toto*, the Court should award legal fees to Debtors' counsel rather than to Claimant's counsel.

### F. Medina 55 failed to mitigate its damages, and therefore its claim must be denied.

Breach-of-contract damages should be lessened by the amount those damages could have been mitigated by non-breaching party through the exercise of reasonable diligence. *Lanesboro Produce & Hatchery Co. v. Forthun*, 16 N.W.2d 326, 328 (Minn. 1944); *Deutz-Allis Credit Corp. v. Jensen*, 458 N.W.2d 163, 166 (Minn. Ct. App. 1990) ("It is a well-settled principle of contract law that a nonbreaching party is duty-bound to use reasonable diligence to mitigate damages.").

---

[4] The Court asked the parties to address the question of whether the Court could award attorney's fees to counsel for an unsecured Claimant defending its Claim.  Debtors respectfully will reserve their right to respond to the Claimant's argument on this issue in their reply brief.

The co-owner of Medina 55, Theodore "Ted" Bigos, has the ability to draw on

a $40,000,000 line of credit for any purpose. Exhibit 26, Deposition of Theodore J.

Bigos dated December 8, 2022 ("Bigos Deposition), at15, line 19 to 16, line 14.

Despite this, there has never been a time when the Claimant attempted to mitigate

its damages by offering to purchase CRP 2 or CRP 3 by paying more than Oppidan

was offering, despite having several opportunities to do so.

> Q. Were you aware that you could tell the bankruptcy court that you were willing to pay more for the property than Oppidan was willing to pay?
>
> A. I was not aware of that.
>
> Q. Okay.  Did -- and I think I know the answer to this question, but did you ever tell the bankruptcy court that?
>
> A. No.
>
> Q. Are you aware that a new deal with Oppidan is being heard by the court on December 15th?
>
> A. Not aware.
>
> Q. Did you know that you could tell the bankruptcy court that you're willing to pay more for the property at that hearing than Oppidan is willing to pay?
>
> A. Not aware.
>
> Q. Do you intend to attend that?
>
> A. No.
>
> Q. Do you intend to follow that hearing?
>
> A. No.

Bigos Deposition at 29:10–30:4.

Claimant will point out that Stipulated Fact No. 76 states that pursuant to the original sales approval motion for Oppidan's contract with the Cates, Claimant would have had to put up a deposit of $10,500,000 in order to bid on the two properties and pay cash if it was the winning bidder. On the other hand, Oppidan was provided terms. However, the damages that the Claimant is claiming are all based on the fact that it could no longer purchase the Cates Property. If in fact Claimant believed that the two parcels were worth $10,500,000 in cash at that point, it had the means to buy the properties and mitigate its damages.[5] Secondly, Claimant could have objected to the proposed sales conditions requested in October of 2021, but it did not.

In addition, the fact that the 36-acre property, CRP 3, is now *not* under contract (see stipulation of Fact 79) provides another way that Medina 55 could mitigate its damages in this matter by purchasing CRP 3, a property that it says is worth between $4,925,000.00 and $5,580,000.00. *See* Broker's Opinion of Value, Exhibit 57 at MED 1746.  The fact that no such offer has been made (Stipulation of Fact 86) makes a mockery out of the claim that Medina 55 has been damaged in any way by the rejection of the Atkinson Purchase Agreement.

The facts are that, until the two pieces of property are included in Medina's development plan, rezoned, and approved for development, the properties have a Fair Market Value of at most $5,000,000 (testimony of Jeff Cates, March 24, 2023

---

[5] Not only did the failure to attempt to purchase CRP 2 and CRP 3 show that Claimant failed to mitigate its damages but it shows definitively that CRP 2 and CRP 3 did not have a Fair Market Value of $10,500,000 as of the date of that hearing, (November 9, 2021).

from 01;53;13;04 to 01;53;48;29) and in fact may be worth nothing more than

someone would pay for farmland, see Exhibit 66 and 67 appraisals of CRP 2 and

CRP 3. This is why there was no offer by Claimant to purchase the property at any

time after the Oppidan Holdings contract was signed in September of 2021.

