## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Jeffrey Cates and Christine Cici-Cates,

    Debtors.

Bankruptcy Case No. 21-40882
Chapter 11

## CLAIMANT'S POST-HEARING BRIEF

Claimant Medina 55, LLC ("Medina 55") respectfully submits this post-evidentiary hearing brief in support of its rejection damages claim [Claim No. 20 (the "Claim")], and in opposition to Debtors' objection of that claim [Dkt. No. 196 (the "Objection")]. The evidentiary hearing in this matter was heard before the honorable William J. Fisher on March 22-23 and 27, 2023 (the "Hearing").

The evidence submitted to Court in this matter includes the parties' Joint Stipulation of Facts [Dkt. No. 281], 137 Stipulated Joint Exhibits admitted at the Hearing (cited to herein as "Ex."), (together the "Stipulated Evidence"), which includes the deposition testimony of Ted Bigos and Robert Atkinson, documents of record in Debtors' Bankruptcy proceedings, and the testimony of the following witnesses who testified at the Hearing: Rose Lorsung, Jonathan Yanta, Christine Therese Cici-Cates, Jeffery Scott Cates, and David Scott.[1]

For convenience, capitalized terms not defined herein have the meaning given them in the Joint Stipulation of Facts.

---

[1] The testimony of Mr. Scott concerning Oppidan's due diligence efforts under its purchase agreement with the Debtors is subject to Medina 55's relevancy objection under Fed. R. Evid. 401.

{00598910 2 }

## INTRODUCTION

Medina 55's Claim is a straightforward breach of contract claim.  Debtors entered into the Atkinson Purchase Agreement (hereafter, the "Medina 55 Purchase Agreement") with Medina 55's predecessor in interest[2] for the sale of CRP Nos. 2 and 3 (hereafter, the "Properties.").  Debtors entered into various amendments to the Purchase Agreement without objection that extended Medina 55's performance obligation, i.e., payment of the purchase price at closing, to, at the earliest, January 31, 2022 or March 2, 2022.[3]  However, Debtors breached the Medina 55 Purchase Agreement before Medina 55's performance obligation was due by: (1) entering into the Original Oppidan Agreement on September 1, 2021, (Ex. 121), in violation of Section 7 of the Medina 55 Purchase Agreement (Ex. 61-A at § 7); and (2) by rejecting the same over Medina 55's objection in these bankruptcy proceedings on October 13, 2021. (Ex. 126) (Order Approving Rejection).  The Stipulated Evidence, therefore, establishes a clear breach of contract by Debtors.

Debtors only defenses are that Medina 55 committed a prior breach by (1) anticipatorily repudiating the Medina 55 Purchase Agreement while negotiating a fourth amendment to same, and (2) failing to meet its good faith and fair dealing obligation with respect to its due diligence efforts.  None of the evidence submitted at the Hearing, however, supports Debtors' defenses.  As discussed more fully below, anticipatory repudiation requires a clear, unconditional, and unequivocal statement that a party refuses to perform under the contract; but Debtors could not

---

[2] The Purchase Agreement was assigned from Atkinson Holdings, LLC, to Medina 55 in May 2021, pursuant to an Assignment and Assumption Agreement. (Ex. 64).  Pursuant to the Assignment and Assumption Agreement, Medina 55 assumed all rights and obligations of Atkinson Holdings under the Purchase Agreement. Mr. Atkinson is the Manager of Medina 55. *Id*.

[3] (*See* Exs. 61-A at § 4 and 61-E) (Closing to occur anytime within 45 days after expiration of Contingency Date, which was last extended to January 31, 2022, with option to extend another 30 days to March 2, 2022).

point to any such statement in the Stipulated Evidence, and Ms. Cates testified that Mr. Atkinson never provided such a statement.  A breach of good faith and fair dealing requires a showing of subjective bad faith, that is, intentional conduct designed to harm or hinder the other party.  But again, the Stipulated Evidence is devoid of any showing of bad faith on the part of Medina 55, and Ms. Cates testified that she did not believe Mr. Atkinson harbored any such bad faith intentions.

The reality here, as demonstrated by the evidence, is that Debtors got into financial troubles and lost their patience with Medina 55.  Instead of letting Medina 55 continue with its plans, Debtors found a better deal and decided to breach the Medina 55 Purchase Agreement. Debtors now try to stretch the facts to satisfy their *post hoc* justifications for breaching the agreement.  The law and facts, however, do not support their positions.  For the reasons addressed below, Medina 55's Claim should be allowed as requested herein.

## I.   Debtors Breached the Purchase Agreement with Medina 55.

Under Minnesota law, the elements for a breach of contract claim are "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his [or her] right to demand performance by the defendant, and (3) breach of the contract by defendant." *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (citations omitted). Notably, damages are not an element for breach of contract claims in Minnesota because nominal damages may be awarded. *See Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 at n.5 (Minn. 2011) (citations omitted).  In this case, the Stipulated Evidence clearly establishes that each of these elements have been satisfied with respect to Medina 55's breach of contract claim.

### a.   Valid Contract.

There is no dispute that a valid contract existed between the Debtors and Medina 55 for the purchase of the Properties: The Medina 55 Purchase Agreement. (Exs. 61-A through -E).

Pursuant to the terms of that agreement, Debtors agreed to sell CRP No. 2 for $4,126,961.00 to Medina 55, based on a per square foot price of $3.14, which included a $100,000 Earnest Money payment that was made by Mr. Atkinson. (J. Stip. of Fact ¶¶ 11-12). The purchase agreement also gave Medina 55 a 3-year option to purchase CRP. No. 3 following the closing of CRP No. 2, for a purchase price of $5,048,621.61 (based on the same $3.14 per sq. ft. price). (*Id*. at ¶ 15).[4] The closing under the purchase agreement was to take place anytime within 45 days following the expiration of the Contingency Date, (Ex. 61-A at § 4), which was ultimately extended to January 31, 2022, and could be further extended another 30 days by Medina 55 to March 2, 2022. (Ex. 61-E). The Medina 55 Purchase Agreement, therefore, represents a valid executory contract between the parties supported by adequate consideration.

### b.  Performance by Medina 55 Prior to Debtor's Breach.

#### i.  Medina 55's Performance Obligation and Strategy for the City Approvals.

Medina 55's primary performance obligation under its purchase agreement with Debtors was to pay the purchase price at Closing. (*See* Ex. 61-A at § 4.2). There is no dispute that Medina 55's performance in that regard was cut off by Debtors' breach. But in addition to paying the purchase price, Medina 55 also reserved the right to cancel the purchase agreement on or before the "Contingency Date" if it was unable to satisfy certain contingencies, (*id*. at § 3.1), which were for the sole benefit of Medina 55. (*Id*. at § 3.3). In this way, Medina 55 reserved a performance right with respect to the contingencies in the purchase agreement. Medina 55 also had the right to waive those contingencies and proceed to closing at any time. (*Id*.). Ms. Lorsung

---

[4] Although the Medina 55 Purchase Agreement labels this as a "right of first refusal," (Ex. 61-A at § 11), by its terms it is an option as it allows Medina 55 to purchase the property at a specific price regardless of whether another offer was made. Mr. Cates also testified at the Hearing that it was an option and that Mr. Atkinson's only performance obligation with respect to that option was to pay the purchase price.

4

and Mr. Scott testified that these were standard terms for real estate purchase agreements, and it was common for buyers to waive such contingencies.

The contingency at issue in this case was Medina 55's right to obtain certain City approvals needed, "in Buyer's judgment," for its intended use of the Properties (the "City Approvals"). (Ex. 61-B at § 3.1.5). The parties expressly indicated that Medina 55's right to pursue the City Approvals was subject to its diligent and good faith efforts. (*Id.*). Good faith in this regard, is characterized by the "exercise [ ] of best judgment in a reasonable manner, in good faith and with honest intent." *White Stone Partners, LP v. Piper Jaffray Companies, Inc.*, 978 F. Supp. 878, 882 (D. Minn. 1997) (quoting *451 Corp. v. Pension System*, 310 N.W.2d 922, 925 (Minn.1981). The evidence submitted to the Court clearly establishes that before Debtors breached the Medina 55 Purchase Agreement, Medina 55 was pursuing a strategy for obtaining the City Approvals in its best judgment, which was known to and approved by Debtors, and Medina 55 followed that strategy honestly and good faith.

Indeed, before signing the Medina 55 Purchase Agreement, the Debtors knew that Mr. Atkinson was relying on investors to fund both the purchase of the Properties as well as the development of the Properties. (J. Stip. of Facts ¶ 9). And at the outset of their agreement, Mr. Atkinson and his team made clear to Debtors that their plan was to put together a "professional package of materials including a well-rounded team" to present to the city of Medina (the "City") for a comprehensive plan amendment and zoning change for the Properties. (*See* Ex. 4 at MED 00438-39). Ms. Lorsung testified that an investor and end-user would ideally be a part of that "well-rounded team" in order to increase their chances of success with the City, and this was conveyed to Mr. Cates at the outset of her engagement. Mr. Cates expressly agreed with this strategy to Ms. Lorsung and in his February 26, 2019, response email to Ms. Lorsung. (*Id.* at MED 00438). Accordingly, a key piece of Medina 55's strategy for obtaining the City

5

Approvals from the beginning, was to obtain investors and a reputable end-user to not only fund the purchase and development of the Properties, but to increase their chances of obtaining the City Approvals.  To that end, Medina 55 proceeded and performed in good faith and in its best judgment in pursuing its strategy for the City Approvals.

