UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: Jeffrey Cates and Christine Cici-Cates | Bankruptcy No. 21-40882 |
| | Chapter 11 Case |
| Debtors | |

**NOTICE OF HEARING AND MOTION FOR AN ORDER CONFIRMING THE SALE OF CERTAIN REAL ESTATE OF THE DEBTORS' VIA AUCTION FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS**

TO:     ALL PARTIES IN INTEREST

1. Debtors Jeffery Cates and Christine Cici-Cates move the Court for the relief requested below and give notice of hearing.

2. **The Court will hold a hearing on this motion at 10:00 a.m. on Wednesday, December 27, 2023.** The hearing will be conducted telephonically. Please dial 1-888-684-8852 to call in for the hearing. When prompted, enter access code: 5988550. When prompted, enter security code: 0428. Any person wanting to appear in person must contact Judge Fisher's Courtroom Deputy at 651-848-1061 at least 48 hours prior to the hearing.

3. **Any response to this motion must be filed and served not later than Wednesday, December 20, 2023,** which is the first business day at least seven days before the time set for the hearing. Bankr. R. 9006(a); Local Rule 9006-1. UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.

4.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. § 157 and 1334, Bankr.

    R. 5005, and Local Rule 1070-1. This proceeding is a core proceeding. The petition

    comencing this chapter 11, subchapter V, case was filed on May 17, 2021. The case is now

    pending in this Court.

5.  This motion arises under 11 U.S.C. § 363(b) and (f) and Bankruptcy Rule 2002(a)(2) and

    6004(f)(1). The motions are filed under Bankruptcy Rules 9014 and Local Rules 2001-

    1(b)(2) and 9013-1 and 9013-2.

6.  This Court has jurisdiction over this motion under 28. U.S.C. §§ 157 and 1334, Bankruptcy

    Rule 5005 and Local Rule 1070-1. This proceeding is a core proceeding.

7.  Pursuant to Local Rule 9013-2(a), these Motions are accompanied by a memorandum of law,

    proposed order, and proof of service.

## PROCEDURAL POSTURE AND MOTION

8.  The Debtors confirmed their Fifth Modified Plan [ECF 269] on February 13, 2023 [order at

    ECF 275] on a consensual basis but with provisions that made the confirmation order similar

    to an order confirming a non-consensual plan.  Specifically, paragraph 9 of the confirmation

    order provided:

    > DISCHARGE.  As provided in the plan pursuant to 11 U.S.C. § 1141 and
    > notwithstanding approval of the plan under § 1191(a), 11 U.S.C. § 1192 shall
    > apply such that the debtors shall be discharged as soon as practicable after
    > completion of all payments due within the term of the plan, upon notice and
    > motion of the debtors.

ECF 275.

9.  The Debtors' Fifth Modified Plan provided that Oppidan Holdings, LLC would close on the

    sale of a previously approved sale of the Debtor's 30.19 acre plot of real property no later

than August 1, 2023.  ECF 269 15 of 40. Failing that, the plan provided that the Debtors

would sell enough of their real property (and, if necessary, their non-exempt personal

property) by public auction no later than October 30, 2023. *Id.*

10. Oppidan Holdings failed to close and, per the terms of the plan, lost all ability to purchase the

Cates' real estate as of August 1, 2023.

11. Based on the Debtors' understanding of the plan terms that ended Oppidan's rights in the

30.19 acre property as of August 1, 2023, the Debtors did not file a Minnesota Statutory

Cancellation of Real Estate Contract under Minn. Stat. § 559.217.

12. Debtors subsequently hired an auction company, Big Iron Realty, to conduct an auction sale

of both the 30.19 acre piece and the 36.92 acre piece. In order to market the property more

fully, Big Iron requested and all significant parties in interest agreed to extend the sales

period to November 30, 2023, at which time an auction would be held with a closing on or

before December 28, 2023.

13. After significant marketing efforts, (see Declaration of Big Iron Employee Michelle Weinzetl

attached as Exhibit A) the auction was held on-line from November 16-30, 2023.

14. The results of the auction were disappointing.  Based on comparable sales, previous offers

and appraisals, the Debtors believed that the sales price of the two parcels at auction would

greatly exceed the $4,000,000 needed in order for the sales proceeds to pay all debts and

allowed claims in the case and that no further sale of real estate or non-exempt personal

property would be necessary.

15. At auction, the 36.92 acre piece sold to the City of Medina, Minnesota for a cash price of

$1,017,146.00. The executed purchase agreement between Debtors and the City of Medina

and the resolution of the City Counsel for the City of Medina authorizing the purchase is

3

attached as Exhibit B.

16. At auction, the 30.18 acre piece sold to CorTrust Bank who credit bid for the purchase of the property in the amount of $1,207,200.00. See Declaration of Michelle Weinzetl.

17. Subsequently, CorTrust agreed to assign their right to purchase the 30.18 acre piece to the City of Medina, Minnesota for a gross cash price of $1,725,000.00. In addition, the City of Medina agreed to waive paying of a $406,000 pending Green Acres property tax assessment that the Debtors had agreed to pay in connection with the sale of the 30.18 acre property. The net to the estate is that it will receive a benefit of approximately $2,131,000 for the sale of the 30.18 piece to the City of Medina. The total sales price, after closing costs, is sufficient to significantly reduce the amount payable to CorTrust on their allowed claim; however no proceeds will be available to pay administrative, priority or general unsecured claims. See form of Assignment and form of purchase agreement for 30.18 acre property along with resolution of the City council of Buyer Minnesota authorizing the purchase as Exhibit C (resolution to be filed when available) attached as Exhibit C, and waterfall of sales proceeds, Exhibit D.

18. As a requirement of the sale of the two parcels, the Debtors have sought a title insurance commitment. The Title Commitment is attached as Exhibit E. Paragraph 7 of the Title Commitment provides that the following condition must be met:

> The effect of bankruptcy proceedings of Jeffrey Scott Cates and Christine CiCi-Cates, Debtor in Case No. 21-40882. The Company requires copies of the docket sheet, petition with schedules, and other satisfactory final nonappealable orders, plans, or documents in the bankruptcy proceedings authorizing the contemplated transaction. At the time the Company is furnished these items, the Company may make additional requirements for exceptions.

19. The Debtors have provided the required documents to the Title Insurance Company but were informed that in addition, quit claim deeds from Oppidan Holdings LLC and Atkinson

Holdings LLC would be needed to remove the bankruptcy exception from the title commitment. As the Court knows, Debtors and Atkinson Holdings, LLC are engaged in litigation and obtaining a quit claim deed from Atkinson Holdings is therefore impossible. Without the removal of the bankruptcy exception, the title commitment will not be issued and the two sales, which have a closing date of December 28, 2023, will not be able to be closed.

20. The fact that the auction was not held by October 30, 2023, the fact that the Debtors did not file a statutory cancellation of the Oppidan Holdings Contract and the stated necessity to obtain a quit claim deed from Atkinson Holdings, LLC will cause the title company to declare that the bankruptcy exception to the title policy to still be in place, despite the plan's provision for the sale of the two properties at auction as a last resort upon the failure of Oppidan Holdings to close on the sale of the 30.18 acre property by August 1, 2023.

21. Therefore, in an abundance of caution and upon the knowledge of the pending closing date, to avoid further delay in the sale of the Debtors' real estate, they request that the Court enter an order approving the sale of these two parcels free and clear of all claims and encumbrances.

## MOTION FOR RELIEF

27. The Debtors seek Court authorization, pursuant to 11 U.S.C. § 363(b), to sell the 36.92 acres (designated as CRP 3 or "Tract One") and the 30.19 acres (designated as CRP 2 or "Tract Two"-together "the Properties") on the terms in the purchase agreements executed by the Debtors and the City of Medina, Minnesota ("Buyer" or "Buyer") after the public auction. The Debtors seeks an order accomplishing the sales with the following terms:

   a.  That the Buyer is a good faith purchaser of the assets being sold and is authorized to enter into that certain Purchase Agreement of November 30, 2023 ("36.92 Acre Agreement") and that certain Purchase Agreement of November 30, 2023 ("30.18

5

Acre Agreement" – together ("The Agreements").

b.  The Debtors' notice of this motion complies with Rule 2002 for the sale of assets of the Debtors.

c.  The Debtors are authorized to sell the real estate described herein free and clear of all liens, claims, encumbrances and interests, on terms contained in the Agreements.

d.  All matters subject to the sales motion and the Agreements are "core" matters over which the Bankruptcy Court has jurisdiction pursuant to 28 U.S.C. Sections 1334 and 157;

e.  The Purchase Price of

f.  $1,017,146.00

g.  for CRP 3/Tract 1 constitutes fair value for the 36.92 acres.

h.  The Purchase Price of $1,725,000.00 for CRP 2/Tract 2 constitutes fair value for the 30.18 acres.

i.  The Properties have been adequately and sufficiently marketed;

j.  The Properties are being purchased in good faith and the Agreements otherwise complies with the requirements of Section 363(f) of the Bankruptcy Code;

k.  Sound business reasons exist for the approval of the Agreements;

l.  Except as otherwise provided in the Agreements, Buyer shall not be liable or obligated for any Liability (including Successor Liability), Employee and Consultant Claims, liens, interests, damages, costs, expenses, claims, or demands arising from or relating to the Debtors' ownership or operation of the Properties or the Debtors' conduct of its affairs on or prior to the Closing Date or taxes

6

arising out of the sale of the Properties.

m.  Any objections to the Motion and to the sale of the Properties are overruled.

n.  Buyer may close upon the sale of the assets as set forth in the Agreements unless
this order has been stayed, materially modified, withdrawn, or reversed as of the
Closing Date;

o.  The form of Warranty Deed  is approved pursuant to Section 365(f) of the
Bankruptcy Code.

l.  Upon the closing of the sale, the Properties are to be conveyed to Buyer free and
clear of all Encumbrances. The conveyance free and clear of Encumbrances shall
be self-executing, and neither the Debtors nor Buyer shall be required to execute
or file releases, termination statements, assignments, consents, or other
instruments in order to effectuate the conveyance of the Properties free and clear
of all encumbrances other than any assumed liabilities.

m.  Upon the closing of the sale, the Debtors shall pay the net proceeds to CorTrust
Bank in partial settlement of the secured interest held by CorTrust Bank, all liens
against the Properties (including the liens held by CorTrust Bank, N.A.) shall
automatically transfer and attach to the net proceeds of the sale in the same order,
priority, and validity as they had with respect to the Properties immediately before
the sale. No further action shall be required to perfect the lienholders' interest in
the net sale proceeds.

n.  The terms and provisions of this Order together with the terms and provisions of
the Agreements shall be binding in all respects on any trustee appointed in the
Bankruptcy Case, or if the Bankruptcy Cases is converted to a Chapter 7

7

proceeding, on any trustee appointed in a Chapter 7 proceeding.

28. The Debtors asks that the Court enter an order approving the Agreements under 11 USC §

363.

29. If testimony is necessary in connection with this Motion, Debtor may call the Debtors or

Dusty Finke, Medina City Planner, and/or a representative of CorTrust or their assignee as

witnesses in support of this Motion.

For the foregoing reasons, Debtor respectfully requests that the Court enter an order

approving the merits of the Motion and granting such other and further relief as the Court deems

appropriate.

Dated: December 6, 2023

/e/  *Kenneth C. Edstrom*
Kenneth C. Edstrom (148696)
Sapientia Law Group
120 South Sixth Street, Suite 100
Minneapolis, MN  55402
612-756-7100
kene@sapientialaw.com
Attorneys for Debtor

## <u>VERIFICATION</u>

I, Jeffery Cates, one of the Debtors in this Chapter 11 case declare under penalty of

perjury that the facts set forth in the preceding Motion and accompanying memorandum of

law are true and correct to the best of my knowledge, information, and belief and any

Exhibit attached hereto is a true and correct copy of the original document.


Date: December 6, 2023                    /s *Jeffery  Cates*_____

                                          Jeffery Cates

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re: Jeffrey Cates and Christine Cici-Cates          Bankruptcy No. 21-40882

Chapter 11 Case

Debtors

**MEMORANDUM OF LAW IN SUPPORT OF DEBTORS' MOTION FOR AN
ORDER CONFIRMING THE SALE OF CERTAIN REAL ESTATE OF THE
DEBTORS' VIA AUCTION FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS FACTS**

The facts relevant to this memorandum are laid out in the Motion and incorporated

herewith by reference.

ARGUMENT

A.  The Motion Should be Granted to Assist the Debtor's Reorganization.

Bankruptcy courts routinely defer to the debtor's business judgment on most business

decisions, including the decision how and when to sell assets. *See Group of Institutional*

*Investors Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523, 550 (1943). "More

exacting scrutiny would slow the administration of the debtor's estate and increase its cost,

interfere with the Bankruptcy Code's provision for private control of administration of the

estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v.*

*Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

Section 363(b) of the Bankruptcy Code provides, in part, that a debtor after notice and

a hearing, may sell or lease property of the estate outside the ordinary course of business. Per

Rule 6004(f)(1) of the Federal Rules of Bankruptcy Procedure, all sales of assets under the

bankruptcy code not in the ordinary course of business may be by private sale or by public

auction.  While the Debtor's Fifth Amended Plan [ECF 269] provided for a sale of the

1

Debtors' real estate at auction, the auction was not held within the time period contemplated by

the Plan. For this reason and for other reasons concerning possible delay of the sale due to

concerns by the title company, the Debtors believe that they need an order of the Court

allowing the sales essentially outside of the confirmed plan. Cases addressing the sale of a

debtor's assets outside a plan of reorganization examine a variety of issues, but most cases

focus on whether a sound business justification has been articulated for the sale of the assets

outside the context of a plan of reorganization. *Id.*; *Stephens Indus. Inc. v. McClung*, 789 F.2d

386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Delaware &

Hudson Ry Co.,* 124 B.R. 169 D.. Del 1991); *In re Titusville Country Club*, 128 B.R. 396

(Bankr. W.D. Pa. 1991).

        In examining business justifications for a sale of a debtor's assets outside a plan of

reorganization, a number of courts have relied upon the financial position of the debtor as

sufficient justification. *See In re Tempo Technology Corp.*, 202 B.R. 363 (D. Del. 1996) aff'd

141 F.3d 1155 (3rd Cir.1998) (sale of substantially all of a chapter 11 debtor's assets pursuant

to section 363(b) motion approved where debtor faced a severe cash shortfall and had no

readily available source of capital); *In re Mulberry Corp.,* 261 B.R. 757 (Banrk. M.D. Fla.

2001) (value of assets will rapidly depreciate if not sold immediately); *Stephens Indus. Inc. v.

McClung*, 789 F.2d 386 (sale justified based on the Debtor's continued losses).

  B.  Under The Facts Of This Case, The Debtors Can Sell Their Land Per The Terms Of The
      Auction And The Assignment By CorTrust Bank Of Their Rights To Purchase The Land.