Therefore, although Medina 55 claims it was damaged by Oppidan Holdings

obtaining the right to purchase CRP 2 and CRP 3, Medina 55 always had the ability

to outbid Oppidan and it chose not to do so.  It has failed to mitigate its damages

and therefore should be foreclosed from obtaining a claim based on the increase in

value that CRP 2 is undergoing based on the work that Oppidan Holdings has put

in to obtain approval of the City of Medina for its development plan.

### G. There is NO evidence that Medina 55 is liable for the liabilities of Atkinson Holdings, Inc.

The only evidence of an agreement between Atkinson Holdings and Medina

55 is Exhibit Ex. 64, the Assignment and Assumption Agreement from May of 2021.

That agreement was discussed in Robert Atkinson's deposition:

> Q. I will tell you that this [Exhibit 64] is the only document
> or only agreement I've ever seen between Medina 55 and
> Atkinson Holdings, so I'm just asking if there are others
> that haven't been produced or that you know of.
>
> A. Not that I know of.  I'm not sure.  I don't recall.

Exhibit 137, Atkinson Deposition at 60:8–14.

The assignment of the purchase agreement between Atkinson Holdings and

Medina 55 (Exhibit 64) provides:

> 1.    Assignment.    Assignor    hereby    absolutely,
> unconditionally and irrevocably sells, grants, conveys,
> assigns, transfers and sets over to Assignee all right, title

44

and interest in the [Atkinson/Cates] Purchase Agreement, including but not limited to the right to acquire the Property pursuant to the terms of the Purchase Agreement.

2. Assumption.  Assignee hereby assumes and agrees to be bound by all of the terms and provisions of the Purchase Agreement and to perform thereunder as the buyer as if the original buyer.

Exhibit 64, Assignment of Atkinson Purchase Agreement dated May, 2021 at 1 (Cates 593).

Obviously, what is missing is any agreement by the assignee, Medina 55, to assume the liabilities of the assignor, Atkinson Holdings, to anyone including liability to vendors who worked for Atkinson Holdings in connection with their work on the Cates development project.  Without an assumption of liabilities, the only damages that Medina 55 could possibly claim would be from the breach of any contract the vendors or the Cates had with Medina 55.  There is no evidence in the stipulated facts, the 135 documents admitted into evidence, the testimony at the hearing or the two depositions admitted into evidence that indicates that either the Cates or any vendor (with the exception of Claimant's counsel) had any agreement whatsoever with Medina 55, LLC. Therefore, even if Atkinson Holdings had suffered any out-of-pocket damages from paying vendors who worked on the Cates project (as set out in copious detail previously, there was no proof of any such payments), Medina 55 has no liability for any of those liabilities, and, for that reason alone, the damage Claims set out in the Claimant's Response to Interrogatories must be denied.

## VII.   Claimant's motion for judicial estoppel should be denied.

There are many reasons why Claimant's pending motion for judicial estoppel as to the Fair Market Value of the properties owned by the Cates should be denied.

### A. Claimant's still-pending motion in limine for judicial estoppel on one of the key elements of the case is a disguised motion for Summary Judgment.

The deadline for any party to bring any dispositive motion in the case was set by the Court in its final scheduling order. [ECF No. 239.] That order provided that any motion needed to be brought by January 30, 2023.   *Id.* The Claimant made no such motion and Medina 55's still-pending motion for the Court to preclude any evidence as to the issue of valuation is an improper attempt at summary judgment. The proper time to have brought such a motion was prior to the January 30, 2023, motion deadline. This precept is uncontroverted in the law.