### ii. Medina 55's Good Faith Performance for Obtaining the City Approvals.

Medina 55 committed substantial time, research, expenses, and resources to pursing its strategy for obtaining the City Approvals, including, *inter alia*, the following:

(1) Medina 55 hired Rose Lorsung to handle the City Approvals and needed entitlements for the development of the Properties, (*see* Exs. 53, 55, 62) (agreements with Ms. Lorsung's entity, ReCreate Real Estate, LLC, and invoice from Pulse Land Group, Inc.);

(2) Medina 55 hired Jon Yanta with Cushman & Wakefield to market the Properties for sale or lease to end-users, and Debtors entered into a commission agreement with Cushman & Wakefield for the sale of the Properties to Medina (as assignee of Atkinson Holdings, LLC). (*See* Exs. 107 and 136) (listing agreement and broker commission agreement);

(3) Rose Lorsung, through Pulse Land Group, Inc., conducted extensive investigation into the history of the Properties and submitted an application to the City in May 2019 on behalf of the Debtors (the "Application"), for a Comprehensive Plan Amendment and Rezoning of the Properties from "Rural Residential-Urban Reserve" to "Business Park," (Ex. 112);

(4) Medina 55 engaged civil engineers to perform an initial site review of the existing sanitary sewer and waterman infrastructure to support the planned use of the Properties for its Application. (Ex. 69 at CATES 00092-94).

(5) Medina 55, through Ms. Lorsung, had various meetings and communications with City staff regarding the Properties and the Application.  (*See, e.g.,* Exs. 5, 74, 114) (references various meetings with City staff and engineers about the Properties and Application);

(6) Because the City requested additional information related to the Properties traffic, sewer and water infrastructure, Medina engaged another engineer to conduct that work. (Ex. 76) (emails engaging Mike Brandt of Kimley Horn);

(7) Medina 55, through its civil engineer, conducted a sewer and water usage estimate for the Properties (Ex. 108), prepared a traffic Trip Generation Analysis for the

Properties (Ex. 22-A), and prepared various site plans for the properties. (*See, e.g.,* Exs. 11-16, 106) (emails with site plans attached);

(8)    Medina, through its Broker Jon Yanta, marketed the property to investors and end-users for sale, leasing, and build to suite, (*see* Joint Ex. 100) (listing agreement with commissions based on each scenario), which Mr. Yanta testified included sending hundreds of mailers to potential end-users. (*See, e.g.,* Joint Ex. 110) (email regarding mailers and list of entities and individuals where mailer was sent);

(9)    Because of interest from reputable end-users in a potential larger development including the Properties, (*see, e.g.,* Exs. 25, 102, 1173) (Walmart and Amazaon), Medina sought to add additional properties to the project to satisfy those end-users and include them in the City Approvals process, including Debtors' homestead property, and engaged lawyers to negotiate those terms with Debtors' counsel and with neighboring properties owners. (*See, e.g.,* Exs. 30, 31, 36 and 61-F, 49, and 56; Joint Stipulation ¶¶ 38, 44) (Emails discussing larger assemblage of properties and site plans for same, purchase agreement for Seymour property; proposed Amended and Restated Purchase Agreement including provision for neighboring "Burgess" property as part of project; and attorney invoices);

(10)   Medina also incurred $10,000 towards wetland delineation work, which was frustrated due to the rejection of the Medina Purchase Agreement and Debtors' warning posts on the properties. (*See* Exs. 50, 135).

While Debtors may complain that these efforts were not enough, or that Medina 55 never submitted another application to the City, the Debtors ignore the reality that Medina 55 was adapting to the changing circumstances while maintaining its strategy to get investors and a reputable end-user on board.

### iii.    Medina 55's Continued Performance with its Strategy for the City Approvals Despite Delays and Unforeseen Circumstances.

In pursuing its strategy for the City Approvals, Medina 55 encountered no less than 6 events that caused delays and required Medina 55 to adapt to changing circumstances.

First, Medina 55 did not expect that the City would require additional engineering work in response to its May 2019 Application.  Indeed, Ms. Lorsung testified that it was highly unusual for a city to require the additional sewer/water and traffic engineering reports for a comprehensive plan amendment and zoning change (as opposed to requiring those for development approvals). (*See also* Ex. 74) (emails informing Mr. Cates that they were being

7

delayed by the City).  This was especially true, as she testified, given the fact that CRP No. 1 was zoned for commercial use, the neighboring property to the South, "Twinco," was already in use as a light industrial business, Polaris was down the road as light industrial, a nearby property owner had recently obtained a comprehensive plan amendment and rezoning to commercial use, the neighboring property to the North had been guided for sewer/water connection, leap frogging the Debtors' properties. Nevertheless, Medina 55 adapted to these additional requirements and engaged Kimley Horn to provide the needed engineering work.

Second, shortly after engaging Kimley Horn in early 2020, (*see* Ex. 76) (emails with Kimley Horn), the covid-19 pandemic hit.  Ms. Lorsung testified that this affected her business, and it is well-known to all that government shutdowns were put in place in March 2020 for all non-essential businesses. While the Debtors maintain that the City continued operations through zoom hearings, City services were generally considered essential services, and it is disingenuous to suggest that Medina 55 could have filed another application for the City Approvals at that time when it was waiting on the engineering work from Kimley Horn.  Further, Debtors themselves, testified that they experienced difficulties due to the covid-19 pandemic with their businesses. (*See* Ex. 124 at ¶ 9, MED 1281) (Debtors' Sept. 9, 2021, Motion to Approve Sale to Oppidan, stating "All of these issues were exacerbated by the COVID-19 pandemic"). Mr. Atkinson similarly testified in his deposition that the covid-19 pandemic delayed their work.  (Ex. 137 at p. 40:23-41:1).  Nevertheless, Medina 55 continued working with Kimley Horn during that time.

Third, Medina 55 did not expect the Trip Generation Analysis to show a failing intersection at Willow Dr. and Highway 55. (*See* Exs. 14 and 22-A).  Ms. Lorsung testified that this was surprising because Mr. Cates' father surrendered property to the City in the early 2000s specifically for an improvement of that intersection by the City, which was intended for future commercial use.  (*See* Ex. 120) (November 8, 2000, Settlement Agreement with City, whereby

the Cates' gave property to the City for that intersection and the City, in turn, agreed to re-guide and rezone the Properties to urban commercial use). Ms. Lorsung testified that the failing intersection was a huge impediment for the project, as the City would likely expect Medina 55 to pay significant amounts of money for off-site improvements.  This was conveyed to Mr. Cates, (*see* Ex. 22), and required Medina 55 to re-strategize its approach with the City to potentially include "resurrecting" the 2020 lawsuit between Mr. Cates' father and the City. (*Id*.). There was also discussion that Medina 55 could leverage the City's need for a lift station to potentially offset the costs for any off-site improvements that the City may require. (*See* Ex. 114).  As Ms. Lorsung testified, Mr. Cates was on board with these plans and Medina 55 reached out to other attorneys for legal analysis on the issues, which added time and expense to its City Approvals process.

Fourth, as Ms. Lorsung and Mr. Yanta testified, beginning in 2020, Medina 55 began receiving interest in the Properties from large, reputable end-users, primarily Walmart, who needed a larger property footprint. (*See also*, Ex. 137 (Atkinson Depo.) at pp. 32:7 – 34:14). Sticking with its plan to get a reputable end-user on board, Ms. Lorsung testified that Medina 55 began seeking additional properties to include in the project, which would be combined with the Debtors' Properties in an application to the City for a comprehensive plan amendment and rezoning.  This "larger assemblage," Ms. Lorsung testified, initially included the neighboring "Burgess property," and the Debtors' relatives' property, the "Combs." (*See also* Ex. 62) (Jul. 21, 2020, Amendment to Ms. Lorsung' s Broker Agreement including these properties).

Ms. Lorsung testified that it is common for parties to change the scope of the project during this process.  She also explained that she discussed this plan with Mr. Cates around the time when Medina 55 sought a third amendment to the Medina 55 Purchase Agreement, (*see, e.g.*, Ex. 30 at MED 0481) (October 8, 2020 email from Ms. Lorsung to Mr. Cates, explaining

that "as previously discussed, we are working on the larger assemblage."), and Mr. Cates was on board and did not express any objections or concerns with that plan. Accordingly, and in keeping with its strategy, Medina 55 continued working on the needed work for the City Approvals, while also working on the larger assemblage of properties to include in that process.

Fifth, Medina 55, in its best and honest judgment, made the strategic decision to wait until after the 2020 City Councilmember elections were over before submitting a new application with the City. (*See* Ex. 30 at MED 0481). Ms. Lorsung, who previously worked for the City, explained that Medina is a very political City and getting projects approved in Medina requires the vote of 4 of 5 Councilmembers. In her professional opinion, it was best to wait until after the City council elections were over and new members were in place, which she testified would have been in early 2021, in order to start that behind the scenes political work to support any forthcoming application to the City. Further, Medina 55 had to wait until the spring of 2021, to do the wetland delineation work that the City had requested. (*See* Nov. 13, 2020, email from Mr. Brandt to Mr. Atkinson regarding delineation work in spring 2021).