        The paramount goal in any asset sale is to obtain the highest and best price available

under the circumstances of the case. The circumstances of this case are a fairly tortured

history of two separate development deals gone bad, increasingly poor economic conditions

for the sale of the property and an auction for the sale of the two parcels at auction.

The business judgment standard used in the section of the Bankruptcy Code governing the use, sale, or lease of assets outside the ordinary course of business is flexible and encourages discretion. *In re ASARCO, L.L.C.,* 650 F.3d 593 (5th Cir. 2011).

A bankruptcy court may even approve a private sale in lieu of a bidding process to a party bidding higher than the initial bidder when, among other things there was nothing to suggest that private purchaser was not acting in good faith. 11 U.S.C. § 363(b). *In re 160 Royal Palm, LLC,* 600 B.R. 119, 127 (S.D. Fla. 2019).

A debtor is in better position than court to choose between possible suitors. A debtor knows its industry and its business and which bidder is best positioned to take advantage of the opportunity. *In re Castre, Inc.,* 312 B.R. 426, 429 (Bankr. D. Colo. 2004).

The Debtors desire to approve a sale to the City of Medina after a well-advertised auction took place.  That is, under the circumstances, a sound use of their business judgment. Further, the sale of a portion of the Debtors' real estate is not undertaken in an effort to circumvent the protections provided through the plan confirmation process. The Debtors will propose a newly modified plan of reorganization concerning the sale of the remainder of their property and hopes to achieve consummation of its plan pursuant to the terms of the newly modified plan.

In light of the present circumstances, concrete business justifications exist for the proposed sale. The Court should grant approval of the sale of the Properties pursuant to the terms of the Agreements.

C.  There is No Collusion or Bad Faith in the Proposed Sale

There is no relationship between the City of Medina and the Debtors nor any relationship between the Debtors and the sales agents who have been hired to assist in the sales process (The Agreement provide for a sales commission to Big Iron Realty). There

was no self-dealing or manipulation in the negotiation of the price of the sale. The

approved sale of the Debtors' assets represents the exercise of sound business judgment.

## CONCLUSION

The Debtors have demonstrated that a sale of its real estate assets represents the

exercise of sound business judgment, and that this motion is necessary to consummate the

Agreements with the City of Medina. Therefore, the Debtors respectfully request that the Court

grant the relief requested in the Motion.

Dated: December 6, 2023

/e/   *Kenneth C. Edstrom*
Kenneth C. Edstrom (148696)
Sapientia Law Group
120 South Sixth Street, Suite 100
Minneapolis, MN  55402
612-756-7100
kene@sapientialaw.com
Attorneys for Debtor

# Exhibit A

# Declaration of Michelle Weinzeitl

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re: Jeffrey Cates and Christine Cici-Cates          Bankruptcy No. 21-40882
Chapter 11 Case

Debtors

---

## DECLARATION OF MICHELLE WEINZETL

Michelle Weinzetl, under penalty of perjury, declares and verifies that the following is true and correct to the best of her own personal knowledge.

1.     I am a duly licensed real estate broker. I am employed by Big Iron Realty, A/K/A bigiron.com headquartered in the state of Nebraska. A copy of my bio is attached as Exhibit 1.

2.     I was hired post-confirmation by the Debtors case to act as a realtor for the now reorganized Debtor for a commission of 5% of gross sales of any closed purchase of real estate. A copy of my agreement with the Debtors is attached as Exhibit 2 to this Declaration.

3.     BigIron.com is an expert in the sale of farm and commercial real estate across the Midwest and nationally.

4.     This declaration is submitted in support of the motion to confirm the sale of two pieces of real property through Auction Free and Clear of all liens and encumbrances.

5.     Attached as Exhibit 3 is a report detailing the marketing done to obtain the highest value possible at auction for the Debtors' real property.  The work done has been substantial and I request that the court approve the motion.

Dated: _____          _____
Michelle Weinzetl

1

# EXHIBIT ONE – BIO OF MICHELLE WEINZETL

# Michelle  Weinzetl

Michelle  brings a wealth of knowledge and experience to Big Iron Realty. Her diverse 25 plus years of real estate experience includes facilitating land transactions as well as commercial, rural, and recreational properties. representing landowners to assist in the acquisition or disposition land and farms through traditional listings and a variety of land auction formats.

Shelly's is communicative, thorough, and detail oriented. Her commitment to delivering valued customer solutions has benefited major clients to include financial institutions, governmental agencies, bankruptcy trustees and individual sellers. Shelly has the proven experience to support and guide buyers though the property procurement process . As the real estate industry evolves Shelly continues to identify innovative approaches to deliver unique and tailored customer value.

## Areas of Expertise

- Farm Land
- Real Estate Auctions
- Hobby Farms
- Recreational Properties
- Institutional Investor Portfolio Creation
- Strategic Marketing
- Real Estates Acquisitions
- Valuation of Real Estate

## Education and Certification

- Licensed Real Estate Broker:
  - Minnesota
  - South Dakota

  - ○ Wisconsin
  - ○ Nebraska
- World Wide College of Auctioneering
- Professional Ringmen's Institute

## Community Focus

- Volunteer and Board Member of Midwest Outdoors Unlimited

## Memberships

- Realtors Land Institute
- Minnesota Auctioneers Association

Email: Michelle.Weinzetl@BigIron.Com

Phone: 763-300-5055

# EXHIBIT TWO
# REAL ESTATE SALES CONTRACT WITH DEBTORS





# Farm, Ranch, & Land Exclusive Right to Sell or Exchange Listing

This is a legally binding agreement. If not understood, seek legal advice.

Jeff Cates                    Christine  Cates                              (Seller) appoints *BigIron Realty* herein after
referred to as Broker, as Seller's exclusive agent for the purposes and under the terms set forth below with my specific Seller's Limited
Agent to be   Michelle Weinzetl                        .   The Agents(s) named in this paragraph and the Seller's Agents who may be
appointed by the Broker are collectively referred to in this Listing Agreement as Seller's Agents. All responsibilities and duties of the
Broker shall also be the responsibilities and duties of the Seller's Agent.

*1.   Purpose of Agency:*   The purpose of this sole and exclusive right-to-sell agency agreement is to engage the efforts of *Broker* to
accomplish the sale of the real property legally described as:

P.I.D.  04-118-2314-0004  30.18 Acres Lot #1 , Block #1 – CATES RANCH SECOND ADDITION 2575 CATES RANCH DRIVE
P.I.D.  04-118-2311- 0002  36.92  Acres Lot #3 , Block #1- CATES RANCH
See Addached Addendumn:

Land Location (Directions):   From I494 / Highway 55 in  Plymouth take Highway 55 West to Willow Drive.

Head North on Willow to land on East side of the road.

Personal Property Included:   All personal property wanted to be retained by the sellers to be removed prior to closing

911 Address   2575 Cates Ranch Drive             Hamel              MN              Hennepin7
              (Street Address)                    (City)             (State)         (County)

*2.   Effect of this Listing:*   By appointing Broker as Seller's exclusive agent, Seller agrees to conduct all negotiations for the sale of
the property through Broker and to refer to Broker all inquiries received in any form from any source during the term of this
Agreement.  Seller agrees not to have conversation with any potential buyers.

*3.   The Listing Period:*  This Agreement shall be for one year, beginning Sept 21st                    20 23  and continuing through
 Jan 10th              20 24 .

*4.   Price and Term:*
      a.   Private Treaty/Private Auction. The Listing Price for the Property shall be:  Selling with No Reserve
           on the following terms: cash or other terms acceptable to Seller. Seller agrees to consider any reasonable offers presented.
           Broker will pay all the advertising expense.
      b.   ☑ Online Auction/_____Public Auction. Property to sell at unreserved auction on  Nov 30th 2023          . Seller to
           pay $ 0              towards advertising and marketing.  Property to sell on online www.bigironrealty.com.

*5.   Survey* of the real estate shall not be made prior to the closing hereof and if one is to be made it shall be at the expense of the
Buyer.

*6.   Professional Service Fee:*  Seller agrees to pay Broker a professional service fee of 4.5% of     gross selling price if:
      a.   Broker procures a purchaser/exchange during the term of this Agreement, ready, willing and able to purchase at the above
           price and terms, or any other price or exchange value agreeable to Seller, or
      b.   Broker is prevented from closing a sale or exchange of this Property by existing liens, judgments, or suits pending against
           this Property, or the owners thereof; or
      c.   Seller or anyone else sells, exchanges, leases, rents or otherwise transfers the Property during the period of this Agreement;
      d.   The Property is sold, exchanged, leased or rented or otherwise transferred within 90 days after the expiration of this
           Agreement to any person, firm or corporation whom Broker or any person representing Broker, has offered this Property
           during the terms of this Agreement; or
      e.   Seller prevents the sale of this Property by adverse actions or attempting to cancel this Agreement. Fee shall be payable in
           cash upon happening of any of the above events, or at the closing, whichever occurs first. Note: the amount or rate of a real
           estate commission is not fixed by law. Seller authorizes Broker or other escrow agent to pay Broker all sums due from
           Seller's funds or proceeds of the sale. If a prospective purchaser deposits earnest money for this Property and thereafter
           defaults, one half of same (but not exceeding the amount of Broker's fee recited herein) shall be paid to Broker.

    f.   The Broker only may terminate this Listing Agreement with Seller by giving written notice to Seller.

*7.  Dual Agency/Buyer Agency: Broker* does not serve as a dual agent or buyers agent unless disclosed in writing by both parties.

*8.  Duties and Responsibilities of Seller's Agent:*  A licensee representing a Seller as a Seller's Agent shall be a limited agent with the following duties and obligations:
    a.   To perform the terms of this agreement;
    b.   To exercise reasonable skill and care for Seller.
    c.   To promote the interest of Seller with the utmost good faith, loyalty and fidelity including:
        1.   Seeking the price and terms which are acceptable to Seller except that Licensee shall not be obligated to seek additional offers to purchase the property while the property is subject to a contract for sale.
        2.   Presenting all written offers to and from Seller in a timely manner.
        3.   Disclosing in writing to Seller all adverse material facts actually known by Licensee; and
        4.   Advising Seller to obtain expert advice as to material matters of that which Licensee knows but the specifics of which are beyond the expertise of Broker;
    d.   To account in a timely manner for all money and property received;
    e.   To comply with the requirements of agency relationships as defined in Neb. Rev. Stat. 76-2401 through 76-2430, the Nebraska Real Estate License Act, and any rules or regulations promulgated pursuant to such sections or act; and
    f.   To comply with any applicable federal, state, and local laws, rules, regulations, and ordinances, including fair housing and civil rights statutes and regulations

*9.  Confidential Information:*  A Broker, acting as a Seller's Agent, shall not disclose any confidential information about Seller, without Seller's written permission, unless disclosure is required by statute, rule, or regulation, or failure to disclose the information would constitute fraudulent misrepresentation. No cause of action shall arise against a Broker acting as a Seller's Agent for making any required or permitted disclosure.

*10. Title:*  Seller agrees to convey Property by a General Warranty Deed or valid deed, and provide Owner's policy of Title Insurance, showing good and merchantable title subject to easements and restrictions of record, applicable building and zoning regulations at cost to be shared equally by Seller and Buyer.  Seller agrees to pay customary closing costs.

*12. Taxes:*  Seller agrees to pay 20 _23_ taxes. Taxes may or may not be pro-rated to day of closing.

*13. Nondiscrimination:*  The undersigned Seller and Broker acknowledge, by their respective signature hereon, that the law prohibits discrimination for or against any person because of race, color, religion, sex, sexual orientation, handicap, familial status, or national origin.

*14. Seller agrees to refer* to Broker all inquires regarding Property during the term of this Agreement and warrants that all equipment and fixtures a part of this sale will be in good operating condition and performing the function for which they were intended on the date of closing and this sale. Seller authorizes his attorney, Certified Public Accountant, Bankers, Mortgage Lenders, and Contract Note Holders, to release to the Broker all pertinent financial and legal information relative to the Property and the Seller's status that would have a bearing on the normal transfer of the listed Property.

*15.  Broker is given authority to advertise* the Property; may place a sign hereon, remove all other sale signs, show the Property at all reasonable times; cooperate with other Brokers as he may elect; accept earnest money and deposit same in his trust account; hold same until the transaction has been fully consummated or finally otherwise terminated; require written releases from all parties before releasing trust funds; hold earnest money checks until both Buyer and Seller have executed a sales agreement.

*16.  Indemnity:*  If Broker successfully defends any new court action brought against him by any party involved in the sale of this Property, including Seller, or if it is necessary to employ an attorney to collect any sums due hereunder, Seller agrees to pay all usual and reasonable court costs and attorney's fees expended by Broker. Seller warrants all information given herein and on any supplementary fact forms, to be correct and agrees to indemnify Broker for all costs and damages that may arise out of the incorrect facts and statements of Seller and acknowledged by Seller. This Agreement shall be binding upon the heirs, assigns, executors, and administrators of the parties, and contains the entire Agreement between the parties. Any Agreement not noted herein shall not be binding upon the parties**.**

*17.  Escrow Closing:*  Seller agrees that the closing of any sale made by Broker may be handled by an Escrow Agent at a fee not to exceed $500 per tract, to be shared equally by the Buyer and Seller.  Additional service provided by the Escrow Company will be billed accordingly.

*18.  FSA Information:*  Seller to fill out the FSA permission form allowing Broker access to the FSA Information.

Page 2 of 3           Initial_____  / _____

09/21/23
4:16 PM CDT
dotloop verified

09/21/23
7:23 PM CDT
dotloop verified

**19. Electronic Transmission:** All digital/electronic messages, (text, emails and faxes) will be accepted as originals.

**20. Offer Disclosure:** Seller grants *Broker*. permission to disclose written offers to all prospective buyers.

Executed this _____20th_____ day of _____September_____, 20___23___

**BigIron Realty**

100 Main Street #206
BirdIsland MN 55315
320.365.4120

**1-402-564-3369**
**1-402-563-1176 (fax)**

Sales Agent _____*Michelle Weinzetl*_____
dotloop verified
09/25/23 3:17 PM CDT
6RMI-DCKH-H4SS-TYTQ

Telephone _____763-300-5055_____

Sales Agent _____

Telephone _____

Seller _____*Jeff Cates*_____
dotloop verified
09/21/23 4:16 PM CDT
EAKP-SDJZ-EZDH-GBMQ

Seller _____

Telephone _____612-366-5341_____

Address _____2400 Cates Ranch Drive_____

Hamel, MN 55340

E-Mail _____Jeff8288612@gmail.com_____

Seller _____

Seller _____

Telephone _____

Address _____

_____

E-Mail _____

Seller _____*Christine Cates*_____
dotloop verified
09/21/23 7:23 PM CDT
ACGK-QYBK-GBZP-MYVV

Seller _____*Christine Cici- Cates*_____
dotloop verified
09/25/23 8:54 PM CDT
NYLB-T0MW-EIQT-FJB6

Telephone _____612-701-7151_____

Address _____2400 Cates Ranch Drive_____

Hamel, MN 55340

E-Mail _____c.cicicates@gmail.com_____

Initial _____*JC*_____ / _____*CC*_____
09/21/23
4:16 PM CDT
dotloop verified
09/21/23
7:23 PM CDT
dotloop verified



Farm, Ranch, & Land Exclusive Right to Sell or Exchange

Listing Contract Addendum Page 1 of 2

Seller: Jeff Cates  and  Chris Ci-Ci Cates

Subject Property: 4-118N-23W     Hennepin Co.