> Normally 'motions in limine are not proper procedural devices for the wholesale disposition of theories or defenses.' " *Kaplan v. Mayo Clinic*, 947 F. Supp. 2d 1001, 1012 (D. Minn. 2013) *(quoting In re Levaquin Prods. Liab. Litig., Civ. No. 08–5743*, 2010 WL 4676973, at *3 (D. Minn. Nov. 9, 2010)); *see also Harrington v. City of Council Bluffs*, 902 F. Supp. 2d 1195, 1198 (S.D. Iowa 2012) ("Although labeled as motions in limine, Defendants' first three motions are actually dispositive motions. Since they were not filed by the deadline for dispositive motions, they are hereby stricken as untimely." (footnotes omitted)); *CardioVention, Inc. v. Medtronic, Inc.*, 483 F. Supp. 2d 830, 842 (D. Minn. 2007) (denying a motion in limine to exclude information plaintiff allegedly failed to designate as protected, reasoning such a designation was dispositive to the plaintiff's breach of contract Claim and therefore not properly before the court as a motion in limine); *Monsanto Co. v. Bayer Bioscience N.V., No. 4:00CV01915 ERW,* 2005 WL 5989796, at *11 (E.D. Mo. Oct. 28, 2005) (declining to address a motion limine because it was "truly a motion for

> partial summary judgment, and thus, [wa]s
> untimely*"). See generally Charles Allen Wright & Kenneth
> W. Graham, Jr., 21 Fed. Prac. & Proc. Evid. § 5037.18 (2d
> ed. 2019)* (noting that motions in limine should not be used
> in civil cases as a substitute for a motion
> for summary judgment or other peremptory ruling). To the
> extent this motion asks the Court to make a dispositive
> ruling as opposed to an evidentiary ruling, it is stricken as
> untimely, and as a motion in limine, it is not properly
> before the Court and must be denied.

*Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*, 416CV00114JEGSBJ, 2019 WL

12529179, at *2 (S.D. Iowa May 29, 2019)

Because the Claimant's request to foreclose any evidence on the key element

of the Fair Market Value of the Debtors' property is an illegitimate and untimely

motion for summary judgment, the motion must be denied.

## B. Judicial Estoppel is an Equitable Remedy inapplicable in this instance.

Judicial estoppel is an equitable form of relief, which is not reducible to a

generic formulation, but often includes consideration of three factors:

> First, a party's later position must be clearly inconsistent
> with its earlier position. Second, courts regularly inquire
> whether the party has succeeded in persuading a court to
> accept that party's earlier position, so that judicial
> acceptance of an inconsistent position in a later proceeding
> would create the perception that either the first or the
> second court was misled. . . . A third consideration is
> whether the party seeking to assert an inconsistent
> position would derive an unfair advantage or impose an
> unfair detriment on the opposing party if not estopped.

*Stallings v. Hussman Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006) (quoting *New

Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001)). Judicial estoppel is invoked only

to prevent a miscarriage of justice, not to bind someone to a fact that is clearly

incorrect—even if previously stated in inadvertent error. *New Hampshire*, 532 U.S. at 1049.

> **1. There is no "Miscarriage of Justice" because the Use of the term "Fair Market Value" in the motions to sell the Debtors' real property to Oppidan Holdings was inadvertent and only effective upon a future, conditioned consummation date.**

The Debtors brought three motions to approve the sale of the Debtors' property to Oppidan Holdings, LLC. *See* ECF 82, ECF 175 and ECF 233. These motions were made at different times and for different prices. The Claimant asks the Court to estop the Debtors from claiming that the Fair Market Value of the properties is different than the price approved in the first motion because of the use of the term "Fair Market Value" in the description of relief requested in the motion. All three motions of the Debtors in connection with the sale to Oppidan had references that the price to be paid, at some conditional, future consumation, was Fair Market Value. None of the motions sought to establish Fair Market Value as of the date of the approval of the sale. The proper term to use in the motions would be "fair value as of the date of the closing." Using "Fair Market Value" was inadvertent and made when the only issue was whether the price to be paid in the future was a fair value for the property, which is what the Court in each instance found.