Sixth, Medina 55 shifted its focus in early 2021 to assist Mr. Cates with his request to be cashed out sooner due to serious financial constraints he was experiencing. On January 6, 2021, Ms. Lorsung explained to Mr. Cates that Medina 55 would like to include his homestead property and CRP No. 1 in the larger assemblage of properties to be included in the City Approvals process, and requested a fourth extension to the Medina 55 Purchase Agreement. (Ex. 38 at CATES 000307). Mr. Cates refused to grant the fourth extension, but offered to renegotiate the deal in order to be cashed out sooner and was willing to consider a "substantial discount" in price to that end. (*Id.* at CATES 000305). The parties engaged in various emails thereafter where Mr. Cates expressed increasing concern due to his financial condition and requested updates, (*see, e.g.,* Ex. 40 MED 1006-1010), while Medina 55 explained that they were working

towards a new application, which Ms. Lorsung testified was for the larger assemblage, (*see also*

Ex. 36) (Jan. 25, 2021, email regarding purchase agreement for additional "Seymour" property).

Ms. Lorsung further testified that Medina 55 would need a purchase agreement for Debtors'

additional properties to move ahead with that application (again, for the larger assemblage). (*See*

*also* Ex. 40 at MED 1005).   Mr. Atkinson also testified that Mr. Cates had verbally agreed to

including his properties in the larger assemblage at this time. (Ex. 137 at p. 46:23-47:4).

Despite initially refusing to agree to another extension, the parties began negotiations for

a fourth amendment to the Medina 55 Purchase Agreement that included terms to cash Mr. Cates

out sooner due to his financial situation. (*See* Exs. 39, 39-A, 41, and 43).   Ms. Lorsung testified

that Medina 55 committed itself to finding investors to fund an accelerated closing to cash Mr.

Cates out sooner, while also continuing to work on procuring the other properties for the larger

assemblage.   Mr. Atkinson testified that the Debtors' financial troubles and request to be cashed

out sooner put everything into a "tailspin," (Ex. 137 at p. 41:25-42:3), as Medina 55 scrambled to

find investors and funding for the accelerating closing. (*See, e.g.,* Exs. 42, 44, 45, 48) (various

emails from March 2021 to July 2021, with investors and discussing work with a lender to fund

the accelerated closing).   All the while, Medina 55 engaged additional attorneys to assist with

securing the larger assemblage of properties for the City Approvals and negotiations with

Debtors for an Amended and Restated Purchase Agreement.   (*See, e.g.,* Exs. 42, and Ex. 61-F)

(attorney email with investor and draft Amended and Restated Purchase agreement, both of

which reference the Burgess property).

All of the foregoing required Medina 55 to adapt to the circumstances and added time to

its City Approvals process.[5]   Medina 55 responded accordingly and always proceeded in good

---

[5] While Debtors make note of that fact that Oppidan Holdings, LLC, was able to proceed much
faster than Medina 55 with respect to the City Approvals, Oppidan had the benefit of all of

faith in pursuance of its strategy and in its best judgment for obtaining the City Approvals.

Throughout this process, the Debtors were on board with Medina 55's plans and did not raise

any objections until they ran into financial troubles. And even then, Medina 55 acted in good

faith to assist Debtors while also maintaining their strategy for the City Approvals.

### c. Breach by Debtors and Date of Breach.

There is no real dispute that Debtors breached the Medina 55 Purchase Agreement prior

to when Medina 55's performance was due.[6] Medina 55's performance obligation with respect

to the contingencies, including the City Approvals contingency, was not due until the

Contingency Date of January 31, 2022, which could be extended to March 2, 2022. (Ex. 61-E).

Similarly, Medina 55's obligation to pay the purchase at closing was not due until, at the earliest,

those same dates (i.e., expiration of the Contingency Date). (Ex. 61-A as § 4). As stated in the

introduction, Debtors breached the Medina 55 Purchase Agreement before that time by: (1)

entering into the Original Oppidan Agreement on September 1, 2021, (Ex. 121), in violation of

Section 7 of the Medina 55 Purchase Agreement (Ex. 61-A at § 7); and (2) by rejecting the same

over Medina 55's objection in these bankruptcy proceedings on October 13, 2021. (Ex. 126)

(Order Approving Rejection). The Stipulated Evidence, therefore, establishes a clear breach of

contract by Debtors.

To be sure, rejection of a contract operates as a pre-petition breach as a matter of law.

*See* 11 USC § 365(g)(1). And Section 7 of the Medina 55 Purchase Agreement provides that

"[e]xcept with Buyer's prior written consent, Seller shall execute no contracts, leases or other

agreements regarding the Property during the Executory Period that are not terminable on or

---

Medina 55's work. Oppidan did not have to encounter all of the above-cited issues as they
occurred.

[6] Debtors merely argue that Medina 55 committed a prior breach via anticipatory repudiation or
by violating its good faith and fair dealing obligation.

before the Closing Date." (Ex. 61-A at § 7 ). There is no evidence that Medina 55 provided Debtors with prior written consent to enter into the Original Oppidan Agreement. Additionally, under the terms of the Original Oppidan Agreement, Oppidan did not have to close until March 30, 2022, at the earliest, (*see* Ex. 121 §§ 3.2, 5.1), and Debtors had not right to terminate that agreement—and were subject to specific performance if they breached. (*Id*. at § 8.2). Accordingly, the Oppidan Contract was not terminable by Debtors before the closing date of the Medina 55 Purchase Agreement, constituting a breach of the Medina Purchase Agreement.

Debtors' breach applies with equal force to the option for CRP No. 3. (Ex. 61-A at § 11). Options are executory contracts that are subject to the same contract laws as purchase agreements. *See Space Ctr., Inc. v. 451 Corp.*, 298 N.W.2d 443, 450 (Minn. 1980) ("An option contract, like other contracts, can be anticipatorily breached by repudiation."). As Mr. Cates testified at the hearing, Medina 55's only performance obligation with respect to the option was to pay the purchase price before the option expired. Mr. Cates also recognized that given the rejection of the Medina 55 Purchase Agreement, Medina 55 no longer had the right to exercise the option. Accordingly, Debtors' breach of the Medina 55 Purchase Agreement applies to the option contained therein, which was breached before Medina 55's performance obligation was due.

Medina 55 concedes that under 11 USC § 365(g)(1), the date of breach is deemed to be "immediately before the date of filing of [Debtors' bankruptcy] petition," which was May 17, 2021. (Ex. 65). While Debtors' beach was committed post-petition, the caselaw supports the application 11 USC § 365(g) in these instances nonetheless.

### d.   Election of Remedy: Damages at Law in Lieu of Specific Performance.

The Medina 55 Purchase Agreement gives Median 55 the right to elect its remedy between liquidated damages (being the return of the earnest money, out-of-pocket costs, and

professional fees), or to bring an action for specific performance.  (Ex. 61-A at § 16.2).  Medina 55 elected specific performance in filing its Claim, and the law is clear that the presence of a liquidated damages provision is not a bar to specific performance.  The law is equally clear that, in real estate cases, when specific performance has been rendered impossible by the actions of the seller, the buyer is entitled to breach of contract damages at law.  As shown below, Medina 55 is entitled to damages at law for Debtors' breach of the Medina 55 Purchase Agreement.

### i.  A Liquidated Damages Clause is not a Bar to Specific Performance.

It is well-established that the presence of a liquidated damages provision is not a bar to specific performance. *See* Restatement (First) of Contracts § 378 (1932) ("The fact that a contract contains a provision for the payment of a penalty or liquidated damages for breach of a promise is not a bar to the specific enforcement of the promise."); *see also* 25 Williston on Contracts § (4th ed.) ("[A] contract provision for the payment of liquidated damages for breach of a promise will not operate as a bar to the specific enforcement of the promise, either affirmatively or by way of injunction, whichever is appropriate.").

It is common in real estate contracts to include both a liquidated damages clause and a specific performance clause, and in those instances, Minnesota courts will apply the remedy chosen by the party entitled thereto. *See Fabian v. Sather*, 316 N.W.2d 10 (Minn. 1982) (recognizing that vendor was entitled to either specific performance or liquidated damages per the contract, but because vendor sold the property to a third party, it was limited to liquidated damages); *John v. Timm*, 153 Minn. 401, 405, 190 N.W. 890, 892 (1922) ("Plaintiffs were not limited to the remedy of forfeiture [of earnest money]. They might demand specific performance."); *Real Est. Dynamics, Inc. v. Genzler*, 369 N.W.2d 22, 25 (Minn. Ct. App. 1985) (citing *Fabian* to hold that although specific performance and liquidated damages were available,

14

vendor's election for liquidated damages foreclosed its agent, as a third-party beneficiary to contract, from receiving damages available through specific performance).

There is no found caselaw in Minnesota barring a party from seeking specific performance in a real estate agreement, merely because the agreement also includes a liquidated damages clause. And when it comes to specific performance, Minnesota courts will generally grant specific performance as a matter of right given the unique character of real estate. *Gethsemane Lutheran Church v. Zacho*, 258 Minn. 438, 443, 104 N.W.2d 645, 648 (1960) ("As damages are ordinarily an inadequate remedy for breach of a promise to transfer interest in a specified tract of land, specific performance will normally be granted as a matter of right if the contract is enforceable.").

Because Medina 55 has chosen specific performance as its remedy here, and because specific performance is generally awarded as a matter of right under Minnesota law, Medina 55 is entitled to seek the damages it would have been entitled to in a specific performance action.