P.I.D. #'s    # 04-118-23-11-0002,  and    #04-118-23-14-0004

1. On-Line Real Estate Auction to take place on November 30st, 2023.

2. Advertising / Promotion to start immediately upon signing contract.

3. Online bidding opens November 16th, 2023.

4. PID # 04-118-23-14-0004   30.18 Acres to be sold absolute- no minimum / no reserve.

5. PID # 04-118-23-11- 0002    Acres 36.92 Acres to be sold absolute -no minimum / no reserve.

Page 1 of 2





6.  Winning bidder at auction to put 10% down per tract held in a trust account. Closing to be on or before Jan 5, 2024

7.  A 3% buyer's premium will be added to the high bid to equal the contract price This 3% goes to Big Iron auction company upon a successful closing.

8.  Sellers to pay 4.5 % Commission. Big Iron to offer a Co Broke Agent 2.5 % for registering the winning bidder and buyer successfully closes on the property. If no co-broke agent represents the buyer, seller commission to be reduced to 2%.

9.  $10,000 to be spent on advertising / marketing of auction- Paid by Big Iron.

Seller: _____

*Jeff Cates*

dotloop verified
09/21/23 11:02 AM CDT
QZFG-ZKYP-V5BO-HVIS

Date: _____

09/21/2023

Seller: _____

*Christine Cates*

dotloop verified
09/21/23 7:24 PM CDT
N6LB-Y6DN-IFPW-4RBY

Date: _____

Page 2 of 2



## *Amendment to Listing Agreement and Listing Addendum*
This is a legally binding agreement.  If not understood, seek legal advice.

The Seller named in the Listing Agreement dated: <u>September 21st,2023</u>

For the listing of the property described as;

Legal Description:___ P.I.D.   04-118-2314-0004  30.18 Acres Lot #1 , Block #1 – CATES RANCH
SECOND ADDITION 2575 CATES RANCH DRIVE and
P.I.D.   04-118-2311- 0002  36.92  Acres Lot #3 , Block #1- CATES RANCH
_____

_____

Consents to the following change(s):

_____ Extend the expiration date of the listing to:_____

_____  Change the price of the listing to:_____

__x___ Other:_____

<u>There will be no Buyers Premium paid by the buyer!</u>

<u>Sellers Paid Commission to be 7.5 %.</u>

<u>Big Iron to offer a 2.5% Co-Broke Fee. If no agent represents the winning bidder- Sellers Commission to
be reduced to 5%.</u>

<u>10% Down per tract to be held in Sapientia Law Group, trust account. Closing to be on or before Dec
29th, 2023.</u>

We accept the above change(s) and affirm all other terms and obligations of the original listing.  Receipt
of a copy of this agreement is acknowledged.

Dated:_____                    Dated:_____

Seller: *Jeff Cates*
dotloop verified
10/09/23 5:25 PM CDT
KPWY-LTCH-SO5B-TUU5

Seller: *Christine Cici-Cates*
dotloop verified
10/09/23 8:38 PM CDT
FE2O-G5DA-MQAB-QPP7

*BigIron Realty*

Dated:____10/09/2023_____                    Agent: *Michelle Weinzetl*
dotloop verified
10/09/23 12:24 PM CDT
4SSB-6OQL-PFRC-X9F9

dotloop signature verification: dtlp.us/uzZs-CzO2-dVEa

# EXHIBIT THREE
# DETAIL OF MARKETING EFFORTS AND AUCTION

4860-7012-0341, v. 1



**[ EXPERTS IN SELLING LAND ]**

## MARKETING RECAP

# Jeff Cates & Christine Cici-Cates

67.1± Acres Hennepin County, Minnesota Sold in 2 Tracts
Development Land - Medina
November 30, 2023



# Jeff Cates & Christine Cici-Cates
## November 30, 2023 Marketing Summary

| | | | |
|---|---|---|---|
| **969** POSTCARDS MAILED | **197,490** EMAILS SENT | **17,312** DIGITAL IMPRESSIONS | **60** DIGITAL ENGAGEMENT |

| | | | | |
|---|---|---|---|---|
| **88,495** FACEBOOK IMPRESSIONS | **114** LINKEDIN IMPRESSIONS | **78** TWITTER IMPRESSIONS | **227** YOUTUBE IMPRESSIONS | **112** INSTAGRAM IMPRESSIONS |

| | | |
|---|---|---|
| **1,191,327+** NEWSPAPER IMPRESSIONS | **38,667** LISTING SITE ENGAGEMENT | **7,842** WEBSITE PAGE VISITS |

## 1,542,693+
### TOTAL MEASUREABLE MARKETING IMPRESSIONS

**Big Iron REALTY**

www.bigiron.com | 800.887.8625

| EXPERTS IN SELLING LAND |



| BIDDERS | 20 |
| WATCHERS | 52 |
| BUYERS | 2 |
| TRACTS | 2 |
| AUCTION PAGE VIEWS | 7,842 |

**November 30, 2023 | Jeff Cates & Christine Cici-Cates Land Auction**
**67.1± Acres Hennepin County, Minnesota Sold in 2 Tracts**

BigIron REALTY

# MARKETING RECAP



## DEVELOPMENT LAND - MEDINA
### 67.1± ACRES HENNEPIN COUNTY, MN
### »SELLING IN 2 TRACTS«

## UNRESERVED ONLINE LAND AUCTION

**BigIron REALTY**

[ EXPERTS IN SELLING LAND ]

Bid Online
### NOV. 16-30, 2023
**BIDDING ENDS AT 1:00 P.M. CST**
Get a salebill, register and bid at
www.bigiron.com

DEVELOPMENT POTENTIAL PROPERTY

**Business | Industrial | Commercial Potential**

Explore the Property from Above
**DRONE TOUR**
www.bigiron.com

### Contact Your Listing Broker
## Michelle Weinzetl 763.300.5055
#### 100 Main Street, Bird Island, Minnesota

## Agent Notes

Online real estate auction, 2 large acreage tracts being sold no minimum / no reserve to the highest bidder. Excellent investment opportunity. Prime location 2 miles west of 101 and 7 miles from I-94 / Highway 55 interchange. Hard to find undeveloped land with sewer and water in close proximity. Unparalleled investment opportunity in a high demand area experiencing exponential growth! Both parcels are currently zoned Rural Residential-Urban Reserve (RR-UR). Tract 2 to be rezoned "Business" upon satisfactions of conditions and recording of the Cates Industrial Park Plat. The City's Comprehensive Plan for both parcels are currently guided Future Development Area (FDA).

The City of Medina has added a lift station on tract 1 to serve properties to the West of this land which could also serve tract 1 and property to the North and East if the City guides for development in the future. Sewer service for Tract 2 from southeast. Water required to be extended to southeast and looped to willow.

This Cates family had a vision some 40 years ago! Realizing that this area over time would be a highly sought out development piece of property. Medina is home to numerous businesses and demand is high for industrial, commercial, and office warehouse space! Cates Industrial Park is what this area needs! Future expansion opportunity as well.

### Tract #1: 36.92± Acres

**Description:** This tract is ideally located for rezoning and future development! Currently zoned Rural Residential-Urban Reserve (RR-UR) Prime development potential! Adjacent land zoned (B) Business. Current crop land income generation from 36.92 acres of farm ground.

**Location:** From I-94 / Highway 55 in Plymouth take Highway 55 for 7 miles to Willow Drive. Turn right and go north on Willow Drive to Land on the east side of the road. Watch for signs.

**Legal:** Lot #3, block #1- CATES RANCH
Parcel #04-118-23-11-0002
*Full legal to be verified by closing company

**2023 Taxes:** $2,111.02



### Tract #2: 30.18± Acres

**Description:** Prime development property along the Highway 55 corridor. City of Medina has granted preliminary plat and site plan review approval for Cates Industrial Park – a proposed development containing approximately 300,000 square feet of building improvements to be used for warehouse/light industrial/office on the property. See Ordinance #709. Final plat approval requires some conditions to be met at the time of Final Plat application. See Resolution #2023-65. This tract is currently being farmed and has a vacant homestead.

**Location:** From I-94 / Highway 55 in Plymouth take Highway 55 for 7 miles to Willow Drive. Turn right and go north on Willow Drive to Land on the east side of the road. Watch for signs.

**Legal:** Lot #1, block #1 – CATES RANCH SECOND ADDITION. Parcel #04-118-23-14-0004
*Full legal to be verified by closing company

**2023 Taxes:** $5,230.46

For more information and photos
on these properties, visit

## www.bigiron.com

### BIDDING PROCESS
The bidding increments will be $100/acre. The final sale price will be calculated based on the total acres times the highest bid. The real estate agent reserves the right to adjust bidding increments. You may place bids on this property for 14 days, beginning November 16, 2023, and ending November 30, 2023, at 1:00 p.m. This unreserved online auction features bidding extensions. If a bid is received within five minutes of the scheduled close time, the bidding period is automatically extended to five minutes. This will continue until there is a five-minute period where no bids are placed on either tract. NOTE: Do not wait until the day the auction closes to register to bid online. All bidders must be approved to bid, so register at least 24 hours before the auction closes or call 800-887-8625 for assistance.

### TERMS & CONDITIONS
The successful buyer will be required to enter into a written purchase agreement immediately after the sale with a 10% non-refundable down payment to be payable to Sapientia Law Group, PLLC and they will be drafting the purchase agreements. The earnest deposit can be made by a personal check, company check, or wire transfer. The balance will be due at closing on or before December 28, 2023. The seller will provide a marketable title to the buyer, evidenced by title insurance; the title insurance and closing costs are split 50/50 between the buyer and seller. Tract 1 (PIN # 04-118-23-11-0002) is eligible for staying in the Green Acres program- Buyer will be responsible for those special assessments and accrued interest if removed from green acres program. The buyer will be responsible for any pending assessments. Tract 2 (PIN # 04-118-23-14-0004) Seller will be responsible for all levied + special assessments owed. The buyer will be responsible for any pending assessments. The property will not be sold subject to financing. Bidding increments may be changed at the discretion of the real estate agent. Please have all the financial arrangements made before the auction. The written purchase agreement, to be signed by the seller and buyer after the auction, is the sole and controlling document of this sale and supersedes any and all other terms, whether verbal, written, expressed, or implied, and shall be the sole and controlling document for this real estate transaction. BigIron Realty is working for the seller.

Information was obtained from sources deemed reliable, but broker makes no guarantees as to accuracy. All prospective buyers are urged to fully inspect property and rely on their own conclusions. Copyright 2023 Bigiron Realty. All rights reserved.

## Salebill Front



**Salebill Back**

# MARKETING RECAP

## UNRESERVED ONLINE LAND AUCTION

### MEDINA, MINNESOTA
### 67.1± ACRES HENNEPIN COUNTY
»SELLING IN 2 TRACTS«
**BUSINESS | INDUSTRIAL | DEVELOPMENT POTENTIAL OPPORTUNITIES**

**»» BID ONLINE NOV. 16-30, 2023 ««**

Get a salebill, register and bid at **www.bigiron.com**

Contact Your Listing Broker
**Michelle Weinzetl**
**763.300.5055**

**BigIron**
REALTY

#20506007        **100 Main Street, Bird Island, MN 55310**

**Newspaper Ad**



## DEVELOPMENT LAND - MEDINA
### 67.1± ACRES HENNEPIN COUNTY, MN
» SELLING IN 2 TRACTS «

### UNRESERVED ONLINE LAND AUCTION

**BigIron REALTY**
EXPERTS IN SELLING LAND

Bid Online
**NOV. 16-30 2023**
BIDDING ENDS AT 1:00 P.M. CST
Get a salebill, register and bid at
www.bigiron.com

Business | Industrial | Commercial Potential

**Contact Your Listing Agent**
**Michelle Weinzetl 763.300.5055**
100 Main Street, Bird Island, Minnesota

Explore the Property from Above
**DRONE TOUR**

---

**» Tract #1: 36.92± Acres**
This tract is ideally located for rezoning and future development! Currently zoned Rural Residential-Urban Reserve (RR-UR) Prime development potential! Adjacent land zoned (B) Business. Current crop land income generation from 36.92 acres of farm ground.

**» Tract #2: 30.18± Acres**
Prime development property along the Highway 55 corridor. City of Medina has granted preliminary plat and site plan review approval for Cates Industrial Park – a proposed development containing approximately 300,000 square feet of building improvements to be used for warehouse/light industrial/office on the property. See www.bigiron.com for additional information.



**BigIron REALTY**
4860 33rd Avenue
Columbus, NE 68601
**www.bigiron.com**

**Postcard**

# MARKETING RECAP



### New Listing!

**67.10± Acres Hennepin County, MN**

[ CLICK FOR DETAILS ]

Bidding opens November 16th and ends November 30th at 1:00 p.m.

**Information**
Online real estate auction, 2 large acreage tracts being sold no minimum / no reserve to the highest bidder. Excellent investment opportunity. Prime location 2 miles west of 101 and 7 miles from I-94 / Highway 55 interchange. Hard to find undeveloped land with sewer and water in close proximity. Unparalleled investment opportunity in a high demand area experiencing exponential growth! Both parcels are currently zoned Rural Residential-Urban Reserve (RR-UR). Tract 2 to be rezoned "Business" upon satisfactions of conditions and recording of the Cates Industrial Park Plat. The City's Comprehensive Plan for both parcels are currently guided Future Development Area (FDA).

The City of Medina has added a lift station on tract1 to serve properties to the West of this land which could also serve tract 1and property to the North and East if the City guides for development in the future. Sewer service for Tract 2 from southeast. Water required to be extended to southeast and looped to willow.

This Cates family had a vision some 40 years ago! Realizing that this area over time would be a highly sought out development piece of property. Medina is home to numerous businesses and demand is high for industrial, commercial, and office warehouse space! Cates Industrial Park is what this area needs! Future expansion opportunity as well.

**Location**
From I-94 / Highway 55 in Plymouth take Highway 55 for 7 miles to Willow Drive. Turn right and go north on Willow Drive to Land on the east side of the road. Watch for signs.