The inadvertent use of "Fair Market Value" should not prejudice the Debtors from showing that the Claimant suffered no damages because the actual value of the property as of the date before the petition was filed was less than the price contained in the contract, which was a price to be paid in the future, after the

passage of two years-time, after extensive work was done to get the property approved for development and after $500,000 was spent (testimony of Dave Scott) to reach the closing. Such a ruling would be rewarding form over substance. Because the use of "Fair Market Value" in the motions to approve the various sales to Oppidan was inadvertent and signified a potential value as of a conditional, future consummation date, the Court should deny the Claimant's motion for judicial estoppel as to the value of the property that is the subject of this evidentiary hearing.

### 2. There is no "Miscarriage of Justice" since the Court has not been misled as to the Fair Market Value of the Debtors' Property

According to the definition for use in Federally regulated appraisals, "Fair Market Value" of real estate is an amount that a willing and reasonable buyer would pay a willing and reasonable seller in cash equivalent in exchange for transfer of title as of a specific effective, consummation date, as is and *without* any unusual financing or other conditions. 12 C.F.R. § 34.42(h). [*See also* J. Ex. 66 at CATES 921 (appraisal citing to this definition); J. Ex. 67 at CATES 1028 (appraisal citing to substantially the same definition from Dictionary of Real Estate, Fifth Edition, 2010).][6]

The rulings of the Court each time the sale to Oppidan was brought up were only that the price to be ultimately paid after all conditions were met or waived was "fair value." Even if "fair value" and "Fair Market Value" were the same, the issue of value in this case has always been one of *when* the value is being determined.

---

[6] These two Joint Exhibits can also be found at ECF No. 122.

Claimant is essentially claiming that the fair value of a piece of property in the future after development is the same as the current Fair Market Value for purposes of determining damages in the case of contract rejection. However, rejection damages are determined as of a date prior to the filing of the bankruptcy petition. The evidence is that, at that time, Debtors' properties were worth less than the price in the Atkinson Holding contract. There is simply no support in the evidence for Claimant's bald assertion that future value of the Cates' real estate is the same as the value as of the Petition Date of May 17, 2023.

Debtors are not estopped from seeking a finding of the Court in this contested hearing that the Fair Market Value of the Properties as of a date prior to the Petition Date is different than the findings in the previous orders. The Court's order is purported to be an "adoption" of Debtors' alleged statement regarding value [Claimant's Motion in Limine at 9 (referring to ECF No. 103)]. However, the Court has made three such orders under circumstances that demonstrate that the Court has not been mislead but rather fully understands the nature of the "value" adopted in those orders. [*See, e.g.*, ECF Nos. 184, 249.]

### C. Claimant has no right to freeze the value of the property at the time when the Motion to Approve the First Oppidan Contract was approved.

There were three orders determining that the value to be paid by Oppidan was "fair value" and the price paid was different each time.

Claimant asks the Court to freeze the Fair Market Value and determine damages based on the initial price to be paid by Oppidan, $10,230,000.00. This was

the "fair value" found by the Court, but subsequent events caused the order to be revised.

As stated above, the order approving the original sales agreement with Oppidan does not make any finding of "Fair Market Value," instead it states:

> The Purchase Price of $10,230,000.00 constitutes fair value
> for the Sales Properties.

[ECF No. 103, November 9, 2021.]

After Oppidan withdrew its offer in May of 2022 when the Medina City Council failed to approve the amendment of the Comprehensive Plan to include both CRP 2 and CRP3, Debtor and Oppidan entered into a new agreement for the sale of CRP 2 only. The Court approved the motion to approve the sale and stated:

> [T]he Purchase Price of $4,501,000.00 constitutes fair
> value for the 30.18 acres of the Debtor's property…

ECF No. 184, May 31, 2022

This contract was also terminated by Oppidan in October of 2022, and a third agreement was entered into and approved by the Court. The Court stated:

> The Purchase Price of $3,400,000.00 constitutes fair value
> for the 30.18 acres of the Debtor's property…

ECF No. 249, December 15, 2022.