### ii.  Damages at Law in Lieu of Specific Performance.

It is long-standing and well-established law in Minnesota that where specific performance is rendered unavailable due to the actions of a seller, the buyer is entitled to contract damages. *See Baumgartner v. Corliss*, 115 Minn. 11, 131 N.W. 638 (1911) ("It is proper, in a situation of that kind, to retain the case and award damages for the breach of the contract."); *see also Greer v. Kooiker*, 312 Minn. 499, 512, 253 N.W.2d 133, 142 (1977) (awarding contract damages to vendee under purchase agreement where specific performance was unavailable because vendor sold the property to a third-party); *accord. M.W. Johnson Const., Inc. v. Progress Land Co.*, No. A07-1752, 2008 WL 2967022, at *7-*9 (Minn. Ct. App. Aug. 5, 2008) (awarding specific performance to vendee under one purchase agreement, and contract damages

on a separate purchase agreement, because the property for the second agreement was sold to a third-party).

There is no dispute here that due to the bankruptcy stay, Debtors are prevented from bringing an action for specific performance.[7] Further, Debtors have agreed to sell the Properties to Oppidan free and clear of Medina 55's interest in same, which the Court has approved and so ordered. (*See* Dkt. No. 103) (Nov. 9, 2021, Order Approving Sale). Accordingly, based on the Stipulated Evidence and Minnesota law, Debtors have rendered Medina 55's specific performance remedy impossible, and therefore, Medina 55 is entitled to damages at law for breach of contract.

### e. Medina 55's Ability to Perform.

#### i. Medina 55 is not Required to Tender Performance in Order to Recover Contract Damages.

The law presumes parties are capable of performance until the stated time performance is due. *See Olson v. N. Pac. Ry. Co.*, 126 Minn. 229, 232, 148 N.W. 67, 69 (1914) ("So long as a contract remains in force, it may be assumed that the parties are able to perform according to its terms and will so do at the appointed time."). Additionally, the breach of a contract by one party, discharges the non-breaching party's performance obligation. *See* Restatement (First) of Contracts § 397 (1932) ("A breach or non-performance of a promise by one party to a bilateral contract, so material as to justify a refusal of the other party to perform a contractual duty,

---

[7] On September 1, 2021, Debtors served Medina 55 with a notice of cancelation of the Medina 55 Purchase Agreement. (J. Stip. of Facts ¶ 71). Under Minnesota law, the statutory stay of commencement of an action to stay cancellation of a purchase agreement "suspend[s] the running of the period of limitation until the [stay] is removed." Minn. Stat. § 541.15(a), (a)(4). Under federal law, a bankruptcy stay continues "until such property is no longer property of the estate." 11 U.S.C. § 362(c)(1). Because the bankruptcy stay prohibits Medina 55 from seeking an injunction to stay the cancellation of the Medina 55 Purchase Agreement, the deadline to respond to the notice of cancellation is temporarily stayed until either the stay is lifted or the Properties are no longer property of the estate. *See* 11 U.S.C. § 362(a)(1); Minn. Stat. § 541.15(a), (a)(4). *See also Sitek v. Striker*, 764 N.W.2d 585, 590–91 (Minn. Ct. App. 2009) (holding the same).

discharges that duty.").  In the real estate context, when a vendor materially breaches a purchase agreement before the vendee's performance is due, the vendee is entitled to sue for damages for breach of contract without having to first tender performance. *See Matteson v. U.S. & Canada Land Co.*, 103 Minn. 407, 115 N.W. 195 (1908) ("Where the vendor in such a contract, before the time of performance is due, expressly renounces or repudiates the same . . . no tender by the vendee of the balance due in the purchase price is essential to the right of action for the breach."); *accord Country Club Oil Co. v. Lee*, 239 Minn. 148, 155, 58 N.W.2d 247, 251 (1953) ("The law is well settled that a tender is unnecessary where it would be an idle ceremony.").

Because Debtors materially breached the Medina 55 Purchase Agreement, and removed Medina 55's ability to seek specific performance, Medina 55 is entitled to sue for contract damages without having to show its ability to tender performance, i.e., pay the purchase price.

### ii. Notwithstanding, Medina 55 was Able to Tender Performance.

Even if Medina 55 is required to show that it had the ability to perform, the Stipulated Evidence establishes that Medina 55 was capable of performing.  First, with respect to the City Approvals, and as discussed below in response to Debtors' anticipatory repudiation claim, *see infra* at Sec. III, pp. 30-34, Medina 55 retained the ability to waive the City Approvals contingency and, therefore, undeniability had the ability to perform in that regard.  Second, with respect to payment of the balance of the purchase price, Mr. Atkinson testified that he brought in Ted Bigos[8] to assist with the payment of the purchase price at closing, who agreed to fund same if the things went well with project. (Ex. 137 at p. 21:23-22:23).  Mr. Bigos similarly testified that he was brought in to "add credibility" to the project from a "financial aspect" and to "make sure the deal could get done."  (Ex. 126 at p. 8:6-19).

---

[8] Ted Bigos is the Chief Manager of Bigos-Bren Road, LLC, a Member of Medina 55, LLC, along with Atkinson Holdings, LLC.  (*See* Ex. 58 at Interrogatory No. 2).

In that respect, Mr. Bigos testified that he had the ability to fund the closing of the Properties under the Medina 55 Purchase Agreement, as evidenced by an untapped $40,000,000 line of credit with Huntington Bank, which he had for his solely-owned Kellogg apartment project (a $100,000,000 million dollar apartment complex which he owned free and clear). (*See id*. at pp. 14:17-17:25; Ex. A at p. 5 "Line of Credit Amount"). In fact, Mr. Bigos testified by way of example that, had Medina 55 been presented with the opportunity to flip the Properties to Oppidan at the purchase price in the Original Oppidan Contract, (Ex. 121 at § 1.2) ($10,230,000), he would have definitely funded the closing because Medina 55 would have been entitled to a ~ 25% return on investment. (Ex. 126 at pp. 11:16-13:13; p.17:18-25).[9] Mr. Bigos would have done so, understanding that there was risk in any such investment. (*Id*. at pp. 13:14-14:11).

Although Medina 55 is not required to tender performance in order to recover on its breach of contract claim, it clearly had the ability to do so as evidence by Mr. Bigos. Any requirement of tender in this regard, would have been "an idle ceremony." *Country Club Oil Co. v. Lee*, 239 Minn. 148, 155, 58 N.W.2d 247, 251 (1953).

## II. Breach of Contract Damages: Fair Market Value and Out of Pocket Loss.

In Minnesota, the damages for the breach of a real estate contract are the difference between the contract price and the fair market value of the property at the time of breach, referred to as the "loss of the bargain" rule. *Greer v. Kooiker*, 312 Minn. 499, 513, 253 N.W.2d 133, 142 (1977) ("The measure of damages for breach by the vendor [i.e., seller] of a contract to

---

[9] The explanation in the deposition uses ballpark figures, but based on actual figures involving a simultaneous sale of the Properties from Debtors to Medina 55 (for $9,175,582.61), and then from Medina 55 to Oppidan (for $10,230,000), all Medina 55 would have to pay to Debtors would have been the remaining balance of $4,026,961 for CRP No. 2, (Ex. 61-A at § 2.2), as the sale of the CRP No. 3, the optioned property, would have been papered as being transferred from Debtors to Medina 55, and then Medina 55, using Oppidan's funds. Accordingly, Medina would have received a profit of $1,054,417.39 on a $4,026,961 investment: a return of 26.18%.

convey land is the difference between the market value and the purchase price at the time of the breach . . . [t]hat is, the vendee [i.e., purchaser] is entitled to the loss of the bargain." (citing *Scheerschmidt v. Smith*, 74 Minn. 224, 77 N.W. 34 (1898))); *see also Costello*, 265 Minn. at 209 (applying the same measure of damages for breach by the purchaser).   This is rooted in the golden rule of contract damages: to place the non-breaching party in the same position had the contract been fully performed. *See M.W. Johnson Const., Inc. v. Progress Land Co.*, No. A07-1752, 2008 WL 2967022, at *6 (Minn. Ct. App. Aug. 5, 2008) ("[The] measure of damages for breach of contract is the amount that will place the plaintiff in the same situation as if the contract had been performed." (citing *Logan v. Norwest Bank Minn., N.A.*, 603 N.W.2d 659, 663 (Minn.App.1999), and 4 Minnesota Practice, CIVJIG 20.60 (1999))).

Based on the foregoing, it is clear that the proper measure of damages in this case is the difference between the purchase price under the Median 55 Purchase Agreement and the fair market value ("FMV") of the Properties at the time of Debtors' breach.

### a.   FMV Standard in Minnesota and Evidence to Support FMV.

There does not appear to be a single, universally accepted definition of FMV in Minnesota, as FMV is determined in a variety of different contexts: e.g., eminent domain cases,[10] property tax disputes,[11] and probate proceedings.[12]   However, the throughline in these cases shows that, in Minnesota, the FMV of property is the price at which a buyer is willing to sell, and

---

[10] *Hous. & Redevelopment Auth. of City of St. Paul v. Kieffer Bros. Inv. & Const*. Co., 284 Minn. 516, 520–21, 170 N.W.2d 862, 864 (1969) ("It is well recognized that the fair market value which an owner is entitled to receive for his property in a condemnation proceeding is the amount of money which a purchaser, willing but not obliged to buy, would pay to an owner, willing but not obliged to sell.")

[11] *Matter of McCannel*, 301 N.W.2d 910, 924 (Minn. 1980) ("'Market value,' the basis for all assessment valuation, is an attempt to create a fictitious sale of the subject property by assuming an owner willing to sell and a buyer desiring to buy.").