**For More Information Contact:**

**Michelle Weinzetl 763.300.5055**

## Email Blast



## Social Media Posts

# MARKETING RECAP













**Digital Banner Ads**













**[ EXPERTS IN SELLING LAND ]**

**www.bigiron.com** | **800.887.8625**



# Listing Agent



**MICHELLE WEINZETL**
**763.300.5055**
michelle.weinzetl@bigiron.com

# Exhibit B

# Purchase Agreement for 36.92 Acres dated November 30, 2023 and City of Medina Resolution Approving Purchase

# PURCHASE AND SALE AGREEMENT

### *2590 Cates Ranch Dr., Medina, Minnesota*
### *Tract 1 (PIN 04-118-23-11-0002)*

This PURCHASE AND SALE AGREEMENT (this "**Agreement**"), dated as of the 30th day of November, 2023 (the "**Effective Date**"), is entered into between JEFFREY S. CATES and CHRISTINE T. CICI-CATES, husband and wife and residents of the State of Minnesota ("**Seller**"), and CITY OF MEDINA, a Minnesota municipal corporation ("**Purchaser**").

## RECITALS

WHEREAS, Seller is the owner of the Property (as hereinafter defined); and

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell to Purchaser the Property and Purchaser desires to purchase the Property from Seller.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## REAL PROPERTY

Seller agrees to sell and convey to Purchaser and Purchaser agrees to purchase from Seller, upon the terms and conditions hereinafter set forth, all right, title, and interest of Seller in and to that certain real property containing approximately 36.92+/- gross acres of land located in the City of Medina, County of Hennepin, State of Minnesota with Parcel Identification No. 04-118-23-11-0002, legally described on <u>Exhibit A</u> attached hereto, together with any and all buildings and improvements thereon, and easements and rights benefiting or appurtenant thereto**.**

## ARTICLE II
## PURCHASE PRICE

**Section 2.01    Purchase Price and Earnest Money.** The purchase price to be paid by Purchaser to Seller for the Property is **ONE MILLION SEVENTEEN THOUSAND ONE HUNDRED FORTY-SIX AND 00/100ths Dollars ($1,017,146.00)**(the "**Purchase Price**"). The Purchase Price shall be payable as follows:

(a)    Within five (5) days of the Effective Date of this Agreement, Purchaser shall pay to and deposit with Sapientia Law Group, PLLC, as escrow agent ("**Escrow Agent**"), to be held in trust, an amount equal to One Hundred One Thousand Seven Hundred Fifteen and 00/100ths ($101,715.00), representing 10% of the Purchase Price (the "**Earnest Money**") by personal or company check made payable to "Sapientia Law Group Trust Account", or by wire transfer of immediately available federal funds to an account at such bank as designated by Escrow Agent.

(b)    The balance of the Purchase Price in the amount of Nine Hundred Fifteen Thousand Four Hundred Thirty-One and 00/100ths Dollars ($915,431.00) shall be paid to Seller on the Closing Date, subject to any credits or apportionments as provided for under this Agreement, simultaneously with delivery of the Deed, by a wire transfer of immediately available federal funds to an account or accounts designated by the Title Company as that term is defined below.

**Section 2.02    No Financing Contingency.** Purchaser expressly agrees and acknowledges that Purchaser's obligations to pay the Purchase Price and otherwise consummate the transactions contemplated hereby

are not in any way conditioned upon Purchaser's ability to obtain financing of any type or nature whatsoever, whether by way of debt financing or equity investment, or otherwise.

**ARTICLE III**
**CLOSING**

**Section 3.01    Closing Date.**

(a)    The closing (the **"Closing"**) shall take place on December 28, 2023 (the **"Closing Date"**) at the office of the Title Insurance Company or remotely. Purchaser acknowledges and agrees that TIME SHALL BE OF THE ESSENCE with respect to the performance by Purchaser of its obligations to purchase the Property, pay the Purchase Price, and otherwise consummate the transactions contemplated in this Agreement on the Closing Date.

**Section 3.02    Seller's Closing Deliverables.** At Closing, Seller shall deliver to Purchaser, the following, executed, certified, and acknowledged by Seller, as appropriate:

(a)    A Warranty Deed (the **"Deed"**) to convey title to the Property as required by this Agreement. The delivery of the Deed by Seller, and the acceptance by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed pursuant to this Agreement.

(b)    All other documents necessary or otherwise required by the Escrow Agent to disburse the Earnest Money and the Title Insurance Company to consummate the transaction contemplated by this Agreement.

**Section 3.03    Purchaser's Closing Deliverables.** On the Closing Date, Purchaser shall deliver or cause to be delivered to Seller, the following, executed, certified, and acknowledged by Purchaser, as appropriate:

(a)    The balance of the Purchase Price.

(b)    A resolution by the City Council of the City of Medina authorizing the transaction contemplated hereby, including payment of the Purchase Price, and the execution and delivery of the documents required to be executed and delivered hereunder.

(c)    Any other necessary approval or authorization of the transaction contemplated hereby from municipal, county, state, or federal bodies as may be required by law.

(d)    All other documents reasonably necessary or otherwise required by the Escrow Agent to disburse the Earnest Money and the Title Company to consummate the transactions contemplated by this Agreement.

**Section 3.04    Closing Costs.**

(a)    Seller and Purchaser shall each pay the fees and expenses of its own counsel in connection with this transaction. The Deed and other agreements and instruments related to the transaction contemplated by this Agreement and such legal costs shall not be part of the closing costs; provided, however, that if any legal action is instituted under this Agreement, the prevailing party in such action shall be entitled to recover from the other party costs related to such legal action, including reasonable attorneys' fees and costs in all trial, appellate, post-judgment, and bankruptcy proceedings.

(b)    Seller shall pay:

(i)      Any applicable transfer taxes payable in connection with the transaction contemplated by this Agreement;

(ii)      Real estate taxes due and payable prior to and in 2023;

(iii)      All levied special assessments, except the Green Acres Costs (as defined herein);

(iv)      The commission owed to the Broker, if any, pursuant to ARTICLE IX of this Agreement;

(v)      All recording fees for the release of any liens on the Property, as required pursuant to the terms of this Agreement; and

(vi)      50% of all (aa) title insurance costs and premiums, including the costs of the title commitment and a base ALTA® Owner's Policy, 2021 v. 01.00 (Effective 07-01-2021) (the "**Title Policy**") issued by Old Republic National Title Insurance Company (the "**Title Company**"), but not any portion of the cost of any endorsements requested by Purchaser, (bb) Closing Fees (as defined herein), and (cc) Escrow Agent's costs and fees associated with its holding and disbursing the Earnest Money. "**Closing Fees**" shall mean any fees charged by the Title Company and/or its closing agent, including settlement or closing fees.

(c)      Purchaser shall pay:

(i)      Real estate taxes due and payable in 2024 and thereafter;

(ii)      50% of all (aa) title insurance costs, including the costs of the title commitment and the Title Policy, (bb) Closing Fees, and (cc) Escrow Agent's costs and fees associated with its holding and disbursing the Earnest Money;

(iii)      The costs of any endorsements to the Title Policy requested by Purchaser;

(iv)      Any and all deferred "Green Acre" assessments and property tax deductions and interest accrued thereon if Purchaser elects to disenroll or not re-enroll the Property in the "Green Acres" program under Minn. § 273.111 ("**Green Acres Costs**");

(v)      All pending special assessments;

(vi)      Any and all fees charged by Purchaser's lender, if any; and

(vii)      All recording fees and state deed tax due and payable in connection with the recording of the Deed.

**Section 3.05    Apportionments.** The following shall be apportioned as of the Closing Date, unless expressly provided for otherwise:

(a)      Any and all utility expenses, including water, fuel, gas, electricity, telephone, sewer, trash removal, heat and other services furnished to or provided for the Property shall be prorated between Seller and Buyer;

(b)      All other costs and expenses customarily apportioned in connection with the sale of real property in the State of Minnesota not already provided for in this Agreement.

      Tract 1; PIN 04-118-23-11-0002

## ARTICLE IV
## TITLE

**Section 4.01    Title.** Seller shall convey, and Purchaser shall accept, marketable title to the Property evidenced by the Title Policy issued by Old Republic National Title Insurance Company (the "**Title Company**").

**Section 4.02    Permitted Exceptions.** The Property shall be conveyed by Seller to Purchaser, and Purchaser shall accept, subject to the following (collectively, the "**Permitted Exceptions**").

    (a)    All covenants, restrictions, and rights of record, and all easements and agreements of record for the erection and/or maintenance of water, gas, steam, electric, telephone, sewer or other utility pipelines, poles, wires, conduits, or other like facilities, and appurtenances thereto, over, across, and under the Property;

    (b)    Any zoning laws or local ordinances affecting the Property;

    (c)    Minerals and mineral rights reserved by the State of Minnesota;

    (d)    Any encroachments or other adverse claims against title to the Property that would be disclosed by an ALTA/ACSM land survey of the Property, whether or not Purchaser obtained such survey;

    (e)    Any and all deferred real estate taxes and special assessments and interest thereon deferred or otherwise unpaid pursuant to Minn. Stat. Section 273.111 known as the "Green Acres" program, whether existing or accrued before Closing or thereafter; and

    (f)    The standard conditions and exceptions to title contained in the Title Policy.

## ARTICLE V
## AS-IS PROPERTY

**Section 5.01**    PROPERTY CONDITIONS, WARRANTIES, CONTINGENCIES, AND INSPECTION RIGHTS: THIS PROPERTY HAS BEEN PURCHASED "AS IS – WHERE IS" AT AUCTION. THERE ARE NO WARRANTIES ASSOCIATED WITH AUCTION SALES. THERE ARE NO FINANCING CONTINGENCIES OR INSPECTION RIGHTS FOR BUYER. SELLER IS NOT OBLIGATED TO MAKE ANY REPAIRS, CHANGES, IMPROVEMENTS OR OTHER MODIFICATIONS TO THE PROPERTY. PRIOR TO SUBMITTING THE HIGH BID FOR THE PROPERTY, BUYER DETERMINED THAT THE PROPERTY MET ALL LEGAL REQUIREMENTS FOR BUYER'S INTENDED USE OF THE PROPERTY AND IS NOT SUBJECT TO GOVERNMENTAL OR PRIVATE RESTRICTIONS THAT WILL INTERFERE WITH SUCH INTENDED USE, INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL REGULATIONS, WETLAND QUALIFICATION, FLOOD HAZARD OR FLOOD PLAIN DESIGNATION AND SEPTIC SYSTEM SUITABILITY.

    (a)    Purchaser acknowledges that it has examined and inspected, and is satisfied with, the physical condition of the Property and any improvements thereon. Purchaser expressly agrees that the Property is sold "as is, where is, with all faults" without any warranty or representation, express, implied or arising by operation of law, including, but not limited to, any warranty of condition, habitability, merchantability or fitness for a particular purpose, and subject to ordinary wear and tear occurring after the date hereof. Purchaser further acknowledges that Seller has neither made nor extended to Purchaser any representation, warranty or indemnity with regard to the environmental condition of the Property or with regard to its compliance with the Americans

with Disabilities Act of 1990, if applicable, and Purchaser hereby assumes sole responsibility therefore, indemnifies and agrees to hold Seller and its assigns harmless from and waives any right, action, claim or cause of action it or its successors or assigns may have now or in the future against Seller or assigns with regard thereto.

(b)    If any improvements on the Property are damaged after the date hereof, but before the Closing, Seller may (but will not be obligated to) attempt to repair the improvements and, at Seller's option, there will be a reasonable extension of the Closing Date during which Seller may attempt to complete the repair. If Seller notifies Purchaser that Seller does not intent to attempt to repair or if Seller attempts but is not successful in effecting repair and notifies Purchaser within ten (10) days of either such notification Purchaser either (i) will terminate this Agreement, in which case Purchaser will be entitled to the return of the Earnest Money and neither party will have any further liability to the other or (ii) will waive any objection to the damage and any right to reduce the Purchase Price, in which case Seller will convey to Purchaser the Property with such damaged improvements as are then thereon and will assign to Purchaser all of Seller's right, title and interest to any insurance proceeds, if any, received or to be received in payment of damage to the improvements.

## ARTICLE VI
### NOTICES

**Section 6.01    Delivery of Notices.** Unless specifically stated otherwise in this Agreement, all notices, waivers, and demands required or permitted hereunder shall be in writing and delivered to the addresses set forth below, by one of the following methods: (a) hand delivery, whereby delivery is deemed to have occurred at the time of delivery; (b) a nationally recognized overnight courier company, whereby delivery is deemed to have occurred the business day following deposit with the courier; (c) registered U.S. mail, signature required and postage-prepaid, whereby delivery is deemed to have occurred on the third business day following deposit with the United States Postal Service; or (d) email.

SELLER:                    Jeff Cates and Christine T. Cici-Cates
                           2400 Cates Ranch Drive
                           Hamel, MN 55340
                           Email: jeff8288612@gmail.com

With a copy to:            Sapientia Law Group, PLLC
                           Attention: Kenneth C. Edstrom
                           120 S. Sixth St., Suite 100
                           Minneapolis, MN 55402
                           Email: kene@sapientialaw.com

PURCHASER:                 City of Medina
                           Attention: Dusty Finke
                           2052 County Road 24
                           Medina, MN 55340
                           Email: dusty.finke@medinamn.gov

With a copy to:            _____
                           _____
                           _____
                           Email: _____

ESCROW AGENT:    Sapientia Law Group, PLLC
Attention: Towle H. Neu
120 S. Sixth St., Suite 100
Minneapolis, MN 55402
Email: towlen@sapientialaw.com

Any Party may change its address for purposes of this Section by giving written notice as provided in this Section. All notices and demands delivered by a party's attorney on a party's behalf shall be deemed to have been delivered by said party.

## ARTICLE VII
## REMEDIES

**Section 7.01    Remedies.**

(a)    If Purchaser shall default in the observance or performance of Purchaser's obligations under this Agreement and the Closing does not occur as a result thereof, Seller may elect to retain the Earnest Money plus accrued interest thereon, if any, as and for full and complete liquidated and agreed damages for Purchaser's default or seek an order from a court for specific performance by Purchaser. SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT IF SELLER ELECTS TO RETAIN THE EARNEST MONEY AND ANY INTEREST EARNED THEREON, SUCH AMOUNTS REPRESENT A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT.

(b)    Upon the release of the Earnest Money, and any interest accrued thereon, to either Purchaser or Seller, as the case may be, and reimbursement of Purchaser's Costs (if applicable), this Agreement shall be deemed null and void and no party hereto shall have any obligations to, or rights against, the other hereunder, except as expressly provided herein.

## ARTICLE VIII
## ESCROW

**Section 8.01    Escrow Terms.** Escrow Agent shall hold and disburse the Earnest Money in accordance with the following provisions:

(a)    If the Closing occurs, then Escrow Agent shall deliver the Earnest Money to Seller.

(b)    If the Closing does not occur because of an uncured default by Seller, Escrow Agent is authorized to disburse the Earnest Money to Purchaser.