Claimant asserts that the Court should freeze the Fair Market Value of the Debtors' property at the price set out in the November 9, 2021 order for sale. This ignores the fact that this price was later reduced by more than 50% in May of 2022 and was then reduced again by 25% in December of 2022. There is no reason why the Court should find that Claimant is entitled to base its damages on a price that

51

was reduced twice in subsequent months.  The "fair value" approved in November of 2021 was an aspirational price based on the happening of future events. If those events did not occur, the order provided (per the Oppidan purchase agreements) that those contracts could be terminated. In fact, the first two contracts were terminated by Oppidan.  The "fair value" set in the Court's November 2021 order was never paid (in fact, as of the date of this memorandum, no price has been paid for any part of Debtors' land). There is no rational reason, much less any principle of law, that would support the Claimant's assertion that their Claim should be based upon a finding of the Court that was amended twice in the year that followed.

Based on the forgoing, Claimant's Motion for Judicial Estoppel should be denied.

## CONCLUSION

For these reasons, the Cates respectfully request that the Court grant their Objection and deny the Claim of Medina 55 in full, order that the $100,000 earnest money in escrow for the Atkinson Purchase Agreement be awarded to them, and grant them their reasonable attorney's fees and costs pursuant to the Contract.

Dated: April 10, 2023

/s/ *Kenneth C. Edstrom*

Kenneth C. Edstrom (148696)
Alexander J. Beeby (398286)
Sapientia Law Group
120 South Sixth Street, Suite 100
Minneapolis, MN  55402
612-756-7100
kene@sapientialaw.com
alexb@sapientialaw.com

Attorneys for Debtors

## EXHIBIT A

MINNESOTA STATUTES § 82.735

BROKER PRICE OPINION; REQUIREMENTS; DUTIES OF LICENSEE;
REGULATIONS.

Subdivision 1. Requirements.

A person licensed under this chapter or chapter 82B may prepare and provide a broker price opinion and a broker may charge and collect a fee for it if the license of that licensee is active and in good standing.

Subd. 2.Duties of licensee.

Notwithstanding any provision of the laws of this state to the contrary, a person licensed under this chapter or chapter 82B may prepare a broker price opinion for:

(1) an existing or potential seller for the purposes of listing and selling a parcel of real property;

(2) an existing or potential buyer of a parcel of real property;

(3) a third party making decisions or performing due diligence related to the potential listing, offering, sale, exchange, option, lease, or acquisition price of a parcel of real property when prepared as required by subdivision 3; or

(4) an existing or potential lienholder or other third party for any purpose other than as the primary basis to determine the value of a piece of property for the purpose of a loan origination of a residential mortgage loan secured by such piece of property, when done in conjunction with the purchase of a consumer's principal dwelling, when prepared as required by subdivision 3.

§

Subd. 3.Written report; requirement.

(a) Unless the party requesting the opinion requires a specific report, a broker price opinion prepared for a party under subdivision 2, clause (3) or (4), must be in writing and contain the following:

(1) a statement of the intended purpose of the broker price opinion;

(2) a brief description of the subject property and property interest to be priced;

(3) the basis of reasoning used to reach the opinion on the price, including the applicable market data;

(4) any assumptions or limiting conditions;

(5) a disclosure of any existing or contemplated interest of the broker or salesperson issuing the opinion;

(6) the name of the broker or salesperson issuing the price opinion;

(7) the name of the real estate brokerage that the broker or salesperson is acting on behalf of;

(8) the date of the price opinion; and

(9) a disClaimer stating, "This opinion is not an appraisal of the market value of the property, and may not be used in lieu of an appraisal. If an appraisal is desired, the services of a licensed or certified appraiser must be obtained."

(b) A copy of the broker price opinion report required under this subdivision together with any supporting materials and documents used in its preparation shall be retained as required under section 82.72, subdivisions 3 and 4.

(c) A licensee may produce or transmit a broker price opinion report electronically to any person entitled to receive it.

4873-7007-4714, v. 4