[12] *In re Est. of Anderson*, No. A15-1513, 2016 WL 3582414, at *4 (Minn. Ct. App. July 5, 2016) ("fair market value [is] the value the market was willing to bear in an arm's length transaction." (citing *Equitable Life Assurance Soc'y of the United States v. Cty. of Ramsey*, 530 N.W.2d 544, 555 (Minn.1995) (defining market value as "the price for which property would sell upon the market at private sale."))).

a seller is willing to purchase, in an open market through an arms-length transaction. *Id.* This standard has been used in breach of real estate contract cases. *See, e.g., Chechik v. Brayboy*, No. A04-1427, 2005 WL 1619265, at *3 (Minn. Ct. App. July 12, 2005) "[FMV] is the sum that a willing buyer would pay to a willing seller on the open market." (citing *DeZurik Corp. v. Cnty. of Stearns*, 518 N.W.2d 14, 16 (Minn. 1994))).

In proving the FMV of property under this standard, Minnesota courts may consider any reasonably competent, admissible evidence that it finds credible. *See Bury v. Bury*, 416 N.W.2d 133, 136 (Minn. Ct. App. 1987) ("We affirm the valuation if it is 'within credible estimates made by competent witnesses.'" (quoting *Johnson v. Johnson*, 392 N.W.2d 922, 925 (Minn. Ct. App. 1986))); *see also Hertz v. Hertz*, 229 N.W.2d 42, 44 (Minn. 1975) ("[V]aluation is necessarily an approximation in many cases, and it is only necessary that the value arrived at lies within a reasonable range of figures."). In this way, FMV is not a specific value that can be proven with exactness. *Id.* Courts will consider a variety of evidence that reasonably supports a fair market valuation, including, *inter alia*, appraisals, *See DeZurik Corp. v. Cnty. of Stearns*, 518 N.W.2d 14, 17 (Minn. 1994) (three competing appraisals), the testimony of the property owners, *see LaValle v. Aqualand Pool Co., Inc.*, 257 N.W.2d 324, 328 (Minn.1977) (holding that an owner of real estate is competent to testify concerning its value), and the price paid in a subsequent sale of the property:

> [I]t seems to be the general rule that where a resale is made upon as favorable terms and under as favorable circumstances as the original sale, and is made within a reasonable time and after proper notice to the purchaser, the amount received on the resale may properly be admitted as evidence—though not conclusive—of the market value of the land for the purpose of fixing damages.

*Costello v. Johnson*, 265 Minn. 204, 211, 121 N.W.2d 70, 76 (1963).

In general, in determining FMV, Minnesota courts will consider any competent witnesses experienced in the specific real estate market that has personal knowledge of the property at

issue. *See, e.g., Knutson v. Lasher*, 219 Minn. 594, 18 N.W.2d 688 (1945) (architect who was familiar with value of building as constructed, and value if constructed according to contract, was competent to testify concerning such values); *Alstores Realty, Inc. v. State*, 286 Minn. 343, 176 N.W.2d 112 (1970) (tax assessor qualified to express a valid appraisal of value of land were supported by his knowledge of land values in particular area); *Grimm v. Grimm*, 190 Minn. 474, 475, 252 N.W. 231, 232 (1934) (farmers having an opinion of value of farm lands in their neighborhood); *St. Paul Mercury Indem. Co. v. Lyell*, 216 Minn. 7, 14, 11 N.W.2d 491, 495 (1943) (individual engaged in the real estate business in the vicinity of the properties for some years and who made a trip to view the property); *Lammi v. Lammi*, 348 N.W.2d 372, 375 (Minn. Ct. App. 1984) (real estate agent's market valuation). *See also State by Humphrey v. Strom*, 493 N.W.2d 554, 559 (Minn. 1992) ("To determine the fair market value of property in a condemnation proceeding any competent evidence may be considered if it legitimately bears upon the market value.") (cleaned up).

A FMV determination will be upheld as long as there is some "meaningful and adequate evidentiary support," which is not clearly erroneous. *See In re Est. of Wingen*, No. A12-1550, 2013 WL 2460190, at *3 (Minn. Ct. App. June 10, 2013) (citing *Montgomery Ward & Co. v. Cnty. of Hennepin*, 482 N.W.2d 785, 791 (Minn. 1992)). As noted in that case:

> The supreme court has observed that real estate appraisal 'is at best an imprecise art,' and a district court asked to determine the value of real estate 'brings its own expertise and judgment to the hearing, and its valuation need not be the same as that of any particular expert as long as it is within permissible limits and has meaningful and adequate evidentiary support. When viewed in the light most favorable to it, the district court's finding of fair market value had meaningful and adequate evidentiary support and was not clearly erroneous.

*Id*. (quoting *Montgomery Ward & Co.*, 482 N.W.2d at 791).

### b.  FMV Accounts for Contingencies: Highest and Best Use.

There is no found caselaw in Minnesota requiring a reduction to a property's FMV based on contingencies in a purchase agreement.  This is presumably because virtually all real estate contracts have some form of contingencies—e.g., financing, inspections, title review, permits etc.—which the willing buyer and willing seller have factored into their price.  In this way, FMV accounts for any contingencies. In other words, the contingencies are factored into the FMV. The concept of "highest and best use," as used by courts and real estate appraisers for determining FMV, demonstrates this fact.

Appraisals of commercial real estate must be considered in light of its "highest and best use," which is "[t]he reasonably probable use of property that results in the highest value." *See Menard, Inc. v. Cnty. of Clay*, 886 N.W.2d 804, 811 (Minn. 2016) (citing *Appraisal Institute, The Appraisal of Real Estate* 332 (14th ed. 2013).  Indeed, in the appraisals provided by Debtors, the appraisers considered the Properties' highest and best use in determining their FMV, using the same definition cited above. (*See* Ex. 66 at CATES 947).

In determining the highest and best use, courts and appraisers may consider "[e]vidence of value for uses prohibited by an ordinance" when there is "evidence showing a reasonable probability" that the property will qualify for a change in zoning in the "near future." *Berry & Co. v. Cnty. of Hennepin*, 806 N.W.2d 31, 35 (Minn. 2011).  In *Hedberg & Sons Co. v. Hennepin Cnty.*, the Minnesota Supreme Court explained the rationale for allowing a future zoning use to be considered as a property's highest and best use in determining FMV:

> If, however, such a purchaser would be presently willing to pay more than an amount justified by the uses permitted under existing zoning because of a general belief that there is a *probability* of a change in zoning, to permit a more valuable use within the reasonably foreseeable future, such evidence is admissible because it does reflect a factor in the present fair market value under existing zoning.

305 Minn. 80, 92, 232 N.W.2d 743, 751 (1975) (quotation omitted).  Accordingly, if a willing buyer and willing seller have valued the property based on "a general belief that there is a probability of a zoning change," and that future zoning reflects the property's highest and best use, then their agreed upon price is evidence of the property's FMV, despite being contingent on a future zoning change.  In this way, FMV, i.e., the price at which a buyer is willing to sell and a seller is willing to buy, accounts for such contingencies.

In this case, there can be no dispute that the highest and best use for the Properties was commercial, specifically light industrial, and not rural residential as currently zoned.  Both the Medina 55 Purchase Agreement and the Oppidan Purchase Agreements include contingencies for government approvals, (*see* Ex. 61-B § 3.1.5; Ex. 121 at § 3.2), and Oppidan's representative, David Scott, testified that the purchase price of $10,230,000 in the Original Oppidan Contract, represented their value of the property as fully entitled, i.e., zoned and approved for commercial purposes.  Both purchase agreements, therefore, reflect a valuation made by knowledgeable and willing buyers, in an arms-length transaction in the open market, factoring in a "general belief that there is a reasonable probability of a zoning change."   The purchase agreements here, therefore, represent the FMV of the Properties for their respective time periods. Occam's razor supports such a finding—both Medina 55 and Oppidan knew the Properties required a zoning change in order to be used for their intended purposes, yet both parties entered into purchase agreements on almost identical terms based on a price that factors in those contingencies.

Additionally, Debtors' testimony establishes that they, too, considered the Properties' highest and best use to be commercial.  Mr. Cates testified that, although their bankruptcy petition lists the Properties' values at a little over one million dollars each, (Ex. 65 at CATES 843-44), which they based on the appraisals, (Exs. 66-67) (using the current zoning of rural residential as the Properties' highest and best use), the Debtors would never sell the Properties at

those appraised values. Therefore, Debtors themselves disregard their own appraisals' determination of highest and best use.[13] The reality here is that no one in this case valued the Properties based on their current zoning of rural residential; all the parties involved valued the Properties based on the "reasonable probability" that the Properties would be zoned for commercial purposes "in the near future." *See Berry & Co. v. Cnty. of Hennepin*, 806 N.W.2d 31, 35 (Minn. 2011).