(c)    If the Closing does not occur because of an uncured default by Purchaser, Escrow Agent is authorized to disburse the Earnest Money to Seller.

(d)    In the event a dispute arises between the parties over the Earnest Money, Escrow Agent may commence an action with a court of competent jurisdiction for a final determination on the disposition of the Earnest Money. The parties agree that all costs and fees, including reasonable attorney fees, incurred by the Escrow Agent in connection with any such action shall be paid from the Earnest Money before disbursement to the appropriate party in accordance with the court's order.

Tract 1; PIN 04-118-23-11-0002

**Section 8.02    Escrow Agent's Duties and Responsibilities.**

(a)    Escrow Agent has signed this Agreement for the sole purpose of agreeing to act as Escrow Agent in accordance with this Article. Escrow Agent shall have no duties or responsibilities except those set forth in this Agreement and Seller and Purchaser agree and acknowledge that Escrow Agent shall act hereunder as a depository only.

(b)    Escrow Agent shall not charge a fee for its services as escrow agent.

**Section 8.03    Indemnification of Escrow Agent.** Seller and Purchaser hereby agree to, jointly and severally, indemnify, defend, and hold harmless Escrow Agent from and against any liabilities, damages, losses, costs, or expenses incurred by, or claims or charges made against Escrow Agent (including reasonable attorneys' fees and disbursements) by reason of Escrow Agent acting or failing to act in connection with any of the matters contemplated by this Agreement or in carrying out the terms of this Agreement, except for those matters arising as a result of Escrow Agent's gross negligence or willful misconduct.

**Section 8.04    Seller's Attorney as Escrow Agent.** Notwithstanding anything to the contrary herein contained, Purchaser acknowledges that Escrow Agent is also acting as Seller's counsel in connection with this Agreement and the transactions contemplated hereunder.

**Section 8.05    Survival.** This Article shall survive the Closing or the termination of this Agreement.

## ARTICLE IX
## BROKERS

**Section 9.01    Brokers.** Purchaser and Seller each represent and warrant to each other that they dealt with no broker in connection with, nor has any broker had any part in bringing about, this transaction other than BigIron Realty for Seller (the "**Broker**"). Seller shall pay the brokerage commission due Broker in accordance with the terms and conditions of a separate written agreement. Seller and Purchaser shall each indemnify, defend, and hold harmless the other from and against any claim of any broker or other person for any brokerage commissions, finder's fees, or other compensation in connection with this transaction if such claim is based in whole or in part by, through, or on account of, any acts of the indemnifying party or its agents, employees, or representatives and from all losses, liabilities, costs, and expenses in connection with such claim, including without limitation, reasonable attorneys' fees, court costs, and interest.

**Section 9.02    Survival.** The provisions of this Article shall survive the Closing or the termination of this Agreement.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01    WELL DISCLOSURE.** [Check one of the following:]

____    Seller certifies that Seller does not know of any wells on the Property.

____    Wells on the Property are disclosed by Seller on the attached Well Disclosure form.

**Section 10.02**    SEWAGE TREATMENT SYSTEM DISCLOSURE.

[Check either A or B:]

____    A.    Seller certifies that sewage generated at the property goes to a facility permitted by the Minnesota Pollution Control Agency (for example, a city or municipal sewer system).

____    B.    Seller certifies that sewage generated at the property does not go to a facility permitted by the Minnesota Pollution Control Agency and Sellers Disclosure of Individual Sewage Treatment System is attached (attach form).

[Check either C or D:]

____    C.    Seller does not know if there is an abandoned individual sewage treatment system on the property.

____    D.    Seller knows that there (strike one:) are / are no abandoned individual sewage treatment systems on the property. If Seller discloses the existence of an abandoned individual sewage treatment system on the property, then Minnesota law requires that the location of the system be disclosed to Buyer with a map. [Attach Seller's Disclosure of Individual Sewage Treatment System with map completed.]

**Section 10.03    Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the State of Minnesota.

**Section 10.04    Merger; No Representations.** This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. This Agreement is entered into after full investigation, no party is relying upon any statement or representation, not set forth in this Agreement, made by any other party.

**Section 10.05    Amendments.** This Agreement cannot under any circumstance be modified or amended orally and no agreement shall be effective to waive, change, modify, terminate, or discharge this Agreement, in whole or in part, unless such agreement is in writing and is signed by both Seller and Purchaser and approved by the U.S. Bankruptcy Court for the District of Minnesota in Bky File No. 21-40882.

**Section 10.06    Successors and Assigns; Assignment.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns. Purchaser shall have the right to assign, transfer, and convey its rights and obligations under this Agreement or in the Property without the prior written consent of Seller, provided that: (a) any assignee shall assume all of Purchaser's obligations hereunder and succeed to all of Purchaser's rights and remedies hereunder; and (b) Purchaser shall deliver written notice to Seller of the assignment and assumption prior to the Closing. If an assignee assumes all of Purchaser's obligations under this Agreement in writing, then upon the effective date of the assignment of this Agreement to such assignee, Purchaser shall be released from all obligations under this Agreement.

**Section 10.07    Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect, invalidate, or render unenforceable any other term or provision of this Agreement.

Tract 1; PIN 04-118-23-11-0002

      **Section 10.08   Counterparts.** This Agreement may be executed by the parties in separate counterparts, each of which when so executed and delivered shall be an original for all purposes, but all such counterparts shall together constitute but one and the same instrument.

      **Section 10.09   IRC §1031 Exchange.**  It is expressly understood and agreed that the Property may be used by either party hereto as replacement property in connection with a like-kind exchange transaction qualifying for tax-deferred treatment under Section 1031 of the Internal Revenue Code.  In such an event, each party agrees to cooperate with the other party, provided no party shall not incur additional costs or liabilities as a result of or in connection with any such 1031 exchange by the other party.

      **Section 10.10   No Waivers.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party providing the waiver. No waiver by either party of any failure or refusal to comply with any obligations under this Agreement shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

      **Section 10.11   Waiver of Jury Trial.** SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY SUCH PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.

      [SIGNATURE PAGE FOLLOWS]

Tract 1; PIN 04-118-23-11-0002

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date.

**PURCHASER:**

CITY OF MEDINA, a Minnesota municipal corporation

_Kathleen Martin_

By: Kathleen Martin
Its: Mayor

_Scott Johnson_

By: Scott Johnson
Its: City Administrator

**SELLERS:**

_Christine Cici-Cates_

Christine T. Cici-Cates

_Jeff Cates_

Jeffrey S. Cates

**ESCROW AGENT:**

SAPIENTIA LAW GROUP, PLLC

By: Towle H. Neu
Its: Member

Tract 1; PIN 04-118-23-11-0002

## EXHIBIT A

### Legal Description

Lot 3, Block 1, Cates Ranch, according to the recorded plat thereof, Hennepin County, Minnesota.

(Abstract Property)

4863-3701-6202, v. 3

Tract 1; PIN 04-118-23-11-0002

Member ____Cavanaugh____ introduced the following resolution and moved its adoption:

### CITY OF MEDINA

### RESOLUTION NO. 2023-108

### RESOLUTION APPROVING PURCHASE AGREEMENT AND AUTHORIZING CITY'S PURCHASE AND ACQUISITION OF HENNEPIN COUNTY PID 0411823110002

**WHEREAS**, the city of Medina (the "City") is a municipal corporation organized under the laws of the State of Minnesota; and

**WHEREAS**, Jeffrey S. Cates and Christine T. Cici-Cates ("Sellers") are fee owners of approximately 36.92 acres of real property located in the City and identified as Hennepin County PID 0411823110002, which is legally described as follows:

*Lot 3, Block 1, Cates Ranch, Hennepin County, Minnesota*

(the "Property"); and

**WHEREAS**, the City desires to purchase the Property from Sellers for $1,017,146.00 and there has been presented before the City Council a form of purchase agreement (the "Purchase Agreement") between the City and Sellers setting forth all terms and conditions of the sale; and

**WHEREAS**, on November 14, 2023, pursuant to Minnesota Statutes, section 462.356, subd. 2, the Medina Planning Commission considered the City's potential acquisition of the Property and thereafter informed the City Council in writing that said acquisition would be consistent with the City's comprehensive plan.

**NOW, THEREFORE, BE IT RESOLVED**, by the City Council of the City of Medina, Minnesota, as follows:

1. The purchase and acquisition of the Property from Sellers for $1,017,146.00, pursuant to all terms and conditions contained in the Purchase Agreement, is hereby approved.

2. The mayor and the city administrator are authorized and directed to execute the Purchase Agreement in substantially the form presented to the City Council on the date of this resolution, subject to any additional modifications approved by the city attorney that do not alter the substance of the transaction, provided that execution of the Purchase Agreement will be conclusive evidence of approval.

3. The mayor and the city administrator are authorized to execute any other documents or instruments deemed necessary to carry out the transaction described in the Purchase Agreement. City officials, staff, and consultants are directed to take any additional steps deemed necessary or convenient to carry out the transaction contemplated by this resolution.

**Dated: November 30, 2023.**

_____
Kathleen Martin, Mayor

ATTEST:

_____
Scott T. Johnson, City Administrator


The motion for the adoption of the foregoing resolution was duly seconded by member
___DesLauriers___ upon vote being taken thereon, the following voted in favor thereof:

**Albers, Cavanaugh, DesLauriers, Martin**

And the following voted against same: (Absent: Reid)

**None**

Whereupon said resolution was declared duly passed and adopted.

Resolution 2023-108
November 30, 2023

# Exhibit B

# Form of Assignment and Purchase Agreement for 36.92 Acres dated November 30, 2023 and City of Medina Resolution Approving Purchase

# PURCHASE AND SALE AGREEMENT

### *2575 Cates Ranch Dr., Medina, Minnesota*
### *Tract 2 (PIN 04-118-23-14-0004) (30 Acres)*

This PURCHASE AND SALE AGREEMENT (this "**Agreement**"), dated as of the 30th day of November, 2023 (the "**Effective Date**"), is entered into between JEFFREY S. CATES and CHRISTINE T. CICI-CATES, husband and wife and residents of the State of Minnesota ("**Seller**"), and CITY OF MEDINA, a Minnesota municipal corporation ("**Purchaser**").

## RECITALS

WHEREAS, Seller is the owner of the Property (as hereinafter defined); and

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell to Purchaser the Property and Purchaser desires to purchase the Property from Seller.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## REAL PROPERTY

Seller agrees to sell and convey to Purchaser and Purchaser agrees to purchase from Seller, upon the terms and conditions hereinafter set forth, all right, title, and interest of Seller in and to that certain real property containing approximately 30.18 gross acres of land located in the City of Medina, County of Hennepin, State of Minnesota with Parcel Identification No. 04-118-23-14-0004, legally described on <u>Exhibit A</u> attached hereto, together with any and all buildings and improvements thereon, and easements and rights benefiting or appurtenant thereto**.**

## ARTICLE II
## PURCHASE PRICE

**Section 2.01    Purchase Price and Earnest Money.** The purchase price to be paid by Purchaser to Seller for the Property is **ONE MILLION SEVEN HUNDRED TWENTY-FIVE THOUSAND AND 00/100ths Dollars ($1,725,000.00)**(the "**Purchase Price**"). The Purchase Price shall be payable as follows:

(a)      Within five (5) days of the Effective Date of this Agreement, Purchaser shall pay to and deposit with Sapientia Law Group, PLLC, as escrow agent ("**Escrow Agent**"), to be held in trust, an amount equal to One Hundred Seventy-Two Thousand Five Hundred and 00/100ths ($172,500.00), representing 10% of the Purchase Price (the "**Earnest Money**") by personal or company check made payable to "Sapientia Law Group Trust Account", or by wire transfer of immediately available federal funds to an account at such bank as designated by Escrow Agent.

(b)      The balance of the Purchase Price in the amount of One Million Five Hundred Fifty-Two Thousand Five Hundred and 00/100ths Dollars ($1,552,500.00) shall be paid to Seller on the Closing Date, subject to any credits or apportionments as provided for under this Agreement, simultaneously with delivery of the Deed, by a wire transfer of immediately available federal funds to an account or accounts designated by the Title Company as that term is defined below.

**Section 2.02    No Financing Contingency.** Purchaser expressly agrees and acknowledges that Purchaser's obligations to pay the Purchase Price and otherwise consummate the transactions contemplated hereby

are not in any way conditioned upon Purchaser's ability to obtain financing of any type or nature whatsoever, whether by way of debt financing or equity investment, or otherwise.

## ARTICLE III
## CLOSING

**Section 3.01    Closing Date.**

(a)    The closing (the **"Closing"**) shall take place on December 28, 2023 (the **"Closing Date"**) at the office of the Title Insurance Company or remotely. Purchaser acknowledges and agrees that TIME SHALL BE OF THE ESSENCE with respect to the performance by Purchaser of its obligations to purchase the Property, pay the Purchase Price, and otherwise consummate the transactions contemplated in this Agreement on the Closing Date.

**Section 3.02    Seller's Closing Deliverables.** At Closing, Seller shall deliver to Purchaser, the following, executed, certified, and acknowledged by Seller, as appropriate:

(a)    A Warranty Deed (the **"Deed"**) to convey title to the Property as required by this Agreement. The delivery of the Deed by Seller, and the acceptance by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed pursuant to this Agreement.

(b)    All other documents necessary or otherwise required by the Escrow Agent to disburse the Earnest Money and the Title Insurance Company to consummate the transaction contemplated by this Agreement.

**Section 3.03    Purchaser's Closing Deliverables.** On the Closing Date, Purchaser shall deliver or cause to be delivered to Seller, the following, executed, certified, and acknowledged by Purchaser, as appropriate:

(a)    The balance of the Purchase Price.

(b)    A resolution by the City Council of the City of Medina authorizing the transaction contemplated hereby, including payment of the Purchase Price, and the execution and delivery of the documents required to be executed and delivered hereunder.

(c)    Any other necessary approval or authorization of the transaction contemplated hereby from municipal, county, state, or federal bodies as may be required by law.

(d)    All other documents reasonably necessary or otherwise required by the Escrow Agent to disburse the Earnest Money and the Title Company to consummate the transactions contemplated by this Agreement.

**Section 3.04    Closing Costs.**

(a)    Seller and Purchaser shall each pay the fees and expenses of its own counsel in connection with this transaction. The Deed and other agreements and instruments related to the transaction contemplated by this Agreement and such legal costs shall not be part of the closing costs; provided, however, that if any legal action is instituted under this Agreement, the prevailing party in such action shall be entitled to recover from the other party costs related to such legal action, including reasonable attorneys' fees and costs in all trial, appellate, post-judgment, and bankruptcy proceedings.