Further, as discussed above, Ms. Lorsung testified that it was reasonable to consider that the Properties would be granted a zoning change because, *inter alia*, CRP No. 1 was already zoned for commercial use; the neighboring property to the South, "Twinco," was already in use as a light industrial business; Polaris was down the road as light industrial; a nearby property owner had recently obtained a comprehensive plan amendment and rezoning to commercial use; and the neighboring property to the North had been guided for sewer/water connection, leap frogging the Debtors' Properties. Additionally, both the Debtors, Ms. Lorsung, and Mr. Scott testified that the City recently approved a comprehensive amendment to reguide CRP No. 2 for commercial light industrial use. (*See also* Ex. 123 at § V(D)) (July 19, 2022, City of Medina consent agenda minutes approving comprehensive plan amendment for CRP No. 2)

Based on the above, together with November 8, 2000, Settlement Agreement, (Ex. 120), and the fact that everyone involved considered the Properties' highest and best use to be commercial, supports the finding that there was a "reasonable probability" that the Properties'

---

[13] Notably, the appraisals offered by Debtors, which they ostensibly disregard, (Exs. 66-67), make no mention of the November 8, 2020, Settlement Agreement between Mr. Cates' father and the City. (Ex. 120). Nor is there any mention of the purchase agreement with Medina 55 or its application to the City for a comprehensive plan amendment and zoning change. Had the appraisers been aware of these facts, especially the existence of an enforceable settlement agreement allowing the Properties to be zoned for commercial uses, their valuations would have likely been different. (*See* Ex. 66 at CATES 961) (noting "The value above indicates a long-term hold with rural residential/agricultural use in the interim. If found to be otherwise, value could differ.").

zoning would be changed in the near future.  Therefore, the contingencies in Original Oppidan

Agreement do not negatively impact the FMV of the Properties, as those contingencies were

accounted for in the purchase price, which can be used to support the Court's FMV

determination herein.

### c.  FVM of Properties on Date of Breach.

Pursuant to bankruptcy law, the date of the breach for purposes of fixing Medina 55's

damages claim here is May 17, 2021.  (Ex. 65) (Debtors' bankruptcy petition).  While the parties

focused on September 1, 2021, as the date of breach in litigating this matter, i.e., the date of the

Original Oppidan Agreement, there is "meaningful and adequate evidentiary support" in the

record to support the finding that the market conditions on the date of the Original Oppidan

Agreement, September 1, 2021, were the same in May 2021. *See In re Est. of Wingen*, No. A12-

1550, 2013 WL 2460190, at *3 (Minn. Ct. App. June 10, 2013) (citing *Montgomery Ward & Co.

v. Cnty. of Hennepin*, 482 N.W.2d 785, 791 (Minn. 1992)).  Indeed, Jon Yanta of Cushman &

Wakefield, testified that he has nearly 40 years of commercial real estate experience in the

Medina, Minnesota market area, which includes valuing properties.  In that regard, he further

testified that commercial real estate prices beginning in mid-2020 through 2021, were at their

peak for this market area, and because of this, his market valuation for September of 2021 would

have been the same in May of 2021.[14]  There is no reason to believe that the market conditions

---

[14] While the Court opined that Mr. Yanta's broker price opinion, (Ex. 57), reflected errors that
called into question its credibility, that does not mean the Court has to disregard all of Mr.
Yanta's testimony.  His testimony regarding the commercial real estate market in the western,
twin cities, is credible.  It is generally known that all real estate, commercial and residential,
were experiencing all-time highs in terms of prices during these time periods given historically
low interest rates and high demand stemming from the covid-19 pandemic.  The Court, therefore,
can reasonably rely on his testimony regarding the market conditions being the same in May of
2021 as they were in September of 2021.

would have been any different between May 17, 2021, and September 1, 2021, that would justify a different FMV for the Properties during those periods.

Mr. Cates also testified that the FMV for his Properties in September of 2021, was $10,230,000. (*See* Ex. 124 at ¶ 21).[15]  And the Stipulated Evidence shows that in early 2021, Mr. Cates recognized that the value of this Properties was increasing, suggesting to Medina 55 that because he was willing to take a "substantial decrease in purchase price for a much faster closing," that Medina 55 could flip the Properties for a profit. (*See* Ex. 38 at CATES 000305) ("I think this is a reasonable request given that the current market for my parcels is increasing that [] you could also get a price increase in purchase price."). While negotiating this "substantial decrease" in the price of his Properties, the offer he made was five million for both CRP Nos. 2 and 3. (*See* Ex. 43 at CATES 000387) ("Also, the 5 million for early/accelerated closing listed in the 4th amendment (Date to be determined) was always for CRP#2 & CRP#3 Bobby knows this!").  Accordingly, Mr. Cates' subsequent testimony at the Hearing that his FMV opinion for the Properties in September 2021 was $5 Million, is belied by the evidence: he entered into the Original Oppidan Agreement for a price of $10,230,000; he testified to the Court, at that time, that $10,230,000 represented the FMV; and in his emails in early 2021, he indicated that the $5 Million price represented a "substantially" discounted value in order to close quickly.

Based on the foregoing, and as supported by the evidence submitted to the Court, the FMV of the Properties on May 17, 2021, was $10,230,000.  This valuation is based on (1) the Debtors' testimony of FVM in September 2021, (Ex. 124 at § 21); (2) the Original Oppidan Agreement price of $10,230,000, (Ex. 121), which reflects the price of a willing seller and will buyer in an arms-length transaction in the open market, considering its highest and best use; (3)

---

[15] Medina 55 stands by the arguments raised in its March 6, 2023, Motion to Exclude Witnesses and Evidence, (Dkt. No. 292 at ¶ 35), that Debtors should be judicially estopped from arguing a different FMV for the Properties.

all the parties involved, including Oppidan, reasonably believed the properties would be zoned for commercial use in the near future, which was factored into the purchase prices for the Original Oppidan Contract; and (4) the market conditions between May 17, 2021, and September 1, 2021, were the same, as supported by the testimony of Mr. Yanta.

### d. Loss of the Bargain Damages to Medina 55.

As discussed above, the damages for breach of a real estate contract are the difference between the contract price and the fair market value of the property at the time of breach, referred to as the "loss of the bargain" rule. *Greer v. Kooiker*, 312 Minn. 499, 513, 253 N.W.2d 133, 142 (1977). The contract price in the Medina 55 Purchase Agreement was 9,175,582.61, (Ex. 61-A at §§ 2.1, 2.2, and 11), while the FMV of the Properties on May 17, 2021, was $10,230,000. The difference being, $1,054,417.39. Medina 55 is entitled to recover this amount as its damages resulting from Debtors' breach of the Medina 55 Purchase Agreement.

Medina 55 is also entitled to recover its attorney's fees in litigating this dispute pursuant to section 5.5 of the Medina 55 Purchase Agreement, to be proved following the Court's ruling on its Claim. *See* Fed. R. Civ. P. 54(d).

### e. Earnest Money and Medina 55's Out-Of-Pocket Costs.

In the event the Court determines that Medina 55 is limited to liquidated damages under the Medina 55 Purchase Agreement, Medina 55 is entitled to the return of its Earnest Money, as well as its out-of-pocket costs and professional fees incurred in preparing and performing under the purchase agreement, including its attorney's fees. (*See* Ex. 61-A §§ 5.5, 16.2(i)). To that end, Medina 55 assumed all of Atkinson Holdings, LLC's obligations, responsibilities, and liabilities incurred in connection with the Medina 55 Purchase Agreement. (*See* Ex. 64) (May 2021 Assignment and Assumption Agreement between Atkinson Holdings, LLC and Medina 55). As a result, Medina 55 received the benefit of various services performed by individuals for

27

Atkinson Holdings, LLC, with respect to their work on the Medina 55 project.  In assuming Atkinson's liabilities with respect to the Medina 55 Purchase Agreement, it was the intent that Medina 55 would use investments or proceeds from the Medina 55 project to pay those individuals.  In that regard, Medina 55 benefited by these services and intended to pay for those services, whether or not a contract existed directly between Medina 55 and those service provides.

With this understanding, Medina 55 is entitled to the return of the $100,000 Earnest Money, (*see* J. Stip. of Facts ¶ 12), and recover the following incurred out-of-pocket costs and expenses within the meaning of the Medina 55 Purchase Agreement: (1) $243,250 for consulting fees owed to Rose Lorsung/Pulse Land Group, Inc (*see* Ex. 55) (invoice addressed to both Atkinson Holdings and Medina 55); (2) $10,000 for wetland delineation services performed by Westwood, (*see* Ex. 50) (email from Westwood indicating they have performed $10,000 worth of delineation work); (3) $36,500 in legal fees to Culligan Legal & Business Counsel, PLLC (*see* Ex. 49) (invoice addressed to both Atkinson Holdings and Medina 55 for services rendered on the "medina project"); and (4) $34,692.50 in legal fees to Huffman, Usem, Crawford, Greenberg & Smith, P.A. (*See* Ex. 56) (statement of invoices for Medina matter).  These documents were included as part of the Stipulated Evidence in this matter, and reflect $324,442.5 in out-of-pocket costs incurred by or for the benefit of Medina 55, which Medina 55 assumed the obligation to pay, when it assumed the Medina 55 Purchase Agreement.  Together with the Earnest Money of $100,000, Medina 55 should be entitled to recover $424,442.50, as well as its attorney's fees (to be proved later), in the event the Court limits Medina 55's recovery in this matter to the liquidated damages set out in the Medina 55 Purchase Agreement.

### f.   A Contract is Not required to incur Out-Of-Pocket Costs.

A contract is not required to incur a liability to pay for services rendered. *See, e.g., Am. Druggists Ins. v. Thompson Lumber Co.*, 349 N.W.2d 569, 573 (Minn. Ct. App. 1984) (discussing the "account stated" doctrine in Minnesota); *Roberge v. Cambridge Co-op. Creamery*, 248 Minn. 184, 188, 79 N.W.2d 142, 145 (1956) (discussing implied contracts at law); *Williams v. Dow Chem. Co.*, 415 N.W.2d 20, 24 (Minn. Ct. App. 1987) (recognizing that an agreement to pay for legal services need not be expressed in a contract, but can be inferred under an implied contract or implied under unjust enrichment).   In this case, Mr. Atkinson testified regarding the above-mentioned service providers and their invoices for work on the Medina project.   (*See* Ex. 137 pp. 61:4-68:4; Exhibits referenced therein).   The documents themselves are either addressed to Medina 55 (in addition to Atkinson Holdings), or reference the Medina matter. (Exs. 49, 50, 55, 56).   The Assignment and Assumption Agreement (Ex. 64) represents an understanding between Medina 55 and Atkinson Holdings, that Medina 55 would assume those obligations as they were provided in furtherance of the Medina 55 Purchase Agreement.   Accordingly, there is a reasonable basis to find that Medina 55 is responsible for those amounts under theories of implied contract, account stated, or unjust enrichment.