(b)    Seller shall pay:

(i)      Any applicable transfer taxes payable in connection with the transaction contemplated by this Agreement;

(ii)      Real estate taxes due and payable prior to and in 2023;

(iii)      All levied special assessments, except the Green Acres Costs (as defined herein);

(iv)      The commission owed to the Broker, if any, pursuant to ARTICLE IX of this Agreement;

(v)      All recording fees for the release of any liens on the Property, as required pursuant to the terms of this Agreement; and

(vi)      50% of all (aa) title insurance costs and premiums, including the costs of the title commitment and a base ALTA® Owner's Policy, 2021 v. 01.00 (Effective 07-01-2021) (the "**Title Policy**") issued by Old Republic National Title Insurance Company (the "**Title Company**"), but not any portion of the cost of any endorsements requested by Purchaser, (bb) Closing Fees (as defined herein), and (cc) Escrow Agent's costs and fees associated with its holding and disbursing the Earnest Money. "**Closing Fees**" shall mean any fees charged by the Title Company and/or its closing agent, including settlement or closing fees.

(c)      Purchaser shall pay:

(i)      Real estate taxes due and payable in 2024 and thereafter;

(ii)      50% of all (aa) title insurance costs, including the costs of the title commitment and the Title Policy, (bb) Closing Fees, and (cc) Escrow Agent's costs and fees associated with its holding and disbursing the Earnest Money;

(iii)      The costs of any endorsements to the Title Policy requested by Purchaser;

(iv)      Any and all deferred "Green Acre" assessments and property tax deductions and interest accrued thereon if Purchaser elects to disenroll or not re-enroll the Property in the "Green Acres" program under Minn. § 273.111 ("**Green Acres Costs**");

(v)      All pending special assessments;

(vi)      Any and all fees charged by Purchaser's lender, if any; and

(vii)      All recording fees and state deed tax due and payable in connection with the recording of the Deed.

**Section 3.05    Apportionments.** The following shall be apportioned as of the Closing Date, unless expressly provided for otherwise:

(a)      Any and all utility expenses, including water, fuel, gas, electricity, telephone, sewer, trash removal, heat and other services furnished to or provided for the Property shall be prorated between Seller and Buyer;

(b)      All other costs and expenses customarily apportioned in connection with the sale of real property in the State of Minnesota not already provided for in this Agreement.

## ARTICLE IV
## TITLE

**Section 4.01    Title.** Seller shall convey, and Purchaser shall accept, marketable title to the Property evidenced by the Title Policy issued by Old Republic National Title Insurance Company (the "**Title Company**").

**Section 4.02    Permitted Exceptions.** The Property shall be conveyed by Seller to Purchaser, and Purchaser shall accept, subject to the following (collectively, the "**Permitted Exceptions**").

(a)    All covenants, restrictions, and rights of record, and all easements and agreements of record for the erection and/or maintenance of water, gas, steam, electric, telephone, sewer or other utility pipelines, poles, wires, conduits, or other like facilities, and appurtenances thereto, over, across, and under the Property;

(b)    Any zoning laws or local ordinances affecting the Property, including all restrictions, conditions, and covenants, if any, set forth in or created by that preliminary plat and site plan review approval for the "Cates Industrial Park", a proposed development containing approximately 300,000 square feet of building improvements for use as a warehouse/light industrial/office on the Property as conditionally approved by the City of Medina as set described in Resolution No. 2023-65 and any related resolutions;

(c)    Minerals and mineral rights reserved by the State of Minnesota;

(d)    Any encroachments or other adverse claims against title to the Property that would be disclosed by an ALTA/ACSM land survey of the Property, whether or not Purchaser obtained such survey;

(e)    Any and all deferred real estate taxes and special assessments and interest thereon deferred or otherwise unpaid pursuant to Minn. Stat. Section 273.111 known as the "Green Acres" program, whether existing or accrued before Closing or thereafter; and

(f)    The standard conditions and exceptions to title contained in the Title Policy.

## ARTICLE V
## AS-IS PROPERTY

**Section 5.01    PROPERTY CONDITIONS, WARRANTIES, CONTINGENCIES, AND INSPECTION RIGHTS:** THIS PROPERTY, INCLUDING ALL IMPROVEMENTS THEREON, HAS BEEN PURCHASED "AS IS – WHERE IS" AT AUCTION. THERE ARE NO WARRANTIES ASSOCIATED WITH AUCTION SALES. THERE ARE NO FINANCING CONTINGENCIES OR INSPECTION RIGHTS FOR BUYER. SELLER IS NOT OBLIGATED TO MAKE ANY REPAIRS, CHANGES, IMPROVEMENTS OR OTHER MODIFICATIONS TO THE PROPERTY. PRIOR TO SUBMITTING THE HIGH BID FOR THE PROPERTY, BUYER DETERMINED THAT THE PROPERTY MET ALL LEGAL REQUIREMENTS FOR BUYER'S INTENDED USE OF THE PROPERTY AND IS NOT SUBJECT TO GOVERNMENTAL OR PRIVATE RESTRICTIONS THAT WILL INTERFERE WITH SUCH INTENDED USE, INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL REGULATIONS, WETLAND QUALIFICATION, FLOOD HAZARD OR FLOOD PLAIN DESIGNATION AND SEPTIC SYSTEM SUITABILITY.

(a)    Purchaser acknowledges that it has examined and inspected, and is satisfied with, the physical condition of the Property and any improvements thereon. Purchaser expressly agrees that the Property is sold "as is, where is, with all faults" without any warranty or representation, express, implied or arising by operation of law, including, but not limited to, any warranty of

condition, habitability, merchantability or fitness for a particular purpose, and subject to ordinary wear and tear occurring after the date hereof. Purchaser further acknowledges that Seller has neither made nor extended to Purchaser any representation, warranty or indemnity with regard to the environmental condition of the Property or with regard to its compliance with the Americans with Disabilities Act of 1990, if applicable, and Purchaser hereby assumes sole responsibility therefore, indemnifies and agrees to hold Seller and its assigns harmless from and waives any right, action, claim or cause of action it or its successors or assigns may have now or in the future against Seller or assigns with regard thereto.

(b)     If any improvements on the Property are damaged after the date hereof, but before the Closing, Seller may (but will not be obligated to) attempt to repair the improvements and, at Seller's option, there will be a reasonable extension of the Closing Date during which Seller may attempt to complete the repair. If Seller notifies Purchaser that Seller does not intent to attempt to repair or if Seller attempts but is not successful in effecting repair and notifies Purchaser within ten (10) days of either such notification Purchaser either (i) will terminate this Agreement, in which case Purchaser will be entitled to the return of the Earnest Money and neither party will have any further liability to the other or (ii) will waive any objection to the damage and any right to reduce the Purchase Price, in which case Seller will convey to Purchaser the Property with such damaged improvements as are then thereon and will assign to Purchaser all of Seller's right, title and interest to any insurance proceeds, if any, received or to be received in payment of damage to the improvements.

## ARTICLE VI
## NOTICES

**Section 6.01    Delivery of Notices.** Unless specifically stated otherwise in this Agreement, all notices, waivers, and demands required or permitted hereunder shall be in writing and delivered to the addresses set forth below, by one of the following methods: (a) hand delivery, whereby delivery is deemed to have occurred at the time of delivery; (b) a nationally recognized overnight courier company, whereby delivery is deemed to have occurred the business day following deposit with the courier; (c) registered U.S. mail, signature required and postage-prepaid, whereby delivery is deemed to have occurred on the third business day following deposit with the United States Postal Service; or (d) email.

|  |  |
|---|---|
| SELLER: | Jeff Cates and Christine T. Cici-Cates |
|  | 2400 Cates Ranch Drive |
|  | Hamel, MN 55340 |
|  | Email: jeff8288612@gmail.com |
| With a copy to: | Sapientia Law Group, PLLC |
|  | Attention: Kenneth C. Edstrom |
|  | 120 S. Sixth St., Suite 100 |
|  | Minneapolis, MN 55402 |
|  | Email: kene@sapientialaw.com |
| PURCHASER: | City of Medina |
|  | Attention: Dusty Finke |
|  | 2052 County Road 24 |
|  | Medina, MN 55340 |
|  | Email: dusty.finke@medinamn.gov |

Tract 2; PIN 04-118-23-14-0004

With a copy to:     _____

_____

_____

Email: _____

ESCROW AGENT:     Sapientia Law Group, PLLC
Attention: Towle H. Neu
120 S. Sixth St., Suite 100
Minneapolis, MN 55402
Email: towlen@sapientialaw.com

Any Party may change its address for purposes of this Section by giving written notice as provided in this Section. All notices and demands delivered by a party's attorney on a party's behalf shall be deemed to have been delivered by said party.

**ARTICLE VII**
**REMEDIES**

**Section 7.01      Remedies.**

(a)      If Purchaser shall default in the observance or performance of Purchaser's obligations under this Agreement and the Closing does not occur as a result thereof, Seller may elect to retain the Earnest Money plus accrued interest thereon, if any, as and for full and complete liquidated and agreed damages for Purchaser's default or seek an order from a court for specific performance by Purchaser. SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT IF SELLER ELECTS TO RETAIN THE EARNEST MONEY AND ANY INTEREST EARNED THEREON, SUCH AMOUNTS REPRESENT A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT.

(b)      Upon the release of the Earnest Money, and any interest accrued thereon, to either Purchaser or Seller, as the case may be, and reimbursement of Purchaser's Costs (if applicable), this Agreement shall be deemed null and void and no party hereto shall have any obligations to, or rights against, the other hereunder, except as expressly provided herein.

**ARTICLE VIII**
**ESCROW**

**Section 8.01      Escrow Terms.** Escrow Agent shall hold and disburse the Earnest Money in accordance with the following provisions:

(a)      If the Closing occurs, then Escrow Agent shall deliver the Earnest Money to Seller.

(b)      If the Closing does not occur because of an uncured default by Seller, Escrow Agent is authorized to disburse the Earnest Money to Purchaser.

(c)      If the Closing does not occur because of an uncured default by Purchaser, Escrow Agent is authorized to disburse the Earnest Money to Seller.

(d)      In the event a dispute arises between the parties over the Earnest Money, Escrow Agent may commence an action with a court of competent jurisdiction for a final determination on the

6

disposition of the Earnest Money. The parties agree that all costs and fees, including reasonable attorney fees, incurred by the Escrow Agent in connection with any such action shall be paid from the Earnest Money before disbursement to the appropriate party in accordance with the court's order.

**Section 8.02    Escrow Agent's Duties and Responsibilities.**

(a)    Escrow Agent has signed this Agreement for the sole purpose of agreeing to act as Escrow Agent in accordance with this Article. Escrow Agent shall have no duties or responsibilities except those set forth in this Agreement and Seller and Purchaser agree and acknowledge that Escrow Agent shall act hereunder as a depository only.

(b)    Escrow Agent shall not charge a fee for its services as escrow agent.

**Section 8.03    Indemnification of Escrow Agent.** Seller and Purchaser hereby agree to, jointly and severally, indemnify, defend, and hold harmless Escrow Agent from and against any liabilities, damages, losses, costs, or expenses incurred by, or claims or charges made against Escrow Agent (including reasonable attorneys' fees and disbursements) by reason of Escrow Agent acting or failing to act in connection with any of the matters contemplated by this Agreement or in carrying out the terms of this Agreement, except for those matters arising as a result of Escrow Agent's gross negligence or willful misconduct.

**Section 8.04    Seller's Attorney as Escrow Agent.** Notwithstanding anything to the contrary herein contained, Purchaser acknowledges that Escrow Agent is also acting as Seller's counsel in connection with this Agreement and the transactions contemplated hereunder.

**Section 8.05    Survival.** This Article shall survive the Closing or the termination of this Agreement.

## ARTICLE IX
## BROKERS

**Section 9.01    Brokers.** Purchaser and Seller each represent and warrant to each other that they dealt with no broker in connection with, nor has any broker had any part in bringing about, this transaction other than BigIron Realty for Seller (the **"Broker"**). Seller shall pay the brokerage commission due Broker in accordance with the terms and conditions of a separate written agreement. Seller and Purchaser shall each indemnify, defend, and hold harmless the other from and against any claim of any broker or other person for any brokerage commissions, finder's fees, or other compensation in connection with this transaction if such claim is based in whole or in part by, through, or on account of, any acts of the indemnifying party or its agents, employees, or representatives and from all losses, liabilities, costs, and expenses in connection with such claim, including without limitation, reasonable attorneys' fees, court costs, and interest.

**Section 9.02    Survival.** The provisions of this Article shall survive the Closing or the termination of this Agreement.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01**    WELL DISCLOSURE. [Check one of the following:]

____    Seller certifies that Seller does not know of any wells on the Property.

_X_    Wells on the Property are disclosed by Seller on the attached Well Disclosure form.

7                                Tract 2; PIN 04-118-23-14-0004

**Section 10.02**   SEWAGE TREATMENT SYSTEM DISCLOSURE.

[Check either A or B:]

_____   A.     Seller certifies that sewage generated at the property goes to a facility permitted by the Minnesota Pollution Control Agency (for example, a city or municipal sewer system).

_____   B.     Seller certifies that sewage generated at the property does not go to a facility permitted by the Minnesota Pollution Control Agency and Sellers Disclosure of Individual Sewage Treatment System is attached (attach form).

[Check either C or D:]

_____   C.     Seller does not know if there is an abandoned individual sewage treatment system on the property.

_____   D.     Seller knows that there (strike one:) are / are no abandoned individual sewage treatment systems on the property. If Seller discloses the existence of an abandoned individual sewage treatment system on the property, then Minnesota law requires that the location of the system be disclosed to Buyer with a map. [Attach Seller's Disclosure of Individual Sewage Treatment System with map completed.]

**Section 10.03**   LEAD PAINT DISCLOSURE. [Check one of the following:]

_____   Seller represents that the dwelling was constructed on the real property in 1978 or later.

_X_   Seller represents that the dwelling was constructed on the real property before 1978. (If such housing is located on the real property, attached and made a part of this Purchase Agreement is "LEAD PAINT ADDENDUM FOR HOUSING CONSTRUCTED BEFORE 1978".)

**Section 10.04   Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the State of Minnesota.

**Section 10.05   Merger; No Representations.** This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. This Agreement is entered into after full investigation, no party is relying upon any statement or representation, not set forth in this Agreement, made by any other party.

**Section 10.06   Amendments.** This Agreement cannot under any circumstance be modified or amended orally and no agreement shall be effective to waive, change, modify, terminate, or discharge this Agreement, in whole or in part, unless such agreement is in writing and is signed by both Seller and Purchaser and approved by the U.S. Bankruptcy Court for the District of Minnesota in Bky File No. 21-40882.

**Section 10.07   Successors and Assigns; Assignment.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns. Purchaser shall have the right to assign, transfer, and convey its rights and obligations under this Agreement or in the Property without the prior written consent of Seller, provided that: (a) any assignee shall assume all of Purchaser's obligations hereunder and succeed to all of Purchaser's rights and remedies hereunder; and (b) Purchaser shall deliver written notice to Seller of the assignment and assumption prior to the Closing. If an assignee assumes all

of Purchaser's obligations under this Agreement in writing, then upon the effective date of the assignment of this Agreement to such assignee, Purchaser shall be released from all obligations under this Agreement.