This is especially true for Ms. Lorsung's consulting fees through her Pulse Land Group company.  (Ex. 55).  As she testified at the hearing that the invoice she provided, (*id.*), reflected accurate fees and charges for her work on the Medina project, which benefited Medina 55. There is a sufficient basis, therefore, to determine that Medina 55 is responsible for her fees under an implied contract or unjust enrichment theories, and therefore, Medina 55 should be able to recover those amounts from Debtor as part of its out-of-pocket costs.

### g.  Out of Pocket Costs include Incurred but Unpaid costs.

There is no found case law limiting recoverable "out of pocket costs" to those actually paid, rather than incurred or charged.  Instead, Minnesota courts will award recoverable costs to a prevailing party for which such party became legally liable for. *Cf. Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 896 N.W.2d 115, 128 (Minn. Ct. App. 2017), *aff'd*, 913 N.W.2d 687 (Minn. 2018) (determining that costs for which the prevailing party became "liable for or subject to" were awardable as disbursements under Minn. Stat. § 549.04, subd. 1).  The same interpretation should be given to out-of-pocket costs here: those costs which Medina 55 became liable for or subject to, should be recoverable under the liquidated damages provision of the Medina 55 Purchase Agreement.  (Ex. 61-A at § 16.2(i)).

### III.    There is No Evidence That Medina 55 Anticipatorily Repudiated the Medina 55 Purchase Agreement.

Debtors claim that Medina 55 committed a prior breach by anticipatorily repudiating the Medina 55 Purchase Agreement.  Whether or not this claim is a counterclaim or an affirmative defense, Debtors carry the burden of proof.  *See D.H. Blattner & Sons, Inc. v. Firemen's Ins. Co. of Newark, N.J.*, 535 N.W.2d 671, 675 (Minn. App. 1995) (stating that a party bringing a breach-of-contract claim has the burden of proof regarding that claim), *review denied* (Minn. Oct. 18, 1995); *See also* 17B C.J.S. Contracts, *Proof of breach of contract subject to action and resulting damages* § 953 (West 2023) ("The burden of proving a breach of contract and resulting damages is ordinarily on the plaintiff, but if the defendant asserts the breach as a ground of affirmative relief or as an affirmative defense, the burden is on the defendant.").  Debtors have failed to carry their burden of proof, as the evidence submitted to the Court does not support their anticipatory repudiation claim.

A review of Minnesota law establishes the following requirements for proving a claim of anticipatory repudiation:

- "It is basic hornbook law that an **unconditional repudiation** of a contract, either by words or acts, which is communicated to the other party prior to the time fixed by the contract for his performance constitutes an anticipatory breach." *Matter of Haugen*, 278 N.W.2d 75, 79 at n.6 (Minn. 1979) (emphasis added).

- "An anticipatory breach occurs when a party to a contract makes an **unqualified repudiation** of the contract; **mere refusal does not eliminate the need to make a tender.**" *Drewitz v. Motorwerks, Inc.*, No. A09-1529, 2010 WL 1541436, at *3 (Minn. Ct. App. Apr. 20, 2010) (emphasis added) (citing *Space Ctr., Inc. v. 451 Corp.*, 298 N.W.2d 443, 450 (Minn.1980).

- "If the refusal to perform is not unconditional and **if performance is still possible, there is no anticipatory breach**." *Id.* (emphasis added) (citing *State ex rel. Friends of the Riverfront v. City of Minneapolis*, 751 N.W.2d 586, 593 (Minn. Ct. App. 2008)).

- "Anticipatory breach may be found only upon **definite and unequivocal manifestation of intention** on the part of the repudiator **that he will not render the promised performance when the time fixed for it in the contract arrives**." Bell v. Olson, 424 N.W.2d 829, 832 (Minn. Ct. App. 1988) (emphasis added) (citing 4 Corbin on Contracts § 973 (1951)).

Based on the above cases, in order for Debtors to establish a claim for anticipatory repudiation, they must prove that Medina "clearly," "unconditionally" and "unqualifiedly" communicated to Debtors, through words or conduct, that it would not perform under the Medina 55 Purchase Agreement at the time when performance was due. There is no such evidence.

### a. There is no Clear, Unconditional and Unqualified Statement that Medina 55 Refused to Perform under the Medina 55 Purchase Agreement.

To support their claim that Medina 55 anticipatorily repudiated the Medina 55 Purchase Agreement, Debtors point to several emails between Mr. Atkinson, Ms. Lorsung, and Mr. Cates negotiating the inclusion of Debtors' additional properties, including their homestead, to the larger assemblage of properties added to the project through a "fourth" amendment. (*See* J. Stip. of Facts at Sec. G, ¶¶ 49-69). Specifically, Debtors point several instances where Mr. Atkinson and Ms. Lorsung stated at various times that "we are at a stand still," and that a purchase agreement for the additional properties would be needed "to move forward" with the application to the City. (*See* J. Stip. of Facts ¶¶ 54, 59-63). Debtors contend that these statements amounted

31

to a refusal of Medina 55 to perform on the underlying Medina 55 Purchase Agreement for just CRP. No 2 and CRP. No 3.  However, those statements cannot be considered clear, unequivocal and unqualified statements of a refusal to perform by Medina 55.

To the contrary, all those statements were made in reference to the fourth amendment being negotiated by Medina 55 and Debtors.  As Ms. Lorsung testified, her statements to Debtors that "we are at a stand still," (J. Stip. of Fact ¶ 62), and that "we need that signed to move forward," (*id*. at ¶ 63), meant that Medina 55 was at a stand still with respect to the fourth amendment, which included the larger assemblage of properties, and they needed the amendment signed to "move forward" with an application to the City that included all of the properties.  Ms. Lorsung further testified that the fourth amendment was never presented as a "take or leave it" offer with respect to the underlying deal for CRP Nos. 2 and 3.  Nor did she ever tell Debtors that Medina 55 would refuse to perform on the Medina 55 Purchase Agreement if they did not sign the fourth amendment.

Similarly, Mr. Atkinson testified that the underlying deal for CRP Nos. 2 and 3 was never off the table while negotiating the fourth amendment.  (*See* Ex. 137 at pp. 44:20-55:12).  In fact, Mr. Atkinson testified that he is "still interested in the Properties," and he "never said that [] it's either 100 acres-plus or no deal." (*See id*. at pp. 51:16-52:12).  There is nothing in the record to support a finding that Medina 55 presented the fourth amendment as a take it or leave it deal, such that Medina 55 would not perform on the purchase agreement if Debtors did not sign the fourth amendment.  Indeed, when asked at the Hearing whether Mr. Atkinson or anyone with Medina 55 had ever clearly and unequivocally told her that Medina 55 would refuse to perform on the Medina 55 Purchase Agreement if Debtors did not sign the fourth amendment, Ms. Cates responded "no."

The record does not support a finding of anticipatory repudiation on the part of Medina 55. While the parties may have been speaking past each other or even misconstrued each other's statements when negotiating the fourth amendment, that only goes to show that their statements were not clear, unconditional, unequivocal, or unqualified. For these reasons, Debtors have failed to carry their burden in proving that Medina 55 anticipatorily breached the Medina 55 Purchase Agreement.

### b.  Performance was Not Rendered Impossible.

Debtors also contend that Medina 55 anticipatorily breached the agreement because its performance was rendered impossible. Debtors' argument concerning impossibility of performance is misplaced, however.

Debtors contend that given Ms. Lorsung's estimated timelines for obtaining the required City Approvals, (*see, e.g., J. Stip. Fact at ¶ 23*), it became impossible for Medina 55 to obtain those approvals by the Contingency Date (either January 31, or March 2, 2021). But obtaining the City Approvals was not Medina 55's primary performance obligation under the Purchase Agreement. The contingency for City Approvals was solely for the benefit of Medina 55, as Buyer, who could waive them at any time by notice to the Debtors. (Ex. 61-A at § 3.2) ("All the contingencies are specifically for the benefit of Buyer, and Buyer has the right to waive any contingency by written notice to Seller."). Accordingly, Medina 55's primary performance obligation under the purchase agreement was to pay the purchase price at Closing. And in that regard, the law presumes that parties are capable of performance until the stated time for performance is due. *Olson v. N. Pac. Ry. Co.*, 126 Minn. 229, 232, 148 N.W. 67, 69 (1914) ("So long as a contract remains in force, it may be assumed that the parties are able to perform according to its terms and will so do at the appointed time.").

Further, because Medina 55 could have performed simply by waiving the City Approvals contingency, its performance cannot be considered impossible.  As Ms. Lorsung and Mr. Scott testified, it is common for buyers in commercial real estate deals to waive their due diligence contingencies.