   **Section 10.08   Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect, invalidate, or render unenforceable any other term or provision of this Agreement.

   **Section 10.09   Counterparts.** This Agreement may be executed by the parties in separate counterparts, each of which when so executed and delivered shall be an original for all purposes, but all such counterparts shall together constitute but one and the same instrument.

   **Section 10.10   IRC §1031 Exchange**.  It is expressly understood and agreed that the Property may be used by either party hereto as replacement property in connection with a like-kind exchange transaction qualifying for tax-deferred treatment under Section 1031 of the Internal Revenue Code.  In such an event, each party agrees to cooperate with the other party, provided no party shall not incur additional costs or liabilities as a result of or in connection with any such 1031 exchange by the other party.

   **Section 10.11   No Waivers.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party providing the waiver. No waiver by either party of any failure or refusal to comply with any obligations under this Agreement shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

   **Section 10.12   Waiver of Jury Trial.** SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY SUCH PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.

[SIGNATURE PAGE FOLLOWS]

Tract 2; PIN 04-118-23-14-0004

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date.

**PURCHASER:**

CITY OF MEDINA, a Minnesota municipal corporation

_____

By: Kathleen Martin
Its: Mayor

_____

By: Scott Johnson
Its: City Administrator

**SELLERS:**

_____

Christine T. Cici-Cates

_____

Jeffrey S. Cates

**ESCROW AGENT:**

SAPIENTIA LAW GROUP, PLLC

_____

By: Towle H. Neu
Its: Member

Tract 2; PIN 04-118-23-14-0004

## EXHIBIT A

### Legal Description


Lot 1, Block 1, Cates Ranch Second Addition, according to the recorded plat thereof, Hennepin County, Minnesota.

(Abstract Property)

4896-1411-1125, v. 1

Tract 2; PIN 04-118-23-14-0004

# ASSIGNMENT AND ASSUMPTION
### *2575 Cates Ranch Dr., Medina, Minnesota*
### *Tract 2 (PIN 04-118-23-14-0004) (30 Acres)*

This **ASSIGNMENT AND ASSUMPTION** ("**Assignment**") is made as of November 30, 2023 (the "**Effective Date**") by and between, **CORTRUST BANK, N.A.**, a national banking association ("**Assignor**"), and **CITY OF MEDINA,** a Minnesota municipal corporation ("**Assignee**").

A.      Assignor, as purchaser, was the winning bidder in a public action (the "**Auction**") for the sale certain real property legal described on <u>Exhibit A</u> attached hereto (the "**Property**") and owned by Jeffery S. Cates and Christine T. Cici-Cates (collectively, "**Seller**"), although Assignor and Seller have not entered into a written purchase and sale agreement for the Property.

B.      Assignor desires to assign, and Assignee desires to assume, all of Assignor's right, title, and interest to the Property, if any, solely due to it being the winning bidder in the Auction, to Assignee, upon the terms and conditions set forth below.

## C O V E N A N T S

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1.      **Assignment**.  Assignor hereby assigns all of its rights, title, and interest to the Property by reason of it being the highest bidder in the Auction to Assignee ("**Right of Purchase**"); provided, however, Assignor, as mortgagee and lender, shall retain its interest in the Property granted to First Minnesota Bank, as original mortgagee, by Seller, as mortgagor and borrower, pursuant to the mortgages described on <u>Exhibit B</u> attached hereto, and as subsequently assigned to, and assumed by, Assignor, until such mortgages are released in accordance with the Fifth Modified Bankruptcy Plan (ECF 269) confirmed by the U.S. Bankruptcy Court for the District of Minnesota Case No. 21-40882 on February 13, 2023 (order designated as ECF 275) or any amendments or modifications thereof.

2.      **Assumption**.  Assignee accepts the assignment of the Right of Purchase, and assumes and agrees to keep, perform and fulfill all liabilities and obligations of Assignor under the terms and conditions of the Auction accruing after the Effective Date, including entering into a Purchase and Sale Agreement with the Seller.

3.      **Additional Provisions**.  This Assignment may be executed in two or more counterparts, all of which when taken together shall comprise one and the same instrument.  A facsimile or electronic scanned copy of a signature shall be as binding as an original signature.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, Assignor and Assignee have executed and delivered this Assignment as of the Effective Date.

<u>ASSIGNOR</u>:

CORTRUST BANK, N.A., a national banking association

_____
By:_____
Its:_____

<u>ASSIGNEE</u>:

CITY OF MEDINA, a Minnesota municipal corporation

_____
By: Kathleen Martin
Its: Mayor

_____
By: Scott Johnson
Its: City Administrator

*Assignment and Assumption*
*Lot 3, Block 1, Cates Ranch*

**CONSENT**

Sellers hereby consent to the foregoing Assignment and Assumption.

<u>SELLERS</u>:

_____
Christine T. Cici-Cates


_____
Jeffrey S. Cates

<u>EXHIBIT A</u>

Legal Description

Lot 3, Block 1, Cates Ranch, according to the recorded plat thereof, Hennepin County, Minnesota.

(Abstract Property)

<u>EXHIBIT B</u>

Mortgages

1.    Mortgage dated November 25, 2016, filed December 02, 2016, as Document No. A10390887, to
      secure indebtedness in the amount of $685,000.00 and any other sums which may become due
      and payable under the terms thereof, executed by Jeffrey S. Cates and Christine T. Cates AKA
      Christine T. Cici-Cates, husband and wife, as mortgagor, to First Minnesota Bank, as mortgagee,
      as assigned to, and assumed by, CorTrust Bank N.A.

2.    Mortgage dated November 25, 2016, filed December 02, 2016, as Document No. A10390888, to
      secure indebtedness in the amount of $250,000.00 and any other sums which may become due
      and payable under the terms thereof, executed by Jeffrey S. Cates and Christine T. Cates AKA
      Christine T. Cici-Cates, husband and wife, as mortgagor, to First Minnesota Bank, as mortgagee,
      modified by Modification of Mortgage filed March 28, 2019, as Document No. A10647873, as
      assigned to, and assumed by, CorTrust Bank N.A.

3.    Mortgage dated October 25, 2017, filed November 2, 2017, as Document No. A10498902, to
      secure indebtedness in the amount of $250,000.00 and any other sums which may become due
      and payable under the terms thereof, executed by Jeffrey S. Cates and Christine T. Cici-Cates,
      husband and wife, as mortgagor, to First Minnesota Bank, as mortgagee, as assigned to, and
      assumed by, CorTrust Bank N.A.

4.    Mortgage dated November 20, 2017, filed November 21, 2017, as Document No. A10507104, to
      secure indebtedness in the amount of $500,000.00 and any other sums which may become due
      and payable under the terms thereof, executed by Jeffrey S. Cates and Christine T. Cates, husband
      and wife, as mortgagor, to First Minnesota Bank, as mortgagee, as. modified by Modification of
      Mortgage filed March 26, 2019, as Document No. A10646971, as assigned to, and assumed by,
      CorTrust Bank N.A.

4856-5796-4181, v. 1

*Assignment and Assumption*
*Lot 3, Block 1, Cates Ranch*
*PIN 04-118-23-14-0004*

# Exhibit D

# WATERFALL FROM SALES

# Exhibit D Waterfall from sale of CRP 2 and CRP 3

| Tract One (CRP 3- 36.9 Acres) | Amount | Proceed from Tract 1 | Remainder after paying line item Cost/Claim |
|---|---|---|---|
| | | | |
| City of Medina | | $1,017,146.00 | $ 1,017,146.00 |
| | | | |
| Closing Costs: | | | |
| 1/2 Title Insurance-estimate | $ 2,000.00 | $ 1,017,146.00 | $ 1,015,146.00 |
| Current RE Taxes | $ 1,800.00 | $ 1,015,146.00 | $ 1,013,346.00 |
| Past Due RE Taxes | $ 5,805.57 | $ 1,013,346.00 | $ 1,007,540.43 |
| Deferred Property Tax Assessment on Tract 1 (to be paid by buyer | $ - | $ 1,007,540.43 | $ 1,007,540.43 |
| Misc. - Deed Transfer Tax, unpaid utilties-estimate | $ 1,000.00 | $ 1,007,540.43 | $ 1,006,540.43 |
| Seller's Attorney's Fees-estimate | $ 8,750.00 | $ 1,006,540.43 | $ 997,790.43 |
| Big Iron, Commission for Tract 1 (5%) | $ 50,857.30 | $ 997,790.43 | $ 946,933.13 |
| | | | |
| Secured Debt of CorTrust as of November 30 | $2,629,347.09 | $ - | $ (2,629,347.09) |
| | | | |
| Remainder to Pay Bank in full as of 11-30-23 | | | $ (1,682,413.96) |
| | | | |
| | | | |
| Property Taxes Total | $ 20,265.50 | | |

# Exhibit D Waterfall from sale of CRP 2 and CRP 3

| Tract Two (CRP 2- 30.18 Acres) | Amount | Proceed from Tract 2 | Remainder after paying line item Cost/Claim |
|---|---|---|---|
| | | | |
| City of Medina (assigned from CorTrust Bank) | | $1,725,000.00 | $ 1,725,000.00 |
| | | | |
| Closing Costs: | | | |
| 1/2 Title Insurance-estimate | $ 2,000.00 | $ 1,725,000.00 | $ 1,723,000.00 |
| Current RE Taxes | $ 6,073.07 | $ 1,723,000.00 | $ 1,716,926.93 |
| Past Due RE Taxes | $ 6,586.86 | $ 1,716,926.93 | $ 1,710,340.07 |
| Deferred Property Tax Assessment on Tract 2 ($390,000 to be paid by buyer) | $ - | $ 1,710,340.07 | $ 1,710,340.07 |
| Misc. - Deed Transfer Tax, unpaid utilties-estimate | $ 1,000.00 | $ 1,710,340.07 | $ 1,709,340.07 |
| Seller's Attorney's Fees-estimate | $ 8,750.00 | $ 1,709,340.07 | $ 1,700,590.07 |
| Big Iron, Commission for Tract Two (5%) | $ 86,250.00 | $ 1,700,590.07 | $ 1,614,340.07 |
| | | | |
| Secured Debt of CorTrust  as of November 30 | $2,629,347.09 | $ - | $ (2,629,347.09) |
| | | | |
| Net from Tract 1 | | | $ 946,933.13 |
| Net from Tract 2 | | | $ 1,614,340.07 |
| Total Net from both tracts | | | $ 2,561,273.20 |
| Remainder to Pay Bank in full as of 11-30-23 | | | $ (68,073.89) |

# Exhibit E

# TITLE COMMITMENT

*Transaction Identification Data for reference only:*
Issuing Agent:  **Guaranty Commercial Title, Inc.**
Issuing Office:   **465 Nicollet Mall, Suite 230, Minneapolis, MN  55401**
Loan ID Number:
Issuing Office File Number:  **66472**
Property Address:  **2590 Cates Ranch Dr, Medina, MN 55340**
Supplemental Number:  **4**

# COMMITMENT FOR TITLE INSURANCE

Issued by

## *Old Republic National Title Insurance Company*

### SCHEDULE A

1.      Commitment Date:  **November 12, 2023, 8:00 AM**

2.      Policy to be issued:

   (a)      2006 ALTA® Owners Policy

         Proposed Insured:  **To be determined**

         Proposed Policy Amount: **$3,400,000.00**
   (b)      2006 ALTA® Loan Policy

         Proposed Insured:

         Proposed Policy Amount: **$0.00**

3.      The estate or interest in the land described or referred to in this Commitment is:
         **Fee Simple**

4.      The title is, at the Effective Date vested in:
         **Jeffrey S. Cates**

5.      The land referred to in this Commitment is described as follows:
         **SEE ATTACHED EXHIBIT "A"**


                                        Countersigned

                                        **Guaranty Commercial Title, Inc.**


                                        

                                        By: _____
                                                     Authorized Signatory

**Copyright 2006-2016 American Land Title Association.  All rights reserved.**
The use of this Form is restricted to ALTA licensees and ALTA members
in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.



*Commitment for Title Insurance (08-01-2016)*
*Technical Corrections 04-02-2018*                                          Page 1
*Schedule A*

# EXHIBIT "A"

**Lot 3, Block 1, <u>Cates Ranch</u>, according to the recorded plat thereof, Hennepin County, Minnesota.**

**(Abstract Property)**

**Copyright 2006-2016 American Land Title Association.  All rights reserved.**
The use of this Form is restricted to ALTA licensees and ALTA members
in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.

*Commitment for Title Insurance (08-01-2016)*
*Technical Corrections 04-02-2018*                                                Page 2
*Exhibit A*

## COMMITMENT FOR TITLE INSURANCE

Issued by

## *Old Republic National Title Insurance Company*

### SCHEDULE B, PART I
### Requirements

All of the following Requirements must be met:

1.  The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2.  Pay the agreed amount for the estate or interest to be insured.

3.  Pay the premiums, fees, and charges for the Policy to the Company.

4.  Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

5.  **Deed of conveyance from Jeffrey S. Cates and Christine T. Cates, husband and wife, to a purchaser to be determined.**

6.  **The interest of Atkinson Holdings, LLC. According to our files, said party is a prior purchaser of the property. We should be advised as to what disposition was made of the prior purchase agreement for possible further requirements.**

7.  **The effect of bankruptcy proceedings of Jeffrey Scott Cates and Christine CiCi-Cates, Debtor in Case No. 21-40882. The Company requires copies of the docket sheet, petition with schedules, and other satisfactory orders, plans, or documents in the bankruptcy proceedings authorizing the contemplated transaction. At the time the Company is furnished these items, the Company may make additional requirements for exceptions.**

8.  **Mortgage dated December 27, 2017, filed January 16, 2018, as Document No. A10522704, to secure indebtedness in the amount of $775,000.00 and any other sums which may become due and payable under the terms thereof, executed by Jeffery S. Cates and Christine T. Cates husband and wife, as mortgagor, to First Minnesota Bank, as mortgagee. (Also covers other land)**

    a.  **Satisfaction, release or subordination is required.**

---

Copyright 2006-2016 American Land Title Association.  All rights reserved.
The use of this Form is restricted to ALTA licensees and ALTA members
in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

9.      **Payment of delinquent taxes is required. Amounts due are good through December 31, 2023**

| Tax Year | Taxes Due |
|---|---|
| **2023** | **$2,322.12** |
| **2022** | **$2,865.62** |
| **2023** | **$2,982.37** |

10.     **Payment of special assessment is required. Amounts due are good through November 15, 2023. Update from City of Media has been requested.**

**a. Green Acres Deferred Assessment Levy 16731: TH55 & Willow Intersection Improvement**
**Original Assessment: $61,633.54**
**Deferred since 2007 at 7.50% compounded interest.  Project completion 2001**
**Balance Due with compounded interest, if paid prior to December 31, 2023:  $226,552.82**

**b. Green Acres Deferred Assessment Levy 19708: Willow Dr N Improvement**
**Original Balance:  $142.92**
**Deferred since 2018 at 5.00% compounded interest.  Project completion 2017**
**Balance due with compounded interest, if paid prior to December 31, 2023:  $201.10**

**c. Outstanding storm water utility bill in the amount of $210.74 for service through December 2023.**

11.     **Payment of deferred Green Acres property tax is required. Estimated amounts are below. The final amounts due for deferred Green Acres will not be known until after closing.**

| Tax Payable Year | Deferred Property Tax |
|---|---|
| **2023** | **$7,538.07** |
| **2022** | **$8,476.84** |
| **2021** | **$9,560.13** |
| **Closing Fee:** | **$35.00** |
| **Total Deferred Tax:** | **$25,610.04** |

12.     **The interest of Oppidan Holdings, LLC, a Minnesota limited liability company. According to our files, said party is a prior purchaser of the property in  Amended New Purchase and Sale Agreement dated November 21, 2022  between Oppidan Holdings, LLC as Buyer and Jeffrey Cates and Christine Cici Cates as Seller.**

**A  termination of the above purchase agreement executed  by Buyer and Seller is required.**

Copyright 2006-2016 American Land Title Association.  All rights reserved.
The use of this Form is restricted to ALTA licensees and ALTA members
in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.