Despite this fact, Debtors contend that Medina 55's right to waive the City Approvals contingency is not material here because it was "illusory."  But Minnesota law does not support this contention, either.  Under Minnesota law, contractual conditions that are subject to one party's discretionary satisfaction, are enforceable because those provisions are subject to the implied covenant of good faith and fair dealing that is imbued into every contract in Minnesota. *See White Stone Partners, LP v. Piper Jaffray Companies, Inc.*, 978 F. Supp. 878, 881-82 (D. Minn. 1997) (applying Minnesota law and holding that lender's discretionary environmental escape clause in financing agreement was not illusory because it was subject to implied covenant of good faith and fair dealing); *See also Olson v. Farm Credit Bank*, 1993 WL 3838 (Minn. Ct.App. Jan 12, 1993) (citing Restatement (Second) of Contracts § 228 (1979), and *Mattei v. Hopper*, 51 Cal.2d 119, 330 P.2d 625, 626–27 (1958)); *See also Sterling Cap. Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998).  There is no dispute here that Medina 55's right to waive contingencies in the Medina 55 Purchase Agreement was supported by a good faith and fair dealing obligation. Accordingly, Minnesota law will not find such clauses as being illusory.

## IV.  There was no Breach of Good Faith and Fair Dealing by Medina 55.

Debtors' breach of good faith and fair dealing argument is equally without support.  As the party claiming the breach, Debtors have the burden of proof.  *See* 23 Williston on Contracts, *Implied covenant or promise of good faith and fair dealing* § 63:22 (4th ed.) ("[S]ince there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of

good faith and fair dealing is on the person asserting the absence of good faith.") (collecting cases).

In Minnesota, in order to prove that party breached their good faith and fair dealing obligation under a contract, the party asserting the breach must provide evidence of subjective bad faith, that is "that the accused party refused to fulfill a duty or contractual obligation based on an ulterior motive, not based on simply a mistake or negligence." *See JMH Land Dev. Co. LLC v. Siegle Fam. Ltd. P'ship*, No. A22-1111, 2023 WL 2125965, at *8 (Minn. Ct. App. Feb. 21, 2023) (citing *Sterling Cap. Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. App. 1998)). Indeed, in applying Minnesota law, the court in *In re ResCap Liquidating Tr. Litig*., 428 F. Supp. 3d 53, 109 (D. Minn. 2019), *aff'd sub nom. ResCap Liquidating Tr. v. Primary Residential Mortg., Inc.*, 59 F.4th 905 (8th Cir. 2023), held that in order to succeed on a breach of good faith claim, there needs to be evidence showing that the breaching party acted "dishonestly," or "maliciously," or by some other showing of "subject bad faith." *Id.* ("the substantial weight of authority is that the covenant is breached only by conduct that is dishonest or malicious or otherwise in subjective bad faith." (quotations omitted). Similarly, in *White Stone Partners, LP v. Piper Jaffray Companies, Inc.*, 978 F. Supp. 878, 881-84 (D. Minn. 1997), the court there, applying Minnesota law, explained that good faith is a "subjective standard," which requires a showing that the breaching party acted "dishonestly" with the intent to "unjustifiably hinder" the other party.

Based on the above caselaw, in order for Debtors to succeed on their good faith and fair dealing claim, Debtors are required to show that, in seeking the City Approvals, Medina 55 acted dishonestly, maliciously, or with some ulterior motive intended to unjustifiably hinder the deal or harm Debtors. A showing that Medina 55 was negligent in that regard, or that it was merely enforcing its contractual rights, is insufficient to prove bad faith. *See Sterling Cap. Advisors, Inc.*

*v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998) ("A party to a contract does not act in bad faith by asserting or enforcing its legal and contractual rights," and "[a]ctions are done in good faith when done honestly, whether it be negligently or not.") (quotations and citations omitted).  There is no evidence that Medina 55 acted with subjective bad faith in seeking the City Approvals.

As Ms. Lorsung testified, and as discussed above, *supra* at Sec. I(b), pp. 4-12, Medina 55 pursued a strategy in seeking the City Approvals designed to get investors and a reputable end-user on board, in order to increase their chances of success with the City.  Ms. Lorsung testified that this plan was based on her professional judgment and experience in dealing with the City of Medina and was implemented from the outset of her engagement, which the Debtors agreed to from the beginning.  Every action taken by Medina 55 along the way was made in its honest judgment in furtherance of this strategy.  And as Ms. Cates testified, the Debtors agreed to all the amendments to the Medina 55 Purchase Agreement, knowing they were under no obligation to do so.

Nothing in the record suggests that Medina 55 acted dishonestly, maliciously or with an ulterior motive intended to hinder or harm Debtors.  All of its actions were made in its honest judgment towards seeking the City Approvals pursuant to its strategy to obtain investors and a reputable end-user.  Indeed, when asked whether she believed that Mr. Atkinson harbored any bad faith, malicious intent, or otherwise acted in way intending to harm the deal or Debtors, Ms. Cates responded "no."   While Debtors may believe that Medina 55 was negligent with its strategy for seeking the City Approvals, that is not sufficient to show that Medina 55 acted in bad faith.  For these reason, Debtors have failed to meet their burden in proving that Medina 55 breached its obligation of good faith and fair dealing.

## V.   Debtors' Mitigation of Damages Argument is Flawed.

Debtors note that Medina 55 had the opportunity to outbid Oppidan, and failed to mitigate its damages by failing to do so. However, this argument is disingenuous because, pursuant to the Court's November 9, 2021, Order Approving the Oppidan Sale, [Dkt. No. 103], anyone offering to bid had 5 days to pay, in full and upfront, $10,230,000, plus an additional $250,000 in order to be a qualified bidder; while Oppidan only had to pay the refundable earnest money of $100,000 under its contract. [*Id.* at ¶ 12].  This was not a fair bidding process and Debtors' suggestion that it was is entirely disingenuous.

Further, the Debtors' mitigation argument is nonsensical because had Medina 55 put in a qualifying bid, it would have increased its damages, not decreased them. Indeed, the bidding process and any new purchase agreement resulting therefrom, would not have extinguished the Debtors' breach of the Medina 55 Purchase Agreement (and Medina 55's right to damages as a result of that breach). Consequently, by bidding a price higher than the Original Oppidan Agreement, Medina 55 would have provided evidence used to establish a higher FMV for the Properties to be used for its calculation of damages.  As a result, Medina 55 would have increased its damages by bidding, not decreased them as argued by Debtors.

The Debtors mitigation of damages arguments is therefore both disingenuous and nonsensical, and should be rejected the by the Court.

## VI.   Medina 55's Claim for Attorney's Fees.

The Medina 55 Purchase Agreement provides for recovery of Medina 55's attorney's fees for enforcing its rights under same. (Ex. 61-A § 5.5).  Under bankruptcy law, attorney's fees arising out of a prepetition contract but awarded post-petition fall within the Bankruptcy Code's definition of a claim. *See* 11 U.S.C.A. § 502(b).  While the Court mentioned a split of authority with respect to recovering such attorney's fees, a review of the caselaw suggests that the split in

authority rests largely at the district court level, while the prevailing view among the Circuit Courts that have considered the issue, have held that such costs are recoverable. *See SummitBridge Nat'l Invs. III, LLC v. Faison*, 915 F.3d 288, 293 (4th Cir. 2019) ("[I]n the years since [*Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007)] was decided, both the Second and Ninth Circuits have concluded that there is no basis in the Code for barring unsecured claims for post-petition attorneys' fees arising out of pre-petition contracts.") (citing *Ogle v. Fid. & Deposit Co. of Md.*, 586 F.3d 143, 146-149 (2d Cir. 2009), and *SNTL Corp. v. Ctr. Ins. Co. (In re SNTL Corp.)*, 571 F.3d 826, 839–45 (9th Cir. 2009)).   The U.S. Court of Appeals for the Fourth Circuit, accordingly followed suit in that case.  *Id*. at 293 ("In sum, like our sister circuits, we can find nothing in § 502(b) that expressly disallows unsecured claims for post-petition attorneys' fees.") (citations omitted).

It does not appear that this issue has been decided upon at any level in the Eighth Circuit post the *Travelers* decision.  Therefore, Medina 55 requests that the Court follow the reasonings and holdings applied by the Ninth, Second, and Fourth Circuits, *id.*, and permit Medina 55 to recover its post-petition attorney's fees incurred in this matter under 11 U.S.C.A. § 502(b).

## CONCLUSION

Based on the foregoing and the evidence submitted to the Court in this matter, Medina 55 has proven that Debtors breached the Medina 55 Purchase Agreement and, as result, they are entitled to contract damages of $1,054,417.39, plus its attorney's fees, or, in the alternative, liquidated damages of $424,442.50, plus its attorney's fees.  Medina 55 respectfully requests that its Claim be allowed in amount the Court deems supported by the evidence.  Debtors, on the other hand, have failed to carry their burden in proving that Medina 55 committed a prior breach

of the Medina 55 Purchase Agreement.  Accordingly, Medina 55 requests that the Court overrule

Debtors' Objection to its Claim.


Dated April 10, 2023                    RAVICH MEYER KIRKMAN
                                        McGRATH NAUMAN & TANSEY,
                                        A PROFESSIONAL ASSOCIATION

                                        By:   /e/ Ted C. Wagor_____
                                              Will R. Tansey, #323056
                                              Ted C. Wagor, #0396347

                                        150 South Fifth Street, Suite 3450
                                        Minneapolis, MN  55402
                                        (612) 332-8511
                                        wrtansey@ravichmeyer.com
                                        tcwagor@ravichmeyer.com

                                        *ATTORNEYS FOR CLAIMANT*