*Commitment for Title Insurance (6-17-06)*
*Technical Corrections 04-02-2018*                                                                 Page 4
*Exhibit A*

**13.**    **Mortgage to secure your loan.**

**Copyright 2006-2016 American Land Title Association.  All rights reserved.**
The use of this Form is restricted to ALTA licensees and ALTA members
in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.

## SCHEDULE B, PART II
### Exceptions

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1.      Defects, liens, encumbrances, adverse claims, or other matters, if any, created, first appearing in the Public Records, or attaching subsequent to the Commitment Date but prior to the date the Proposed Insured acquires for value the Title or Mortgage covered by this Commitment.

2.      Any encroachment, encumbrance, violation, variation or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.

3.      Rights or claims of parties in possession not shown by the Public Records.

4.      Easements, or claims of easement, not shown by the Public Records.

5.      Any lien, or right to lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the Public Records.

6.      **Taxes due and payable in 2020 and prior years are paid.  Taxes due and payable in 2021 and 2022 are delinquent.  Taxes due and payable in 2023 in the total amount of $2,111.02 (Base tax $1,851.47) are not paid on PID No. 04-118-23-11-0002.  Non-Homestead (Parcel 1)**

   **NOTE:  This commitment does not cover utility bills against the subject property that are not shown on current taxes or assessment searches.**

7.      **Utility and drainage easement(s) as shown on the recorded plat of Cates Ranch.**

8.      **Terms and conditions of access and roadway easement as evidenced by Document No. A10254796.**

9.      **Communications system easement(s) over part of the Land in favor of Northwestern Bell Telephone Company, as created in Document No. 2929202.**

   **Partial Release of Easement made by Centurylink of Minnesota, Inc., filed January 3, 2023, as Document No. A11174641.**

10.    **Certificates of Deferral of Special Assessments dated September 21, 2007, filed September 27, 2007 as Document No. 9043816 and dated April 5, 2019, filed April 5, 2019 as Document No. A10649892.**

Copyright 2006-2016 American Land Title Association.  All rights reserved.
The use of this Form is restricted to ALTA licensees and ALTA members
in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.



11.     A portion of the property contains wetlands which may be subject to federal, state or local regulation. The right to use or improve these wetlands is excepted herein.

12.     Communication easement(s) over the Land in favor of Centurylink of Minnesota, Inc., a Minnesota corporation, as created in Document No. A11174679.

13.     Terms and conditions of Easement Agreement by and between Jeffrey S. Cates and Christine T. Cates, husband and wife, and City of Medina, dated December 19, 2022, filed January 10, 2023, as Document No. A11175029.

INFORMATIONAL NOTE: Fee owner took title by vesting deed Document No. A10286148.

This commitment was prepared by Beth Sheehan.
If there are any questions or requests, please contact your Closer, Wendy Ethen, at wethen@guarantytitle.net / 612-746-0412 and Assistant Closer, Heather Haars, at hhaars@guarantytitle.net / 612-746-0429.

Copyright 2006-2016 American Land Title Association.  All rights reserved.
The use of this Form is restricted to ALTA licensees and ALTA members
in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.



*Commitment for Title Insurance (6-17-06)*
*Technical Corrections 04-02-2018*
*Schedule B*

**COMMITMENT FOR TITLE INSURANCE**
**ISSUED BY**
**Old Republic National Title Insurance Company**

**NOTICE**

**IMPORTANT-READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

**COMMITMENT TO ISSUE POLICY**

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, Old Republic National Title Insurance Company, commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within 180 Days after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**COMMITMENT CONDITIONS**

1.   **DEFINITIONS**
     (a)    "Knowledge" or "Known": Actual or imputed knowledge, but not constructive notice imparted by the Public Records.
     (b)    "Land": The land described in Schedule A and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Guaranty Commercial Title, Inc.. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; and Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association.  All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



    (c)     "Mortgage": A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.

    (d)     "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.

    (e)     "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.

    (f)     "Proposed Policy Amount": Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.

    (g)     "Public Records": Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.

    (h)     "Title": The estate or interest described in Schedule A.

**2.**     If all of the Schedule B, Part I-Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

**3.**     The Company's liability and obligation is limited by and this Commitment is not valid without:

    (a)     the Notice;

    (b)     the Commitment to Issue Policy;

    (c)     the Commitment Conditions;

    (d)     Schedule A;

    (e)     Schedule B, Part I - Requirements;

    (f)     Schedule B, Part II - Exceptions; and

    (g)     a counter-signature by the Company or its issuing agent that may be in electronic form.

**4.**     **COMPANY'S RIGHT TO AMEND**

The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company shall not be liable for any other amendment to this Commitment.

**5.**     **LIMITATIONS OF LIABILITY**

    (a)     The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:

        (i)     comply with the Schedule B, Part I - Requirements;

        (ii)     eliminate, with the Company's written consent, any Schedule B, Part II-Exceptions; or

        (iii)     acquire the Title or create the Mortgage covered by this Commitment.

    (b)     The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.

    (c)     The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Guaranty Commercial Title, Inc.. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; and Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



(d)     The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.
(e)     The Company shall not be liable for the content of the Transaction Identification Data, if any.
(f)     In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I-Requirements have been met to the satisfaction of the Company.
(g)     In any event, the Company's liability is limited by the terms and provisions of the Policy.

**6.     LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT**
(a)     Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.
(b)     Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.
(c)     Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.
(d)     The deletion or modification of any Schedule B, Part II-Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.
(e)     Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.
(f)     When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

**7.     IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT**
The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

**8.     PRO-FORMA POLICY**
The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

**9.     ARBITRATION**
The Policy contains an arbitration clause. All arbitrable matters when the Proposed Policy Amount is $2,000,000 or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at <http://www.alta.org/arbitration>.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Guaranty Commercial Title, Inc.. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; and Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association.  All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



Escrow File No.:  **66472**

## EXHIBIT "A"

**Lot 3, Block 1, Cates Ranch, according to the recorded plat thereof, Hennepin County, Minnesota.**

**(Abstract Property)**

# EXHIBIT F

# FORM OF WARRANTY DEED

**(Top 3 inches reserved for recording data)**

**WARRANTY DEED**
**Individual(s) to Business Entity**

DEED TAX DUE:  $15,303.40                                    DATE: _____, 202__

FOR VALUABLE CONSIDERATION, **Jeffrey Cates and Christine Cates**, husband and wife
("**Grantors**"), hereby convey and warrant to **Oppidan Holdings, LLC, a Limited Liability Company**
under the laws of **Minnesota** ("**Grantee**"), real property in **Hennepin** County, Minnesota, legally
described as follows:

      See attached legal description.

*Check here if all or part of the described real property is Registered (Torrens)* ☐

together with all hereditaments and appurtenances belonging thereto, subject to the following exceptions:
None.

*Check applicable box:*

☒ The Seller certifies that the Seller does not
   know of any wells on the described real
   property.

☐ A well disclosure certificate accompanies this
   document or has been electronically filed.

☐ I am familiar with the property described in this
   instrument and I certify that the status and
   number of wells on the described real property
   have not changed since the last previously filed
   well disclosure certificate.

Grantors

_____
**Jeffrey Cates**

_____
**Christine Cates**

**WARRANTY DEED**

---

State of Minnesota, County of _____

This instrument was acknowledged before me on _____, 202\_\_, by **Jeffrey Cates and Christine Cates**, husband and wife.

(Stamp)

_____
*(signature of notarial officer)*

Title (and Rank): _____

My commission expires: _____
*(month/day/year)*

THIS INSTRUMENT WAS DRAFTED BY:

Kenneth C. Edstrom
Sapientia Law Group, PLLC
120 6th St. S. Ste 100
Minneapolis MN 55402
(612)756-7108

TAX STATEMENTS FOR THE REAL
PROPERTY DESCRIBED IN THIS
INSTRUMENT SHOULD BE SENT TO:

[Buyer]

**WARRANTY DEED**

## LEGAL DESCRIPTION

CERTIFICATE OF SERVICE

Under penalty of perjury, I declare that on December 6, 2023 in connection with the matter below, the following document(s) were served on the party(s) listed below in the manners indicated:

1.  Notice of Hearing and Motion for Order approving Sale of Assets of the Debtors by

    Auction.

2.  Memorandum in Support of Motion and Exhibits

3.  Verification

4.  Certificate of service

5.  Proposed Order

by ECF/EMAIL NOTIFICATION to those Registered Users of the Court's ECF Filing system and that other parties in interest will be served by US Mail through certificatesofservice.com who will file their own certificate of service.

/e/  *Kenneth C. Edstrom*

Kenneth C. Edstrom

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re: Jeffrey Cates and
Christine Cici-Cates

Bankruptcy No. 21-40882

Chapter 11 Case

ORDER APPROVING THE SALE OF REAL ESTATE OF THE DEBTORS VIA AUCTION
FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS

The Debtors' Motion for an Order Approving the Sale of Certain Real Estate of
the Debtors Via Auction Free and Clear of Liens, Claims, Encumbrances and Interests
came on for a hearing before the undersigned on December 27, 2023. Appearances, if
any, were noted the record.

Based on the arguments of counsel, all the files, records and proceedings herein,
the Court being advised in the premises, the Court rules as follows:

FINDINGS OF FACT

  a.  The Buyer, The City of Medina, Minnesota, is a good faith purchaser of the assets
      being sold and was authorized to enter into those certain Purchase Agreements of
      November 30, 2023 ("36.92 Acre Agreement") and that certain Purchase
      Agreement of November 30, 2023 ("30.18 Acre Agreement" – together ("The
      Agreements").

  b.  The Debtors' notice of this motion complies with Rule 2002 for the sale of assets
      of the Debtors.

  c.  The Debtors are authorized to sell the real estate described herein free and clear of

2

all liens, claims, encumbrances and interests, on terms contained in the

Agreements.

d.   All matters subject to the sales motion and the Agreements are "core" matters

over which the Bankruptcy Court has jurisdiction pursuant to 28 U.S.C. Sections

1334 and 157;

e.   The Purchase Price of $1,017,146.00 for CRP 3/Tract 1 constitutes fair value for

the 36.92 acres.

f.   The Purchase Price of $1,725,000.00 for CRP 2/Tract 2 constitutes fair value for

the 30.18 acres.

g.   The Properties have been adequately and sufficiently marketed.

h.   The Properties are being purchased in good faith and the Agreements otherwise

complies with the requirements of Section 363(f) of the Bankruptcy Code.

i.   Sound business reasons exist for the approval of the Agreements.

Based upon the forgoing:

IT IS HEREBY ORDERED THAT:

1.   The Motion is granted.

2.   Any objections to the Motion and to the sale of the Properties are overruled.

3.   The Debtors are authorized to sell the following real estate free and clear of all liens, claims,

encumbrances and interests, on terms contained in that certain Purchase Agreement dated as

of November 30, 2023 between the Debtors and the City of Medina, Minnesota ("the Buyer")

and that certain Purchase Agreement dated as of November 30, 2023 between the Debtors

and the City of Medina, Minnesota:

Approximately 30.13 acres described as 2575 Cates Ranch Drive A/K/A CRP No.

3

2 and A/K/A Tract Two, Parcel Nos. 04-118-23-14-0004 and legally Described as: LOT 1, BLOCK 1, CATES RANCH SECOND ADDITION, HENNEPIN COUNTY, MINNESOTA, and

Approximately 36.92 acres described as 2590 Cates Ranch Drive, A/K/A CRP No. 3, and A/K/A Tract One, Parcel No. 04-118-23-11-0002 and legally described as Lot 3, Block 1, CATES RANCH, Hennepin County, Minnesota.

4. The sale for the described real estate, together with the building and all improvements thereon, and easements and rights benefiting or appurtenant thereto is hereby referred to as the "Properties".

5. Except as otherwise provided in the Agreements, the Buyer shall not be liable or obligated for any Liability (including Successor Liability), Employee and Consultant Claims, liens, interests, damages, costs, expenses, claims, or demands arising from or relating to the Debtors' ownership or operation of the Properties or the Debtors' conduct of its affairs on or prior to the Closing Date or taxes arising out of the sale of the Properties. The conveyance free and clear of Encumbrances shall be self-executing, and neither the Debtors nor Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate the conveyance of the Properties free and clear of all encumbrances other than any assumed liabilities.

6. Buyer may close upon the sale of the assets as set forth in the Agreements unless this order has been stayed, materially modified, withdrawn, or reversed as of the Closing Date.

7. The form of Warranty Deed attached to the motion is approved pursuant to Section 365(f) of the Bankruptcy Code.

8. Upon the closing of the sale, the Debtors shall pay the net proceeds to CorTrust Bank in partial settlement of the secured interest held by CorTrust Bank, all liens against the Properties (including the liens held by CorTrust Bank, N.A.) shall automatically transfer and

4

attach to the net proceeds of the sale in the same order, priority, and validity as they had with

respect to the Properties immediately before the sale. No further action shall be required to

perfect the lienholders' interest in the net sale proceeds.

9. The terms and provisions of this Order together with the terms and provisions of the

Agreements shall be binding in all respects on any trustee appointed in the Bankruptcy Case,

or if the Bankruptcy Cases is converted to a Chapter 7 proceeding, on any trustee appointed

in a Chapter 7 proceeding.

10. The 14-day stay set out in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure is

hereby waived.

Date: _____

_____
William J. Fisher, Bankruptcy Judge

4876-9535-6564, v. 1

5